**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DSM DESOTECH INC., ) | |
| ) | |
| Plaintiff, ) | Civil Case No. 08-C-1531 |
| ) | |
| v. ) | Hon. Joan H. Lefkow |
| ) | |
| 3D SYSTEMS CORPORATION and ) | |
| 3D SYSTEMS, INC., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF 3D SYSTEMS IN SUPPORT OF ITS
MOTION TO DISMISS DESOTECH'S ANTITRUST AND STATE LAW CLAIMS**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  SUMMARY OF DESOTECH'S ALLEGATIONS ............................................ 3

III.  STANDARD ...................................................................................................... 5

IV.  ARGUMENT .................................................................................................... 6

    A.  Desotech Fails to Adequately Allege the Elements of Coercion (Counts I-V) ......................................................................................................... 6

        1.  The Allegations That 3D Systems Requires Resins Purchases at the Time of System Sales Are Insufficient and Contradictory ........................ 6

        2.  The Allegations Also Fail to Allege a Post-Sale Theory of Tying Based on Customer "Lock-In" ................................................................. 11

    B.  The Complaint Fails to Make Other Allegations Necessary for All of Desotech's Antitrust Claims (Counts I–V) .......................................... 15

        1.  The Allegations of Market Power in the Alleged Tying Product Market Are Deficient ................................................................. 15

        2.  The Complaint Fails to Allege that 3D Systems Has or Will Gain Market Power in the Tied Product Market ................................ 17

        3.  The Allegations of the Amended Complaint Fail to Allege the Requirements of a Claim for Tying Under the Rule of Reason ............... 22

        4.  All of Desotech's Antitrust Claims Fail Because Desotech Has Not Alleged Antitrust Injury ................................................................. 25

        5.  The Complaint Fails to Allege Required Elements of Its Claim for Attempted Monopolization  (Count IV) ................................... 26

    C.  The Complaint Also Fails to State a Cause of Action for Desotech's  State Law Claims (Count V-VII) ................................................................. 28

        1.  Illinois Antitrust Act (Count V) ................................................... 28

        2.  Illinois Uniform Deceptive Trade Practices Act (Count VI) .................. 28

        3.  Tortious Interference with Prospective Economic Advantage (Count VII) ................................................................................. 31

V.  CONCLUSION ................................................................................................ 34

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1405 (7th Cir. 1992) ................................................................................................................33

*A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546 (7th Cir. 1992) ...................17, 22

*Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620 (5th Cir. 2002) ........................................................................................................15, 18

*Appraisers Coalition v. Appraisal Institute*, 845 F. Supp. 592 (N.D. Ill. 1994)...........................28

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)............................................25

*Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325 (7th Cir. 1986)...........................................................................................................2

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ....................................................... passim

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995)...........................................................................................................2, 18

*Borschow Hospital and Medical Supplies, Inc. v. Cesar Castillo Inc.*, 96 F.3d 10 (1st Cir. 1996) .........................................................................................................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ......................................22, 25

*CCBN.Com v. Thomson Finance, Inc.*, 270 F. Supp. 2d 146 (D. Mass. 2003) ........................6, 22

*California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727 (9th Cir. 1979) ...................................................................................14, 23

*Capital Options Investments, Inc. v. Goldberg Brothers Commodities, Inc.*, 958 F.2d 186 (7th Cir. 1992) .......................................................................................32

*Carl Sandburg Village Condominium Association No. 1 v. First Condominium Development Co.*, 758 F.2d 203 (7th Cir. 1985)......................................................17, 18, 26

*Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704 (N.D. Ill. 2006)..........................................................................................................29

*Donnelley Marketing, Inc. v. Sullivan*, No. 01-C-9273, 2002 WL 314631 (N.D. Ill. Feb. 28, 2002) ..........................................................................................................29

## TABLE OF AUTHORITIES
(continued)

**Page**

*E&L Consulting, Ltd. v. C.B.C. Lumber Co.*, 472 F.3d 23 (2d Cir. 2006) .........................6, 15, 16

*Eastern Food Services, Inc. v. Pontifical Catholic University Services Association*,
    357 F.3d 1 (1st Cir. 2004) ..............................................................................................15

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992).........................11, 12

*Genderm Corp. v. Biozone Laboratoriess*, No. 92-C-2533, 1992 WL 220638
    (N.D. Ill. Sept. 3, 1992) ..............................................................................................30

*Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532 (7th Cir. 1986) ..................6, 11, 26, 27

*HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543 (8th Cir. 2007)...............................9, 13, 24

*Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954 (N.D. Ill. 2007) ...............................32

*Hardy v. City Optical, Inc.*, 39 F.3d 765 (7th Cir. 1994)..............................................................15

*Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912) ..................................................................................21

*Illinois Bell Telegraph Co. v. Haines & Co.*, 744 F. Supp. 815 (N.D. Ill. 1990) .........................28

*Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006) ...........................................1

*Intervisual Communications, Inc. v. Volkert*, 975 F. Supp. 1092 (N.D. Ill. 1997) .......................33

*International Star Registry of Illinois v. ABC Radio, Inc.*, 451 F. Supp. 2d 982
    (N.D. Ill. 2006).............................................................................................................32

*Jacobson v. Ford Motor Co.*, No. 98-C-742, 1999 WL 966432 (N.D. Ill. Sept. 30,
    1999) ............................................................................................................................28

*Jefferson Parish Hospital District No. 2. v. Hyde*, 466 U.S. 2 (1984)................................... passim

*LaSalle Bank National Association v. Moran Foods, Inc.*, 477 F. Supp. 2d 932
    (N.D. Ill. 2007)........................................................................................................32, 34

*Limestone Development Corp. v. Village of Lemont*, 520 F.3d 797 (7th Cir. 2008) .......................5

*McLaughlin Equipment Co. v. Servaas,* No. IP98-0127, 2004 WL 1629603
    (S.D. Ind. Feb. 18, 2004) .........................................................................................18, 26

# TABLE OF AUTHORITIES
### (continued)

**Page**

*MJ Partners Restaurant Ltd. Partnership v. Zadikoff*, 126 F. Supp. 2d 1130
  (N.D. Ill. 1999)..................................................................................................33

*Marts v. Xerox, Inc.*, 77 F.3d 1109 (8th Cir. 1996) ....................................................12

*Montgomery Ward & Co., Inc. v. Fretter, Inc.*, No. 91-C-8011, 1992 WL 212513
  (N.D. Ill. Aug. 28, 1992)....................................................................................29

*Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ....................8, 26

*Parts & Electric Motors, Inc. v. Sterling Electric, Inc.*, 826 F.2d 712 (7th Cir.
  1987) ............................................................................................................18, 26

*Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657 (7th Cir 2002) ................................................10

*Rx System, Inc. v. Medical Tech. System, Inc.*, No. 94-C-50358, 1995 WL 577659
  (N.D. Ill. Sept. 29, 1995) ....................................................................................8

*Siemer v. Quizno's Franchise Co.*, -- F. Supp. 2d. --, No. 07-C-2170, 2008 WL
  904874 (N.D. Ill. March 31, 2008) ..............................................................15, 16

*SMS System Maintenance Services, Inc. v. Digital Equipment Corp.*, 188 F.3d 11
  (1st Cir. 1999) ..............................................................................................11, 13

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ............................................26

*Stamatakis Industrial, Inc. v. King*, 965 F.2d 469 (7th Cir. 1992) ..............................25

*Stenograph Corp. v. Microcat Corp.*, No. 86-C-10231, 1989 WL 99543 (N.D. Ill.
  Aug. 22, 1989) ............................................................................................28, 29

*In re Super Premium Ice Cream Distribution Antitrust Litigation*, 691 F. Supp.
  1262 (N.D. Cal. 1988)........................................................................................16

*T. Harris Young & Associates, Inc. v. Marquette Electronics, Inc.*, 931 F.2d 816
  (11th Cir. 1991)..................................................................................................7

*Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ............................................7, 18

*Tri-General Inc. v. International Union of Operating Engineers, Local 150, AFL-
  CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006) ....................................................25

*Uline, Inc. v. JIT Packaging, Inc.*, 437 F. Supp. 2d 793 (N.D. Ill. 2006)................................29, 30

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir. 1976) ....................................8

*Unijax, Inc. v. Champion International, Inc.*, 683 F.2d 678 (2d Cir. 1982)....................................8

*United States v. Continental Can Co.*, 378 U.S. 441 (1964) ..........................................................17

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ..................................15, 17

*United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) .................................................22, 36, 27

*Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860 (Fed. Cir. 1998) .......................................8

*W.H. Brady Co. v. Lem Products, Inc.*, 659 F. Supp. 1355 (N.D. Ill. 1987) ..................................9

*Will v. Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir. 1985)...........................18, 19, 20

**STATE CASES**

*Allcare, Inc. v. Bork*, 531 N.E.2d 1033 (Ill App. Ct. 1988).........................................................29

*American Buyers Club of Mt. Vernon, Illinois, Inc. v. Honecker*, 361 N.E.2d 1370
    (Ill. App. Ct. 1977).............................................................................................................30

*Associated Underwriters of America Agency, Inc v. McCarthy*, 826 N.E.2d 1160
    (Ill. App. Ct. 2005)........................................................................................................32, 34

*Candalaus Chicago, Inc. v. Evans Mill Supply Co.*, 366 N.E.2d 319 (Ill. Ct. App.
    1977) ...................................................................................................................................31

*Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33
    (Ill. App. Ct. 1989)..............................................................................................................33

*Kruger v. Menard Electric Cooperative*, 523 N.E.2d 708 (Ill. App. Ct. 1988)............................32

*Soderlund Brothers Inc. v. Carrier Corp.*, 663 N.E.2d 1 (Ill. App. Ct. 1995)..............................31

**FEDERAL STATUTES**

15 U.S.C. § 14 ...........................................................................................................................4, 7, 18

Fed. R. Civ. P. 12(b)(6)...................................................................................................................5

## TABLE OF AUTHORITIES
(continued)

**Page**

### STATE STATUTES

815 ILCS 510/2(a)(7)...........................................................................28, 30

815 ILCS 510/2(a)(8)...........................................................................28, 30

740 ILCS 10/11 .........................................................................................28

### MISCELLANEOUS

Richard A. Posner, *Antitrust Law* 197 (2d ed. 2001)...........................................1, 21, 24

3D Systems Corporation and 3D Systems Inc. ("3D Systems"), by their undersigned attorneys, submit this Memorandum in support of their motion to dismiss the antitrust and state law claims (Counts I-VII of the Amended Complaint ("Am. Cmpl.")) brought by plaintiff DSM Desotech Inc. ("Desotech").[1]

## I.      INTRODUCTION

"A practice long thought to epitomize the exclusionary practices but now recognized to be only rarely exclusionary is the tying arrangement."  Richard A. Posner, *Antitrust Law* 197 (2d ed. 2001) (pp. 197-207, attached as Exhibit A).  The Supreme Court echoed this increasing skepticism of tying as an antitrust violation in *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 35 (2006), observing that its previously "strong disapproval of tying arrangements has substantially diminished."  This change in view has occurred because, as the Court explained, "Many tying arrangements . . . are fully consistent with a free competitive market." *Id.* at 45.

Nevertheless, the centerpiece of Desotech's complaint is a tying claim.  Desotech claims that in telling customers to use resins that have been tested and approved in 3D Systems' newest stereolithography system, the Viper™ Pro SLA® System ("Viper™ Pro"), 3D Systems has engaged in tying or other unlawful conduct.  Its allegations, however, contradict that claim. Desotech concedes that not all resins work in SL systems and that some resins work better than others.  It also acknowledges that the approved resins include Desotech resins and that 3D Systems has engaged in this practice with respect to only one of its systems, the recently introduced Viper™ Pro.

---

[1]     3D Systems does not move to dismiss Count VIII (patent infringement).  It has answered that claim in a contemporaneous filing.

The complaint, moreover, fails to allege required elements of Desotech's claims. "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product" that the buyer did not want. *Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 12 (1984). Thus, to state its cause of action Desotech must assert that 3D Systems exploited its control over the alleged large-frame SL system market to force customers to buy resins from 3D Systems (based on the alleged product markets, see ¶ 26). Desotech makes conclusory assertions to this effect that are deficient as a matter of law under the Supreme Court's recent landmark antitrust decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ("*Twombly*"). It makes specific allegations with respect to only five customers, but those customer-specific allegations fail to allege any acts of coercion or forcing of customers to purchase 3D Systems' resins.

In addition, the complaint fails to allege "market power" in the tying market and the exercise of it sufficient to create "market power" in the tied product market, both of which are required elements of all tying claims in the Seventh Circuit. A defendant has market power in a product market if it has "the ability to control output and prices." *Ball Mem. Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 7784 F.2d 1325, 1336 (7th Cir. 1986) (Easterbrook, J.). The allegations of the complaint fail to allege a properly defined tying market, and thus necessarily fails to allege market power in a tying market. In the putative tied product market (resins for large-frame SL systems), the complaint acknowledges that 3D Systems has just a 50 percent market share, a percentage that the Seventh Circuit has held "below any accepted benchmark" to give rise, alone, to an inference of monopoly power. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,* 65 F.3d 1406, 1411 (7th Cir. 1995) (Posner, J.). Moreover, given Desotech's acknowledgement that the resins restriction affects only those resins sold for use in one of 3D

Systems' models, the claimed restraint affects only a small portion of the alleged tied resins market.

The same deficiencies also prevent Desotech from stating a cause of action for its remaining antitrust and other state law claims. There is nothing anticompetitive, tortious or otherwise unlawful in requiring customers to use tested and approved materials in a complex system, and that is the extent of Desotech's allegations.

## II.    SUMMARY OF DESOTECH'S ALLEGATIONS[2]

Desotech alleges the following. Stereolithography ("SL") is a technology used in the rapid prototyping industry. ¶¶ 19, 21.[3] SL systems use liquid photopolymers, or resins, to create three-dimensional models from computer designs. ¶ 21. 3D Systems has sold large-frame SL systems since 1992, including the SLA® 500, SLA® 5000 and SLA® 7000. ¶ 30. Desotech sells resins under the brand name "Somos." ¶ 33. 3D Systems also manufactures and sells resins for use in SL systems, and distributes certain Somos resins. ¶¶ 5, 49. Desotech asserts that 3D Systems introduced the Viper™ Pro system in October 2004. ¶ 31.

Desotech acknowledges that SL systems are complex, sophisticated systems, that only certain resins can be used in SL systems and that some resins "work better" than others. ¶¶ 22, 48. It alleges that in 2007, 3D Systems began telling customers that only approved or qualified resins may be used in the Viper™ Pro. ¶ 5. Desotech acknowledges that 3D Systems has explained to customers that this restriction is to prevent them from using resins that will not work well in the Viper™ Pro. ¶ 54. There is no allegation that 3D Systems has attempted to restrict

---

[2]    All assertions of fact in this Memorandum are taken from the allegations of Desotech's complaint. Although they are taken as true for the purposes of this motion, 3D Systems does not admit or concede the truth of any such assertions now.

[3]    All references using the "¶" symbol refer to the Amended Complaint unless expressly noted otherwise.

customers' use of non-3D Systems' resins with any of its previous generation systems, or that Desotech cannot continue to sell resins for use in those systems.  Am. Cmpl. *passim*.  3D Systems has implemented a software feature (the "RFID" feature) on many installed systems and all new systems that reads a tag on a resin cartridge to determine if it is an approved resin for use with the customer's system and explained to customers that this feature would help improve the machines' performance quality.  ¶¶ 39, 40.

Desotech suggests that 3D Systems' purported resin approval or licensing process is nonexistent, but its basis for this assertion is that its one phone inquiry was not returned and that unidentified customers and competitors are unaware of the approvals process.  ¶¶ 5, 55.  It acknowledges, however, that 3D Systems discussed its licensing process with Desotech in May 2007 during negotiations regarding the parties' relationship and acknowledges that those negotiations broke down.  ¶ 52.  It also acknowledges that 3D Systems has approved two Desotech resins as well 3D Systems' own resins for use in the Viper™ Pro system.  ¶ 73. Desotech makes conclusory allegations about the entire marketplace but makes factual allegations about just five customers, which are discussed in more detail below.

Desotech claims that 3D Systems' restriction of the resins used in the recently introduced Viper™ Pro system to approved, licensed resins is a tying arrangement that violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2,  Section 3 of the Clayton Act, 15 U.S.C. § 14, and the Illinois state antitrust act.  It also alleges that those efforts violate the Illinois Uniform Deceptive Trade Practices Act and constitute a tortious interference with prospective economic advantage.  Finally, Desotech alleges two patent infringement claims which are not addressed in this motion.

### III.     STANDARD

Desotech makes two kinds of allegations: empty recitations of the elements of its causes of action, and factual allegations that both omit required elements and are completely consistent with lawful action.  The Supreme Court's recent decision in *Twombly* elaborated on the requirements for pleading an antitrust case under Fed. R. Civ. P. 12(b)(6), holding that where the allegations of the complaint are either conclusory or as consistent with lawful as with unlawful conduct, it cannot survive a Rule 12(b)(6) motion.  The Court explained:

> The need at the pleading stage for allegations plausibly suggesting (**not merely consistent with**) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief."

*Twombly,* 127 S. Ct. at 1966. (emphasis added).[4]  The Court explained that requiring the plaintiff's allegations to be factually robust and complete, and consistent with lawful conduct, is necessary because of the substantial cost of permitting discovery to proceed in a complex antitrust case:  "[I]t is only by taking care to require allegations that reach the level suggesting [the alleged unlawful conduct] that we can hope to avoid the potentially enormous expense of discovery" in cases that have "no hope" of succeeding.  *Id.* at 1967.

*Twombly* applies beyond its antitrust conspiracy context.  In *Limestone Development Corp. v. Village of Lemont*, 520  F.3d 797 (7th Cir. 2008) (Posner, J.), a civil RICO case, the Seventh Circuit explained that the "plausibility" required by *Twombly* is essential when discovery is likely to be extremely expensive:  "If discovery is likely to be more than usually costly, the complaint must include as much factual detail and argument as may be required to show that the plaintiff has a plausible claim."  *Id.* at 803-04.  Thus, a complaint must contain

---

[4]     *Twombly* was a antitrust conspiracy case, and thus the Court discussed the requirement that the plaintiff allege an agreement.  Here, Desotech's allegations need to plead the elements of tying – not agreement – with the required specificity.

enough detail "to indicate that the plaintiff has a substantial case." *Id.* at 802-03; *see also E&L Consulting, Ltd. v. C.B.C. Lumber Co.*, 472 F.3d 23 (2d Cir. 2006) (dismissing tying claim as insufficiently specific pursuant to Rule 12(b)(6)); *CCBN.Com v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146, 155 (D. Mass. 2003).  Desotech's complaint fails the *Twombly* standard, as set forth below.

## IV.    ARGUMENT

### A.    Desotech Fails to Adequately Allege the Elements of Coercion (Counts I-V)

Desotech attempts, but fails, to support a tying claim consistent with *Twombly* and misstates antitrust law by alleging that 3D Systems imposes its putative resins restriction in three ways.  First, it alleges that 3D Systems refuses to sell Viper™ Pro systems to customers unless they also agree to purchase only approved resins.  Second, it alleges that 3D Systems engages in two kinds of restrictions after customers have already purchased Viper™ Pro systems: (a) it allegedly imposes the requirement on customers to use only approved resins after they have already bought Viper™ Pro systems by refusing to honor warranties or service for those systems if unapproved resins are used; and (b) it purportedly activates software, the "RFID" feature, after customers have already bought Viper™ Pro systems so that an attempt to use unapproved resins will result in the system shutting down or not functioning.  None of these allegations states a claim for tying or other anticompetitive conduct.

### 1.    The Allegations That 3D Systems Requires Resins Purchases at the Time of System Sales Are Insufficient and Contradictory

To the extent that Desotech's theory is that 3D Systems requires customers to agree to purchase only approved resins as a condition for purchasing a Viper™ Pro system, its allegations are insufficient and contradictory.  As noted above, the Supreme Court has explained that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its

control over the tying product to force the buyer into the purchase of a tied product" that the buyer did not want to buy. *Jefferson Parish*, 466 U.S. at 12. *See also Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 538 (7th Cir. 1986) (affirming summary judgment for defendants where plaintiff failed to prove that it was threatened with the loss of the tying product if it did not also buy the tied product).[5] Thus, using Desotech's alleged tying and tied markets, Desotech had to allege that 3D Systems has used its market power in the large-frame SL market to coerce customers into purchases of resins to state a claim for tying.

Desotech, however, makes a conclusory assertion of this coercion that is insufficient under *Twombly*. ¶ 5. As shown below, it also makes factual allegations about five customers, none of which adequately alleges coercion.[6]

### a.    Express Pattern

In ¶¶ 56-59, Desotech alleges that 3D Systems told a Viper™ Pro system user, Express Pattern, Inc., that it could henceforth use only 3D Systems' resins and certain Desotech resins in the Viper™ Pro system that Express Pattern already owned. Thus the allegation is that the Viper™ Pro system was already in place when 3D Systems allegedly imposed the resins restriction, not that 3D Systems conditioned the sale of system on the purchase of resins, which is not a tie. *See T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 822

---

[5]    Likewise, Section 3 of the Clayton Act prohibits only sales and agreements made "on condition" that the purchaser will not buy from the seller's competitors if the effect of the sale or agreement "may be substantially to lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14; s*ee also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961).

[6]    In addition, far from alleging that customers want the Viper™ Pro system so much that they capitulate to demands for resin purchases, Desotech alleges that customers do not actually even want the Viper™ Pro system because it has "severe quality problems" and is "more expensive." ¶¶ 34-35, 41. In other words, according to Desotech, 3D Systems is forcing customers to buy resins they do not want as a condition for purchasing a system they do not want either. This improbable scenario does not constitute tying. *See Jefferson Parish*, 466 U.S. at 12.

(11th Cir. 1991) ("for a tie to exist as seller must withhold product A unless the buyer also selects product B").

### b.    Dynacept

In ¶¶ 60-63, Desotech discusses another customer, Dynacept.  It begins with two statements that are irrelevant to a claim of tying.  One is an alleged statement by the chief executive officer of 3D Systems to a Desotech (not Dynacept) employee.  ¶ 60.  The other is a purported statement by 3D Systems to a Dynacept employee to the effect that using certain Desotech resins in Dynacept's Viper™ Pro system could cause operational problems and would void the customer's warranty. ¶ 61.  Neither statement alleges that 3D Systems required Dynacept to agree to purchase resins as a condition for selling it a Viper™ Pro system.

The amended complaint then alleges in ¶ 62 that Dynacept complained to Desotech about the pressure that 3D Systems was exerting to get Dynacept to buy 3D Systems' resins.  There is no allegation that this "pressure" involved the withholding of a Viper™ Pro system or that it was anything other than aggressive competition.  "Mere sales pressure" is not the coercion required for a tying claim.  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1160 (9th Cir. 2003) (affirming summary judgment dismissing tying claim where plaintiff showed sales pressure but not coercion), citing *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982); *Ungar v. Dunkin' Donuts of Am.*, *Inc.,* 531 F.2d 1211, 1224 (3d Cir. 1976).  Without any coercion alleged, the assertion in ¶ 62 that Dynacept preferred Desotech's resins is irrelevant.

Nor does the claimed "threat" that Dynacept's Viper™ Pro system warranty will be voided allege a tie-in.  "[V]oiding a warranty on a product already sold, while possibly a breach of warranty, cannot be a tying arrangement because the purchaser is not deciding whether to buy a product."  *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 870-71 (Fed. Cir. 1998) (also noting that such a threat at the time of purchase would simply be a limitation of warranty and

thus a matter of contract between the seller and buyer); *Rx Sys., Inc. v. Med. Tech. Sys., Inc.*, No. 94-C-50358, 1995 WL 577659, *5-6 (N.D. Ill. Sept. 29, 1995) (explaining that to void a warranty when unauthorized parts and accessories are used "is a long way from requiring a buyer to purchase [parts] from defendant as a condition of purchasing defendant's machine").[7]

**c.    Lockheed**

In ¶¶ 65-67, Desotech attempts to allege a tie-in sale to another customer, Lockheed.  In ¶ 66, Desotech asserts in conclusory fashion that Lockheed was forced to purchase unwanted resins without any factual specificity, thus failing the *Twombly* test.  The allegation is devoid of any factual detail such as who communicated the alleged tie-in to whom under what circumstances.  Moreover, Desotech asserts that Lockheed was subjected to "pressure" by 3D Systems which "included," but (as alleged) was not limited to, the purported tying.  For example, if that "pressure" was simply a discount on resins to get Lockheed to agree to a package deal, no tying occurred.  These allegations exemplify why the Supreme Court in *Twombly* rejected empty allegations as the basis for launching discovery in an antitrust case.

In addition, a tied sale to one customer does not constitute actionable tying conduct.  *See Jefferson Parish*, 466 U.S. at 16 ("If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law"); *W.H. Brady Co. v. Lem Prods., Inc.*, 659 F. Supp. 1355, 1372 (N.D. Ill. 1987) (same).  The Lockheed allegations are the only customer-specific allegations where Desotech has even attempted, however conclusorily and deficiently, to claim that any forcing occurred.  This dubious allegation of a single tie-in to one customer does not warrant the

---

[7]    Limitation or voiding of warranties based on the use of unapproved products is common.  *See, e.g., HDC Med. Inc. v. Minntech Corp.*, 474 F.3d 543, 549-50 (8th Cir. 2007) (holding that manufacturer's uncertainty about how its dialyzer reprocessing machines would work if used with unapproved reprocessing solutions was a legitimate business explanation for its policy of voiding its warranty if such solutions were used).

9

concern of antitrust law nor open the door to the "enormously expensive" litigation that concerned the Supreme Court in *Twombly*. *Twombly*, 127 S. Ct. at 1975.

### d.    Tangible Express

In ¶ 68, Desotech alleges that in a March 2007 Memorandum of Understanding ("MOU"), Tangible Express agreed to buy both Viper™ Pro machines and resins from 3D Systems.  The MOU (attached hereto as Exhibit B[8]) shows that no coercion occurred.  The terms of the MOU reflect a more extensive relationship than that of customer and supplier.  3D Systems and Tangible Express agreed to share customer leads (§ 2) and collaborate in marketing activities (§ 4).  3D Systems agreed to provide a service agreement including an onsite engineer and other services (§ 5).  Tangible Express agreed to purchase all of its materials for the operation and service of its 3D Systems' machines at list price, except for resins which 3D Systems agreed to provide at a discount (§ 6).  Section 8 of the MOU provided that "Tangible Express undertakes" to purchase a minimum of six Viper™ Pro machines and three laser sintering machines, to buy its resins from 3D Systems and to buy its maintenance and repair services for 3D Systems' machines from 3D Systems, in exchange for which 3D Systems agreed to designate Tangible Express as its exclusive "fractional ownership provider" (a reference to Tangible Express's type of business) (§ 8).  None of these or any other sections of the MOU shows an unlawful conditioning of system sales on an agreement to purchase resins.

### e.    AP Proto

Similarly, in ¶¶ 69-70, Desotech simply alleges that it expected to supply a "potential customer," AP Proto, but instead 3D Systems won the business and sold AP Proto both resins and a Viper™ Pro system.  Once again, there is no allegation that 3D Systems refused to sell the

---

[8]    *Rosenblum v. Travelbyus.com Ltd*., 299 F.3d 657, 661 (7th Cir 2002) (on motion to dismiss, court may consider additional documents that are referred to in the complaint and central to the claims).

Viper™ Pro system to AP Proto unless it also bought 3D Systems' resins.  All that is alleged is that somehow 3D Systems managed to convince AP Proto to trade in an older system and to buy resins.  These assertions add up to a lost customer and an unhappy Desotech, but not anticompetitive conduct.  *Great Escape,* 791 F.2d at 539 ("There is no anticompetitive effect when a buyer simply terminates an at-will contract with one supplier and enters into a similar contract with another supplier").

**2.**      **The Allegations Also Fail to Allege a Post-Sale Theory of Tying Based on Customer "Lock-In"**

As shown above, the amended complaint contradicts its assertions of unlawful tying at the time of purchase by occasionally asserting instead that 3D Systems has engaged in tying by taking coercive actions ***after*** customers have already purchased Viper™ Pro systems to restrict resins used in those systems to approved resins.  These assertions of post-sale conduct fail to allege a claim for unlawful tying.

System suppliers' restrictions on aftermarket products that may be used in their systems may be lawful.  The seminal case is *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 478-79 (1992) ("*Kodak*").  Kodak had implemented a policy that parts and service for its photocopiers could only be obtained from Kodak.  *Id.* at 458.  Kodak sought summary judgment dismissing another service provider's tying claim, defending the Kodak policy on the ground that it did not have market power in the primary market and therefore could not monopolize the aftermarket.  Its reasoning was that customers would consider Kodak's restriction of aftermarket offering in making the initial purchase decision, and would buy from a competitor if Kodak's primary and aftermarket offerings taken together were anticompetitive.  The court rejected this argument on the facts, explaining that there was evidence that some customers did not know about the restriction until they were "locked in" (had already purchased the copier).  Thus there

11

was an issue of fact regarding whether Kodak's restriction was procompetitive or anticompetitive that could not be decided "without any evidence of actual economic impact." *See also SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11 (1st Cir. 1999) (applying *Kodak* and affirming summary judgment dismissing tying claim).

Thus, under *Kodak*, a tying theory based on "locking in" of customers to aftermarket supplies subsequent to their purchase of the alleged tying product fails unless the plaintiff alleges and proves that the practice is more anticompetitive than procompetitive. Desotech apparently attempts to allege two versions of a "lock-in" theory, a post-sale refusal to honor warranties and provide services, and a post-sale activation of "new features" to prevent use of unapproved resins. Neither states a cause of action for tying, even under the expansive reasoning contemplated by *Kodak*.[9]

> **a.    Voiding Warranties and Refusing to Provide Services If Unapproved Materials Are Used Do Not Support a Tying Claim**

Desotech's assertion that 3D Systems' purported policy of voiding a warranty and refusing to service equipment if unapproved resins are used fails to state a claim for at least two reasons.

First, courts have repeatedly held that there is nothing unlawful or exclusionary in a policy of voiding warranties and refusing to provide maintenance service if unapproved aftermarket supplies are used where – as alleged in Desotech's complaint – alternative sources of maintenance services are available. For example, in *Marts v. Xerox, Inc.*, 77 F.3d 1109 (8th Cir. 1996), the plaintiff challenged Xerox's practice of voiding warranties if non-Xerox copy

---

[9]    Although Desotech seems to allege in several paragraphs that maintenance services are a tying product, it does not include them in its definitions of the relevant markets (¶ 26) or allege that 3D Systems has market power in a putative market for maintenance services. Under *Jefferson Parish*, failure to allege market power in the tying market is fatal to any intended claim that maintenance services or warranties are a tying product. *Jefferson Parish*, 466 U.S. at 12.

cartridges were used, alleging that this was an illegal tying arrangement. *Id.* at 1111. The court explained, "Although the warranty does condition its continuation on the use of Xerox cartridges, a warranty is only one way of receiving service for a new Xerox copier." *Id.* at 1112. Because buyers remained free to take either product by itself, there was no tie. *Id.*, *cited with approval in SMS*, 188 F.3d at 20-21; *see also HDC*, 474 F.3d at 549 (dialyzer reprocessing system manufacturer did not engage in anticompetitive conduct by voiding warranties if unapproved reprocessing solution was used in its systems).

Like Xerox, 3D Systems has (according to Desotech) refused to provide maintenance services for Viper™ Pro systems in which unapproved aftermarket materials (resins) are used. Desotech does not allege that maintenance services are unavailable except through 3D Systems. Am. Cmpl. *passim*. Moreover, it acknowledges that third party maintenance service providers exist, both in its allegation that one such provider has decided that it will not maintain systems in which unapproved resins are used (¶ 72), and in its acknowledgement that sources other than 3D Systems exist for parts for 3D Systems' Viper™ Pro machine. ¶ 71 (asserting that 3D Systems required National RPS to "buy all parts" through 3D Systems, apparently as opposed to other sources). Thus, as in the cases cited above, 3D Systems' refusal to provide warranty and maintenance services fails to amount to a coercive withholding of maintenance or warranty services to force the purchase of resins.

### b.    The Allegations that "New Features" Are Exclusionary Are Both Deficient and Contradicted by the Complaint

The allegations regarding this theory are conclusory and devoid of *Twombly*-required factual specificity. The amended complaint asserts that 3D Systems employs "new Viper Pro features, such as the RFID feature, to prevent customers from using Desotech's Somos® ('Somos') resins . . . making the features mandatory and using the features as a means to exclude

13

competition." ¶ 33.  Not one of the customers about which Desotech makes specific allegations, however, was allegedly subjected to this tactic.  ¶¶ 56-70.  Nor does Desotech identify any customers with whom 3D Systems has "employed" these unidentified features.  *See* ¶¶ 33-40 (identifying no customers, dates or methods of communication).  Desotech does not even identify the "features" at issue, other than the RFID feature.  Finally, Desotech's assertion that 3D Systems has "told customers that it soon intends" to activate the feature is not only conclusory, but simply alleges possible future action.  ¶ __.  A proposed future action is not a tie-in.  *Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo Inc.*, 96 F.3d 10, 17 (1st Cir. 1996) (affirming summary judgment for defendant where proof of threat of tying was insufficient to establish tying under *Jefferson Parish*).

In any event, 3D Systems has no obligation to ensure that suppliers of materials used in its older systems can also supply its new system.  The Ninth Circuit rejected that argument in *Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 742-44 (9th Cir. 1979).  There, California Computer Products ("CalComp") sold disk drives and disk drive controllers for use in IBM computers by reverse-engineering IBM's products to design competing, "plug-compatible" products.  *Id.* at 731.  IBM announced a new product in 1970 that changed the design interface, however, so that CalComp's products were no longer compatible.  As Desotech has done, CalComp sued, alleging that IBM's design changes were "'technological manipulation' which did not improve performance."  *Id.* at 744.  The court rejected the notion that IBM had violated any legal duty owed to CalComp under the antitrust laws:

> IBM, assuming it was a monopolist, had the right to redesign its products to make them more attractive to customers.  It was under no duty to help CalComp or other peripheral manufacturers survive or expand.

*Id.*  The court thus held that there was no jury issue regarding CalComp's assertion that IBM had violated the antitrust laws by redesigning its products.  *Id.*  Likewise, here, Desotech's assertion

that 3D Systems has encouraged customers to replace their older systems with the newer Viper™

Pro machine does not state a cause of action for tying, regardless of the impact of that

replacement on Desotech's business.

     **B.**    **The Complaint Fails to Make Other Allegations Necessary for All of Desotech's Antitrust Claims (Counts I–V)**

          **1.**    **The Allegations of Market Power in the Alleged Tying Product Market Are Deficient**

Desotech has also failed to allege that 3D Systems has market power in a properly

defined relevant tying product market, as it must to state a claim for tying.  Courts require market

power in the tying market as an essential element of a tying claim because without such power,

the defendant would have no ability to coerce sales of the tied product by refusing to sell the

tying product.  *Jefferson Parish*, 466 U.S. at 12.   A relevant market must be defined as a market

that includes all "products that have reasonable interchangeability for the purposes for which

they are produced."  *Id.* at *10, quoting *United States v. E.I. du Pont de Nemours & Co.*, 351

U.S. 377, 404 (1956); *see also Apani Southwest, Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620,

628 (5th Cir. 2002) (affirming dismissal "where plaintiff fails to define its proposed market with

reference to the rule of interchangeability and cross-elasticity of demand"); *Eastern Food Servs.,*

*Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 7-8 (1st Cir. 2004) (same, where

allegations failed to allege interchangeability); *E&L Consulting*, 360 F. Supp. 2d at 472-73

(same; "Missing from [plaintiffs'] analysis is any discussion, in 'economically meaningful

terms,' of 'cross-elasticity of demand between the product itself and substitutes for it'").[10]  Thus,

---

[10]   Although market definition is often considered to be part of a rule of reason rather than *per se* analysis, this is not true for tying claims in the Seventh Circuit.  Market power in the tying market is a required element of a tying claim in the Seventh Circuit, and market power cannot be pleaded or proven without first defining the relevant market in which that power allegedly exists.  *Siemer v. Quizno's Franchise Co.*, -- F. Supp. 2d. --, No. 07-2170, 2008 WL 904874, at *9 (N.D. Ill. March 31, 2008) (requiring the plaintiff to allege facts showing market definition because "'a tying agreement is not

"plaintiffs remain responsible for defining a relevant market at the complaint stage." *Siemer,* 2008 WL 904874 at *9 (dismissing complaint in part because plaintiffs failed to plead sufficient facts regarding the relevant market to satisfy *Twombly* standard).

Accordingly, Desotech needed to allege why the market for large-frame SL machines is "so wholly segmented from the available substitutes that a rise in [its] price would not shift demand to some of the alternatives." *E&L Consulting*, 360 F. Supp. 2d at 473.  Instead, Desotech's allegations amount to no more than sketchy assertions about some product differences.  It concedes that SL is only one of a number of technologies used in the rapid prototyping industry.  ¶ 22.  Laser sintering is one such technology, but assertedly does not "presently produce products of similar quality" to SL.  Fused Deposition Modeling ("FDM") is another member of the rapid prototyping industry, but Desotech dismisses it as "neither fast nor cost-effective."  *Id.*  It dismisses two other rapid prototyping technologies, Digital Light Processing and 3-D printers, because they "do not match the substantial variety and performance" of SL.  *Id.*  It concedes that the benefits of large-frame SL machines could be "replicated by owning numerous other RP technology machines," but asserts that this would be neither cost-efficient or practical.  *Id.*  If the difference between other rapid prototyping technologies is that they are not as cost-effective as a large-frame SL machine, as Desotech alleges, then an increase in the price of large-frame SL machines would neutralize that distinction and make the products interchangeable.

Courts have "repeatedly rejected efforts to define markets by price variances or product quality variances" as "economically meaningless."  *In re Super Premium Ice Cream Distribution*

---

(continued…)

actionable unless the defendant has substantial market power in the tying market"), quoting *Hardy v. City Optical, Inc.*, 39 F.3d 765, 767 (7th Cir. 1994).

*Antitrust Litig.*, 691 F.Supp. 1262, 1268 (N.D. Cal. 1988) (internal citations omitted).  The

reason that markets are defined with reference to interchangeability as opposed to mere

differences is that products with different prices and characteristics can nevertheless substitute

for one another.  For example, in *du Pont*, the Supreme Court observed that cellophane was

priced differently from other materials, had different characteristics and was used for different

purposes.  *Id.* at 398-400.  The Court also observed, however, that  cellophane "has to meet

competition from other materials in every one of its uses." *Id.* at 399.  In *United States v. Cont'l.*

*Can Co.*,  378 U.S. 441 (1964), the Supreme Court held that glass and metal containers

constituted one submarket.  The Court observed that "[i]t is quite true that glass and metal

containers have different characteristics which may disqualify one or the other, at least in their

present form, from this or that particular use."  *Id.* at 450.   Nevertheless, the question was not

whether the products had some differences but "whether glass and metal containers faced

competition from one another."  *Id.* at 455.

Price and product variances are significant only to the extent that they affect the

plaintiff's showing (here, allegations) of interchangeability (*see du Pont*, 351 U.S. at 403-04),

but Desotech makes no allegations to that effect.  It has failed to allege a relevant market

sufficiently, and its assertion of 3D Systems' power in the tying market therefore fail.

> **2.     The Complaint Fails to Allege that 3D Systems Has or Will Gain**
> **Market Power in the Tied Product Market**

Market power in the tied market, or a substantial danger of such power, is an explicit

requirement of a tying claim in the Seventh Circuit: "Antitrust plaintiffs must prove the

substantial danger that defendant will acquire market power in the tied market under both rule-

of-reason and *per se* claims."  *A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546,

550 (7th Cir. 1992), quoting *Carl Sandburg Vill. Condo. Assoc. No. 1 v. First Condo. Dev. Co.*,

758 F.2d 203, 210 (7th Cir. 1985) ("One of the threshold criteria that a plaintiff must satisfy under both the *per se* and rule of reason analyses . . . is that there is a substantial danger the tying seller will acquire market power in the tied product market").[11]  *See also Jefferson Parish*, 466 U.S. at 34 (tying occurs when the seller is able to use its control over the tying product "to appreciably restrain free competition in the market for the tied product").[12]

Proof of Desotech's allegations, however, would show that 3D Systems neither has the required market power in the tied market nor that any substantial danger exists that it will gain such power, as set forth below.[13]

>    a.    **The Allegations Show that 3D Systems Does Not Have Market Power in the Tied Product "Market" Now.**

Desotech concedes that 3D Systems has only a 50 percent share of the so-called market for resins.  ¶ 46.  A 50 percent share is legally insufficient, alone, to establish monopoly power.

---

[11]   The Seventh Circuit held that a substantial danger that the seller will obtain market power in the tied market was "one of the threshold criteria" that plaintiffs must establish.  *See Will v. Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir. 1985).  Its subsequent decision in *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 719 (7th Cir. 1987), contained a discussion in which the court noted that the Supreme Court in *Jefferson Parish* had not "endorsed" the requirement of market power in the tied market as a requisite for a tying violation.  Based on that discussion, in *A.O. Smith* the defendants argued that *Parts & Elec. Motors* eliminated the requirement of market power in the tied market.  The Seventh Circuit, however,  rejected that argument.  It explained that, contrary to the discussion in *Parts & Elec. Motors*, the *Jefferson Parish* decision did not "address[] the tied market power issue directly."  *A.O. Smith*, 979 F.2d at 551.  It held that *Will* and *Sandburg Village* were controlling precedents on the issue and thus tied market power was indeed a requirement for a tying claim.  *Id.*  The Seventh Circuit's actual holding in *A.O. Smith* was limited to whether tied market power was a requirement in 1985 at the time a jury instruction was given.  Neither *Will* nor *Sandburg Village*, however,  has been revisited, so they remain controlling.  *See also McLaughlin Equip. Co. v. Servaas,* No. IP98-0127, 2004 WL 1629603, *24 (S.D. Ind. Feb. 18, 2004) ( "An essential element of a tying claim is market power in the tied product market," relying on *A.O. Smith*).

[12]   Market power in the tied product market is also a requirement for a Clayton Act Section 3 claim.  15 U.S.C. § 14 (tying arrangements are unlawful only where they "substantially . . . lessen competition or tend to create a monopoly").  *See also Tampa Elec. Co.*, 365 U.S. at 326; *Apani*, 300 F.3d at 625 (dismissing Clayton Act tying claims pursuant to Rule 12(b)(6) where plaintiff's allegations did not show that an appreciable proportion of the product market would be affected).

[13]   3D Systems addresses the alleged "market" for resins used in large-frame SL machines as required in this motion to dismiss, but does not concede the existence of such a market.

*Blue Cross,* 65 F.3d at 1411 (Posner, J.) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share").  More importantly, Desotech has failed to allege that 3D Systems' practices have enhanced or increased its market power in the tied market.  Its market share in resins, whether 5 percent or 50 percent, remains substantially unaffected by the conduct Desotech alleges is unlawful.

The allegations also show that the other factors courts consider in analyzing market power or market effect do not exist here.  For example, courts consider market share in conjunction with the existence of barriers to entry or expansion in unlawfully tied markets: "Unless barriers to entry prevent rivals from entering the market at the same cost of production, even a very large market share does not establish market power."  *Will*, 776 F.2d at 672 n.3.  Desotech, however, makes no allegations that barriers exist to prevent entry and expansion in the alleged tied product market, the market for resins used in large-frame SL systems.  Am. Cmpl. *passim*.  Desotech attempts to dismiss 3D Systems' approvals process by suggesting it is a sham, but its allegations are completely insufficient.  One unreturned phone call does not constitute a barrier to entry, especially given that 3D Systems has, as Desotech acknowledges, discussed its licensing of resins for the Viper™ Pro system with Desotech.

Moreover, the alleged tied market is, according to Desotech, characterized by vigorous competition among a number of rivals.  Desotech notes its own 35 percent market share, the 10 percent share of another rival, Huntsman, and the total 5 percent share held by "smaller niche suppliers."  ¶ 46.  These "resin suppliers compete vigorously for business."  ¶ 28.  The resin market has been "highly competitive," with suppliers that "vigorously compete for customers" and purchasers that "often switch suppliers."  ¶ 47.  "Many resin purchasers/owners of large-

frame SL machines currently buy resin from resin suppliers other than 3DS." ¶ 28. "Customers have long viewed Desotech as **the** industry leader." *Id.* (emphasis added).

These allegations of vigorous competition, coupled with a market share that is too low to give rise to a presumption of monopoly power, would (if proven) defeat any possibility of showing a danger that 3D Systems has market power in the resins market, especially in the absence of allegations of high barriers to entry. *See Will*, 776 F.2d at 674 (vigorous competition in the alleged market defeated attempt to show that defendant had market power).

> **b.    The Allegations Show that No Substantial Danger Exists that 3D Systems Will Gain Market Power in the Tied "Market"**

The factual allegations of the complaint also show that no "substantial danger" exists that 3D Systems will gain or enhance market power in the alleged tied product market.

First, the tying practice as alleged by Desotech would affect only a small part of the tied product market, and thus is lawful. *Will*, 776 F.2d at 672 (Easterbrook, J.) ("The Vertical Restraint Guidelines of the Department of Justice accurately reflect [Supreme Court] authority in treating as lawful any tying arrangement affecting less than 30% of a relevant market"). Desotech acknowledges that 3D Systems began selling its first large-frame SL machine 16 years ago in 1992 and introduced new large-frame SL systems in 1998 and 1999. ¶ 30. According to Desotech, 3D Systems has been selling SL systems continuously since that time. ¶ 29. It also asserts that 3D Systems began selling the Viper™ Pro system in October 2004. ¶ 31. In addition, Desotech acknowledges the existence of a robust resins market for sales to the installed base of SL machines as well as new purchases of secondhand large-frame SL systems that are not Viper™ Pro systems (the Viper™ Pro system is "the only large-frame SL option in the U.S. market for new purchasers" ¶ 41). Desotech has omitted any specific allegations of the numbers of each of the 3D Systems' models that are in use today, but the obvious conclusion of the

allegations listed above is that the alleged tying practice affects only a small portion of the installed base of 3D Systems' large-frame SL machines.  Thus, the alleged practice of tying affects only the demand for resin by users of one 3D Systems' model who are not using the two approved Desotech resins.[14]  Desotech omits any allegation of the percentage of that market that is affected or that the affected percentage is greater than 30 percent.

Second, Desotech's additional allegations put even further out of reach any substantial danger that 3D Systems will obtain or enhance market power in resins.  As set forth above, Desotech alleges that customers do not even want the Viper™ Pro system because it is "more expensive" than other options and has quality problems.  Desotech also alleges that customers prefer Desotech resins due to several superior qualities in comparison with 3D Systems' resins (*see, e.g.,* ¶¶ 28, 38, 56, 59).  Taking these allegations as true, the probable effect of any attempt by 3D Systems to tie sales of the allegedly expensive and unreliable Viper™ Pro system to the purchase of inferior (according to Desotech) resins would likely result in fewer sales of Viper™ Pro systems, not more sales of 3D Systems' resins.

Nor is a substantial danger that 3D Systems will gain market power in the so-called tied market alleged by Desotech's conclusory assertion that 3D Systems has embarked on a campaign to modify the RFID feature of installed Viper™ Pro systems to foreclose resins competition. ¶ 39.  The allegations are devoid of any factual specificity, so they fail under *Twombly.*  In addition, Desotech acknowledges that only Viper™ Pro machines are subject to this alleged RFID modification practice.  Desotech's allegations show that this is only a subset of the market (as set forth above), and also that customers do not even want the Viper™ Pro system due to its

---

[14]    As Judge Posner observed: "At most the defendant was trying to secure control over the ink used in its machines, which is not at all the same thing as trying to monopolize the ink market."  Richard A. Posner, *Antitrust Law* 198, 202, discussing *Henry v. A. B. Dick Co.*, 224 U.S. 1 (1912).

alleged quality problems and higher price.  *See* footnote 6 above.  Thus by its own allegations, Desotech has nothing to fear from 3D Systems' recently introduced Viper™ Pro system.

### 3. The Allegations of the Amended Complaint Fail to Allege the Requirements of a Claim for Tying Under the Rule of Reason

Desotech has also failed to state a cause of action for tying that is unlawful under the rule of reason.  One of the "threshold criteria" in the Seventh Circuit for both *per se* and rule of reason tying claims is the existence of a substantial danger that the defendant will acquire or enhance market power in the tied product market.  *A.O. Smith,* 979 F.2d at 550.  As set forth above in Section IV.B.2., Desotech has failed to allege this requirement, so its complaint must be dismissed.  *See CCBN.Com*, 270 F. Supp. 2d at 156 (elements common to both types of claims were missing, so rule of reason inquiry "cannot get off the ground").

Desotech's complaint fails to state a rule of reason claim for additional reasons.  To state a claim for tying under the rule of reason, Desotech had to allege the basis for a showing that the alleged restraint on competition in the so-called resins market was unreasonable.  *Jefferson Parish*, 466 U.S. at 17-18.  This showing has two components: (1) an actual adverse effect on competition, and (2) greater harm than benefit to competition.  *United States v. Microsoft,* 253 F.3d 34, 95-96 (D.C. Cir. 2001).  Both are addressed below.

### a. The Complaint Fails to Allege an Actual Effect on Competition

Desotech failed to allege the first requirement, that 3D Systems' resins restriction had an actual adverse effect on competition in the alleged resins market.  Desotech alleges, of course, that it has  purportedly been precluded from selling resins to certain customers for use in the Viper™ Pro system, but it is by now well-established that harm to a competitor is not the same thing as harm to competition.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  As noted above, Desotech concedes that the resin market is "highly competitive."

¶ 47. It concedes that it has discussed the licensing of its resins with 3D Systems, although those discussions broke down; that 3D Systems has told customers that an approvals process for resins exists; and that two Desotech resins have been approved. ¶¶ 52, 73. Desotech nowhere alleges that it or other resin suppliers have lost market share. Am. Cmpl. *passim*. At most, Desotech alleges that it has lost individual deals with five customers, but as set forth above, it failed to demonstrate that those losses were anything other than the ordinary give and take of a competitive market and failed to assert anything satisfying *Twombly* that those losses were caused by unlawful tying versus other incentives or "pressure." Moreover, as set forth above, 3D Systems has no obligation as a matter of law to guarantee that other suppliers are able to compete for sales of resins in a new or redesigned system. *See Cal. Computer*, 613 F.2d at 742-44 (even a monopolist has no duty to refrain from redesigning its products to facilitate competitors' sales).

### b. The Allegations Show that the Resins Restriction is Procompetitive

As for the second requirement, far from alleging that the anticompetitive harms outweigh the procompetitive benefit of the alleged restriction on resins used in Viper™ Pro systems, Desotech's allegations would, if proven, show just the opposite. The amended complaint asserts the stated basis of 3D Systems' resins restriction policy is a concern that untested and unapproved resins will not work properly in the Viper™ Pro system. ¶ 54. It further asserts that 3D Systems has explained the need for resin testing and approval with customers, discussed the licensing process with Desotech, and approved two Desotech resins. Given the absence of any allegation that 3D Systems has refused to approve any Desotech resins, its allegations support a procompetitive basis for the restriction. Based on the amended complaint itself, this procompetitive rationale outweighs the modest anticompetitive harm, if any, suggested by the amended complaint and its reference to five purportedly affected customers.

In his 2001 book *Antitrust Law*, Judge Posner described a practice like 3D Systems'

resins restriction as the "goodwill" motivation for alleged tying practices:

> There will be an exclusionary effect if the purpose of the tie-in is to protect the manufacturer's goodwill rather than to discriminate. Our hypothetical computer manufacturer might decide to make [computer] cards himself because he believed that another firm would not produce them to the exacting tolerances required for them to function optimally in his computers. **But exclusion in this case results from the superior efficiency of the tied sale to a sale of the product separately in promoting customer satisfaction.**

Richard A. Posner, *Antitrust Law* 201 (emphasis added). In other words, promoting customer

satisfaction by restricting the supplies that can be used in a seller's equipment to those that meet

the seller's qualifications is procompetitive. Such conduct is exactly what Desotech claims

violates the antitrust laws.

The Eighth Circuit held that facts similar to those alleged by Desotech were

demonstrably procompetitive in *HDC*, 474 F.3d at 550 (affirming summary judgment because

the plaintiff failed to establish that alleged exclusionary conduct was more harmful to

competition than beneficial). The defendant manufactured reprocessing systems that enabled

kidney dialysis centers to reuse dialysis filters. *Id.* at 546. Both parties manufactured

reprocessing fluids that could be used in the defendant's systems. *Id.* The defendant, however,

made modifications to the design of its reprocessing system that rendered the plaintiff's fluid

incompatible and then told customers it would not honor the warranties on its systems if the

plaintiff's fluid was used in them. *Id.* at 549. The defendant explained that it could not predict

how its machine would react to another manufacturer's fluids and noted that it was willing to test

the plaintiff's fluids (for a fee). The Eighth Circuit affirmed the district court's decision that this

was a legitimate business justification for the practice at issue and thus, as procompetitive

conduct, could not be challenged as unlawful tying under the rule of reason. *Id.* at 549-50.

Desotech's allegations add up to the same essential set of facts that were held to be procompetitive in *HDC*. Its complaint thus fails to state a rule of reason claim for tying.

### 4.    All of Desotech's Antitrust Claims Fail Because Desotech Has Not Alleged Antitrust Injury

For the same reasons, the complaint should be dismissed for failure to allege a basis for any claim of antitrust injury. Antitrust injury (not simply injury in fact or lost business or profits) is a requirement of all antitrust claims, and is defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Brunswick Corp.,* 429 U.S. at 489. A plaintiff must allege the basis for antitrust injury to bring a *per se* as well as a rule of reason claim. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-42 (1990). The complaint fails to allege the basis for antitrust injury because it fails to allege the harm to competition from which its injury must flow.

Without allegations of coercion, Desotech has simply alleged that it lost business to 3D Systems – which, though arguably "injury" or "lost business," is not the type of injury the antitrust laws were designed to prevent. "[A] producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from one another." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) (granting summary judgment dismissing antitrust claim for exclusionary conduct), quoted in *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006) (same). As shown above in Section IV.A.1., Desotech made specific factual allegations about several customers, none of which contains anything more than an empty recitation of the required element of coercion (and all but one not even that). Lost sales opportunities based upon customer choices in SL systems and resins do not constitute antitrust injury.

To show antitrust injury, "[t]o have standing as a competitor, [plaintiff] needed to show that 'its loss comes from acts that reduce output or raise prices to consumers.'" *Tri-Gen Inc.*, 433 F.3d at 1031, quoting *Stamatakis*, 965 F.2d at 471. Desotech has made no allegations that 3D Systems has raised prices or caused output to decrease in the so-called SL resins market. Nor is there a dangerous probability it will be able to do so, given that Desotech's allegations show that 3D Systems' resins restriction applies only to one recently introduced system that, according to Desotech, customers do not want. *See* Section IV.A.1. above. "The objective of the tying doctrine is to protect competition in the tied market." *McLaughlin*, 2004 WL 1629603 at *25, quoting *Parts & Elec. Motors*, 866 F.2d at 235 and *Sandburg Village*, 758 F.2d at 210. Given that Desotech's allegations show no threat to competition in the alleged tied market from 3D Systems' conduct, Desotech has not suffered any injury the antitrust laws were designed to prevent.

Finally, Desotech's allegations, if proven, would show that far from injuring competition, 3D Systems' policy of restricting resins used in the Viper™ Pro system is procompetitive. Injury that hurts one competitor's business but results from conduct otherwise beneficial to the process of competition is not antitrust injury. *Paladin Assocs.*, 328 F.3d at 1158 (affirming summary judgment for defendant in part because plaintiff failed to show antitrust injury). As shown above, Desotech's allegations show that the resins restriction is procompetitive, not anticompetitive. *See* Section IV.A.2. above.

5.     **The Complaint Fails to Allege Required Elements of Its Claim for Attempted Monopolization  (Count IV)**

Desotech's Sherman Act Section 2 claim for attempted monopolization fails for the same reasons its Sherman Act Section 1 and Clayton Act Section 3 claims fail. A claim for attempt to monopolize must allege "(1) that the defendant has engaged in predatory or anticompetitive

conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving

monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Great*

*Escape*, 791 F.2d at 540. *See also Microsoft*, 253 F.3d at 80.

As shown above, Desotech fails to allege the first element, that 3D Systems has engaged

in anticompetitive conduct, because it does not allege coercion with the requisite factual

specificity. *See* Sections IV.A.1& IV.A.2 above. It also fails to allege the third element, a

dangerous probability that 3D Systems will achieve monopoly power in the alleged tied market

for resins, as shown in Section IV.B.2. above.

The complaint also fails to allege the second element of an attempted monopolization

claim, specific intent to monopolize. Desotech alleges that 3D Systems wants to exclude

Desotech and other competitors (*see, e.g.*, ¶ 5), but the Seventh Circuit has made clear that an

intent to exclude competitors is lawful, and thus not sufficient to establish the specific intent

necessary for an attempted monopolization claim:

> All lawful competition aims to defeat and drive out competitors. Therefore, the
> mere intention to exclude competitors and to expand one's own business is not
> sufficient to show a specific intent to monopolize.

*Great Escape*, 791 F.2d at 541. Specific intent may be inferred from predatory conduct, *id.*, but

as shown above, Desotech has failed to make adequate allegations of such conduct. Its Section 2

claim therefore fails to state a cause of action sufficiently to survive dismissal.

An additional reason for dismissal of this claim is that attempted monopolization does not

exist where, as here, the defendant's conduct has a procompetitive justification and the

procompetitive benefits outweigh any anticompetitive harms. *See* Section IV.A.2. above; *see*

*also Microsoft*, 253 F.3d at 58-59.

C.    **The Complaint Also Fails to State a Cause of Action for Desotech's  State Law Claims (Count V-VII)**

1.    **Illinois Antitrust Act (Count V)**

The Illinois Antitrust Act, the basis of Count V, expressly provides that when its provisions are similar to those of a federal antitrust law, courts "shall use the construction of the federal law by the federal courts as a guide in construing this Act."  740 ILCS 10/11; *see also Appraisers Coalition v. Appraisal Institute,* 845 F. Supp. 592, 608 (N.D. Ill. 1994).  *See also Ill. Bell Tel. Co. v. Haines & Co.,* 744 F. Supp. 815 (N.D. Ill. 1990) (stating that "[b]ecause the counterclaim and supporting evidence fail to raise issues of fact that counter-defendants violated Sections 1 and 2 of the Sherman Act, the evidence does not support Haines' claims under the Illinois Antitrust Act").  Accordingly, Count V fails for the reasons set forth above regarding Counts I- IV, Desotech's federal law claims.

2.    **Illinois Uniform Deceptive Trade Practices Act (Count VI)**

Desotech's conclusory allegations fail to state a cause of action for commercial disparagement under both Sections 2(a)(7) and 2(a)(8) of the Illinois Uniform Deceptive Trade Practices Act ("UDTPA").

Under Section 2(a)(8), to allege commercial disparagement sufficiently, Desotech must state "specific written or oral statements to third parties that wrongly criticize the quality of another's goods or services."  815 ILCS 510/2(a)(8); *Stenograph Corp. v. Microcat Corp.,* No. 86-C-10231, 1989 WL 99543, *4 (N.D. Ill. Aug. 22, 1989).  Likewise, Section 2(a)(7) requires that Desotech "ascribe . . . particular conduct" to 3D Systems.  815 ILCS 510/2(a)(7); *Jacobson v. Ford Motor Co.,* No. 98-C-742, 1999 WL 966432, *6 (N.D. Ill. Sept. 30, 1999).  Accordingly, allegations supporting a claim of disparagement that fail to specify the actual disparaging

statements made or fail to identify the parties to the communications are insufficient as a matter of law.

Throughout its complaint, Desotech primarily recites and relies upon conclusory generalizations that fail to satisfy *Twombly*: 3D Systems has ostensibly made "disparaging statements" to "customers," purportedly telling these unidentified third parties that Desotech's resins are of poor quality or unapproved.  ¶¶ 8, 54; *see also* ¶¶ 53, 55, 113.  None of the referenced allegations lists specific instances of such statements or details the content of any of these statements (except the unattributed phrase "due diligence," made by an unknown person to an unknown person in unidentified circumstances in ¶ 54).  None of the referenced allegations even identifies the customers to whom such statements were allegedly made.  Thus, these generic and conclusory allegations fail to meet the threshold requirement of specificity for a commercial disparagement action under Illinois law.  *See Stenograph,* 1989 WL 99543, at *4.

Desotech's conclusory assertions also fail for the reason that they do not meet the legal definition of disparagement.  For example, Desotech states that 3D Systems told Express  Pattern Inc. that "the newer Somos resins . . . were not qualified and/or licensed for use on the Viper™ Pro."  ¶ 56.  Desotech also asserts that 3D Systems told Dynacept Company, Inc. of "non-approved Somos resins."  ¶ 63.  However, these statements neither "**criticize the quality** of one's goods or services,"  *Montgomery Ward & Co., Inc. v. Fretter, Inc.,* No. 91-C-8011, 1992 WL 212513, *3 (N.D. Ill. Aug. 28, 1992) (emphasis added), nor describe the attacked service or product as "substandard, negligent, or harmful."  *Allcare, Inc. v. Bork,* 531 N.E.2d 1033, 1037, 176 Ill. App. 3d 993, 1000 (Ill App. Ct. 1988); *see also Donnelley Mktg., Inc. v. Sullivan,* No. 01-C-9273, 2002 WL 314631, *4 (N.D. Ill. Feb. 28, 2002).  The cited statements, merely describe performance characteristics (and limitations) of the Viper™  Pro and do not, therefore,

amount to disparagement.  *See Uline, Inc. v. JIT Packaging, Inc.,* 437 F. Supp. 2d 793 (N.D. Ill. 2006) (holding that statements detailing performance and other characteristics of a product do not constitute disparagement); *see also Conditioned Ocular Enhancement, Inc. v. Bonaventura,* 458 F. Supp. 2d 704, 710 (N.D. Ill. 2006) (dismissing a claim because statements regarding "license or authorization" for a product did not constitute disparagement).

Desotech also fails to show any "**false or misleading** representation of fact" regarding the Viper™ Pro or the use of newer Somos resins.  815 ILCS 510/2(a)(8) (emphasis added). That Desotech allegedly called 3D Systems seeking information on licensing and received no reply certainly does not allege a misrepresentation.  Desotech attempts to allege that 3D Systems' statements about the licensing of resins were misrepresentations by suggesting, without actually pleading, that no such licensing or approvals process exists – but Desotech never actually makes that allegation, and moreover concedes that it actually discussed the licensing of its resins with 3D Systems and that two Desotech resins have been approved.  ¶¶ 52, 73.  Where there is "no admissible evidence in the record from which a finder of fact could conclude [that] this [allegedly disparaging] statement was false," a disparagement claim under UDTPA Section 2(a)(8) fails.  *Uline,* 437 F. Supp. 2d at 804 n.1.  Thus, Desotech has simply attempted to suggest without actually pleading a misrepresentation, which does not satisfy *Twombly.*  Moreover, that suggestion is contradicted by its other allegations.

Desotech also fails to allege that 3D Systems incorrectly represented that the newer Somos resins "are of a particular standard, quality, or grade," as it must to state a claim under 815 ILCS 510/2(a)(7).  Desotech has not alleged that 3D Systems ascribed to the resins a false characteristic or property, invoked a false comparison of Somos and other resins, or misrepresented the properties of the Somos resins.  *See Am. Buyers Club of Mt. Vernon, Ill., Inc.*

30

*v. Honecker,* 361 N.E.2d 1370, 46 Ill. App. 3d 252 (Ill. App. Ct. 1977); *Genderm Corp. v.*

*Biozone Labs.,* No. 92-C-2533, 1992 WL 220638 (N.D. Ill. Sept. 3, 1992).  Instead, all Desotech

has logically asserted is that 3D Systems informed Express Pattern and Dynacept that the newer

Somos resins do not work with the Viper™ Pro system, and that this incompatibility *is truly the*

*case*.  *See, e.g.,* ¶ 33 (noting that Viper™ Pros with activated RFID chips actually do not work

with Somos resins).

### 3. Tortious Interference with Prospective Economic Advantage (Count VII)

The complaint also fails to state a cause of action for tortious interference because its

allegations, taken as true, fail to allege "malice" and other required elements of its claim, as

shown below.

### a. Desotech's Allegations Fail to Show the "Malice" Required to Overcome the Competitor's Privilege

Desotech cannot show the required element of malice because Illinois recognizes a

competitive privilege that protects competitors from claims of tortious interference with

prospective business advantage.  *Soderlund Bros Inc. v. Carrier Corp.*, 663 N.E.2d 1, 8, 278 Ill.

App. 3d 606, 615 (Ill. App. Ct. 1995), citing *Candalaus Chi., Inc. v. Evans Mill Supply Co.*, 366

N.E.2d 319, 51 Ill. App. 3d 38 (Ill. Ct. App. 1977).  In *Candalaus*, counterplaintiff Evans Mill

alleged that counterdefendant Candalaus "maliciously contacted and sold to Evans' customers the

same goods which Candalaus had been selling to Evans for resale to these customers" – much as

Desotech alleges that 3D Systems has won business for itself from Desotech.  *Candalaus*, 366

N.E.2d at 326.  The court observed that "malice" is a required element of tortious interference,

and explained that the term "malice" is not used in "its popular sense," but to signify some ill

will other than a desire to expand one's business.  "Exploitation of the market should be

conducted with the intent at least in part to further one's business; but if pursued **solely** in spite or

ill will and not in the advancement of competitive interest, the conduct is not privileged." *Id.* (emphasis added). Because Candalaus's sales to Evans' customers could not be said to have been made "**solely** out of spite or ill will, but at least in part to further Candalaus's own business interest," the conduct was privileged and not tortious. *Id.* (emphasis added).

Likewise here, Desotech does not and cannot allege that 3D Systems' conduct has been motivated "solely" out of ill will rather than out of a desire to further its own business. *See also Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir. 1992) (to establish malice under Illinois law, plaintiff must prove that defendant "acted with a desire to harm"), quoted in *Int'l Star Registry of Ill. v. ABC Radio, Inc.*, 451 F. Supp. 2d 982, 992 (N.D. Ill. 2006). Desotech has alleged that 3D Systems' conduct was motivated by its desire to expand and enhance its business, not by a desire to harm Desotech, so this claim requires dismissal. *Kruger v. Menard Elec. Coop.*, 523 N.E.2d 708, 710, 169 Ill. App. 3d 861, 865 (Ill. App. Ct. 1988).

> **b.    The Complaint Also Fails to Allege Other Required Elements of a Cause of Action for Tortious Interference**

Desotech has also failed to plead required elements of the cause of action of tortious interference with prospective economic advantage. These elements are well established under Illinois law and require a plaintiff to allege: "(1) he had a reasonable expectancy of a valid business relationship; (2) defendant knew about the expectancy; (3) defendant intentionally interfered with the expectancy and prevented it from ripening into a valid business relationship; and (4) the intentional interference injured the plaintiff." *Associated Underwriters of Am. Agency, Inc v. McCarthy*, 826 N.E.2d 1160, 1169, 356 Ill. App. 3d 1010, 1020 (Ill. App. Ct. 2005); *LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc.*, 477 F. Supp. 2d 932, 939 (N.D. Ill. 2007). Moreover, these required elements must be pleaded with factual specificity. A complaint which

"merely recites each legal element of the tort of interference with prospective economic advantage, without supplying actual facts in support of allegations," must be dismissed. *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 971 (N.D. Ill. 2007).

The complaint's factual allegations for the five customers fail to include required elements of the cause of action for tortious interference. For three of the customers, Lockheed, Tangible Express and AP Proto, Desotech has merely alleged facts showing that it hoped to sell resins to those customers but the customers chose, as the result of "pressure" or for reasons that are not alleged, to buy resins from 3D Systems instead. To establish the existence of a reasonable expectancy, however, Desotech had to plead facts showing that it had more than the "mere hope" of continuing its relationship. *Intervisual Commc'ns., Inc. v. Volkert*, 975 F. Supp. 1092, 1103 (N.D. Ill. 1997); *MJ Partners Rest. Ltd. P'ship v. Zadikoff*, 126 F. Supp. 2d 1130, 1138 (N.D. Ill. 1999). Simply alleging a past customer relationship is not sufficient to prove a "reasonable expectation" of a future business relationship. *Intervisual Commc'ns.*, 975 F. Supp. at 1103. Desotech's allegations for these three customers simply show that 3D Systems won their business away from Desotech – but under Illinois law, "one may not simply sue any competitor who lures away customers." *Downers Grove Volkswagen, Inc. v. Wigglesworth Imps., Inc.*, 546 N.E.2d 33, 36, 190 Ill. App. 3d 524, 528 (Ill. App. Ct. 1989). The competitor's privilege also is a complete defense to Desotech's allegation that it had an "oral commitment" from AP Proto. *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1405 (7th Cir. 1992) (affirming summary judgment; competitor's interference with oral promise is privileged).

As for the two remaining customers, Express Pattern and Dynacept, Desotech does not even allege that they stopped buying from Desotech. The complaint alleges that Express Pattern wanted to continue buying Desotech resins, acknowledges that it actually did so, and nowhere

alleges that express Patterns has stopped buying Desotech resins.  ¶¶ 59, 114.  It alleges that 3D Systems has a "stated intent" to activate the RFID feature on Express Pattern's systems to prohibit the use of unapproved resins but not that 3D Systems has done so,  and asserts that 3D Systems told Express Pattern that it could no longer use Desotech resins but nowhere alleges that Express Pattern complied with that prohibition.  *Id.*  It also makes no allegation that Dynacept stopped buying Desotech resins.  ¶¶ 60-63.  Thus, for these two customers, Desotech has failed to allege the third required element, that interference occurred and prevented Desotech's expectancy from developing in a business relationship.

Accordingly, Count VII fails as a matter of law and should be dismissed for failure to state a claim for tortious interference with prospective economic advantage.  *Associated Underwriters*, 826 N.E.2d at 1169; *LaSalle Bank*, 477 F. Supp. 2d at 939.

## V.  CONCLUSION

For the foregoing reasons, 3D Systems requests that this Court dismiss Desotech's antitrust and state law claims (Counts I-VII), and grant 3D Systems such other and further relief as is appropriate.

DATED: June 6, 2008

/s/ Paula W. Render
*One of the Attorneys for 3D Systems Corp. and 3D Systems, Inc.*

Sidney David
Jonathan A. David
LERNER DAVID LITTENBERG
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel: (908) 654-5000
Fax: (908) 654-7866
sdavid@ldlkm.com
jdavid@ldlkm.com

Michael Sennett (IL #02550199)
Paula W. Render (IL #06237954)
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601
Tel: (312) 782-3939
Fax: (312) 782-8585
msennett@jonesday.com
prender@jonesday.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on June 6, 2008, a copy of the foregoing

**Motion To Dismiss Desotech's Antitrust and State Law Claims** was served via ECF pursuant

to Local Rule 5.5 to the following attorneys of record:

> Andrew S. Marovitz
> Britt M. Miller
> Thomas V. Panoff
> courtnotification@mayerbrown.com
> MAYER BROWN LLP
> 71 South Wacker Drive
> Chicago, Illinois 60606

> Bruce M. Gagala
> Jeffrey B. Burgan
> bgagala@leydig.com
> jburgan@leydig.com
> LEYDIG, VOIT & MAYER, LTD.
> Two Prudential Plaza, Suite 4900
> 180 North Stetson Avenue
> Chicago, Illinois 60601

> /s/ Niloy Ray
> Niloy Ray

# EXHIBIT A

# RICHARD A.
# POSNER

## ANTITRUST LAW

### SECOND EDITION

THE UNIVERSITY OF CHICAGO PRESS
CHICAGO AND LONDON

R I C H A R D   A .   P O S N E R is judge of the U.S. Court of Appeals, Seventh Circuit, and senior lecturer at the University of Chicago Law School. Among his many books are *Economic Analysis of Law* (5th ed. 1998) and, most recently, *Frontiers of Legal Theory* (2001).

The University of Chicago Press, Chicago 60637
The University of Chicago Press, Ltd., London
© 1976, 2001 by The University of Chicago
All rights reserved. Published 2001
Printed in the United States of America

10 09 08 07 06 05 04 03 02 01        1 2 3 4 5

ISBN: 0-226-67576-9 (cloth)

Library of Congress Cataloging-in-Publication Data

Posner, Richard A.
    Antitrust law / Richard A. Posner—2nd ed.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 0-226-67576-9 (cloth : alk. paper)
    1. Antitrust law—United States.  I. Title
    KF1649 .P66 2001
    343.73′0712—dc21
                                    2001035164

♾The paper used in this publication meets the minimum requirements of the American National Standard for Information Sciences—Permanence of Paper for Printed Library Materials, ANSI Z39.48-1992.

dominant firm were less efficient. And one way of thwarting a rival is to deprive him of revenues without necessarily affecting his costs. A campaign of predatory pricing might bankrupt a new entrant by forcing him to sell below cost without affecting his costs at all. Raising rivals' costs is neither a necessary nor a sufficient condition of predation. Which is not to deny the possibility that it can be an effective method of predation. Suppose, for example, that two competitors, both unionized, have different ratios of capital to labor inputs. The firm that is more capital intensive might agree with the union to a wage increase, hoping that the union would pressure the other firm to grant a similar increase, since otherwise the first firm would lose business and so its employees would be hurt, to the union's detriment. If the second firm granted a similar wage increase, this would place it at a competitive disadvantage, since labor is a higher percentage of its overall costs.[8]

But how realistic is this? Not very. It is a fearfully risky strategy, since the first firm will be placed at a disadvantage if the union does not succeed in obtaining an equally sizable wage increase from the second firm. It is a risky strategy for the union as well, since it may confer monopsony power on the first firm by cooperating in that firm's scheme to take over the market. And if the second firm is destroyed and the output of the market shrinks because it is now a monopoly, workers will be laid off.

## TYING ARRANGEMENTS

A practice long thought to epitomize the exclusionary practices but now recognized to be only rarely exclusionary is the tying arrangement: as a condition of the sale of one product, the seller requires the buyer to purchase a second product from him. The traditional objection to tying arrangements is that they enable a firm having a monopoly in one market to obtain a monopoly in a second one. Thus, a firm having monopoly power in the market for business machines could obtain a monopoly of punch cards as well simply by refusing to sell or lease its machines unless the purchaser or lessee agreed to use only its punch cards in the machines.[9] The early cases required proof of monopoly power, or of some proxy therefor such as a patent,[10] in the market for the tying product. Actually, a patent is a poor proxy for monopoly power, since most patents

8. The example is from W. Kip Viscusi, John M. Vernon, and Joseph E. Harington Jr., *Economics of Regulation and Antitrust* 183–84 (2d ed. 1995).

9. See International Business Machines Corp. v. United States, 298 U.S. 131 (1936).

10. See, e.g., id.; United Shoe Machinery Corp. v. United States, 258 U.S. 451 (1922); International Salt Co. v. United States, 332 U.S. 392 (1947).

confer too little monopoly power to be a proper object of antitrust concern. Some patents confer no monopoly power at all. A patent may simply enable a firm to reduce the cost advantage of a competing firm; in such a case the patent might actually reduce the amount of monopoly power in the market. The frequency with which patents have been involved in tie-in cases may stem from the fact that the earliest such cases were not antitrust cases at all. They were patent-misuse cases,[11] where the issue was whether the patentee had improperly extended the patent monopoly by monopolizing an unpatented product tied to the patented product.

Later the requirement of proving monopoly power was attenuated, to the point where only a minimal, and in some cases no, showing was required. For once the courts became accustomed to thinking of the tie-in as a device by which a monopolist of one market levered his way into a position of dominance in other markets, it seemed redundant to require proof of monopoly in the first market, since how could the tie-in have been imposed unless such power existed? When opinion turned and the nonexclusionary function of tying became understood, the courts restored the requirement of proof of monopoly power, or some approximation to it, in the market for the tying product.[12]

A striking deficiency of the traditional "leverage" theory of tie-ins that I've been expounding was its failure to require any proof that a monopoly of the tied product was even a remotely plausible consequence of the tie-in. In the *A. B. Dick* case,[13] for example, the defendant had tied ink to its mimeograph machines. It is hardly credible that it was attempting to monopolize the ink industry; only a small fraction of the ink sold in this country was purchased for use in Dick's mimeograph machines. At most the defendant was trying to secure control over the ink used in its machines, which is not at all the same thing as trying to monopolize the ink market. Restating Dick's objective in this way, we can see that tying is much like a manufacturer's owning the retail outlets through which his product is sold and thereby "tying" retail distribution to the sale of that product. It is only when the users of the tying product are also the principal customers for the tied product—by no means the typical tie-in case—that tying could conceivably be viewed as a method of obtaining a second monopoly.

A second—and fatal—weakness of the leverage theory is its inability

11. Such as Motion Picture Patents Co. v. Universal Films Manufacturing Co., 243 U.S. 502 (1917).

12. See, e.g., Jefferson Parish Hospital District No. 2. v. Hyde, 466 U.S. 2 (1984); Will v. Comprehensive Accounting Corp., 776 F.2d 665, 671–74 (7th Cir. 1985).

13. Henry v. A. B. Dick Co., 224 U.S. 1 (1912).

to explain why a firm with a monopoly of one product would want to monopolize a complementary product as well. It may seem obvious that two monopolies are better than one, but since the products are used in conjunction with one another to produce the final product or service in which the consumer is interested (such as duplication, as in the *A.B. Dick* case), it is far from obvious. If the price of the tied product is higher than the purchaser would have had to pay on the open market, the difference will represent an increase in the price of the final product or service to him and so he will demand less of it and therefore buy less of the tying product. To illustrate, let a purchaser of data processing be willing to pay up to $1 per unit of computation, requiring the use of one second of machine time and ten punch cards, each of which costs 1 cent to produce. The computer monopolist can rent out the computer for 90 cents a second and allow the user to buy cards on the open market for 1 cent, or, if tying is permitted, he can require the user to buy cards from him at 10 cents a card—but in that case he must reduce his machine rental charge to nothing, so what has he gained?

I have described the tied product as a complement of the tying product, because that is the relation that the cases reveal and because the definition of complementarity makes clear the difficulty of levering a monopoly over the tying product into a monopoly of the tied product. $X$ is a complement of $Y$ if an increase in the price of $Y$ will reduce the demand for $X$. An increase in the price of punch cards will reduce the demand for computers that use punch cards, just as an increase in the price of nails will reduce the demand for hammers. But it is important to note that leverage is no more effective when the products are unrelated. Had IBM refused to sell computers unless the customers agreed to buy cake mix from it, this would not have enabled IBM to obtain greater profits. The price of the cake mix, minus whatever value the cake mix had, would have been perceived by the customers as an addition to the price of the computer.

The significance of complementarity [14] is that it provides an alternative explanation of tying. Tying complementary goods can be a method of price discrimination, enabling a monopolist to obtain higher profits than

---

14. More precisely, of complementarity independent of the tie itself. For tying *makes* the tied product a complement of the tying one; the buyer cannot get the tying product without the tied product and therefore will demand less of the tying product the higher the price for the tied product (the definition of complementarity). The significance of the fact that the tied product is usually a complement of the tying product independently of the tie is, as we're about to see, that the quantity demanded of the tied product is a measure of the intensity of the buyer's demand for the tying product.

he could if he charged a uniform price. By providing the computer at cost and selling each punch card at a monopoly price, the computer monopolist can vary the charge for computation according to the amount of each purchaser's use. The purchaser who uses a thousand cards a month will thereby be charged much more for the use of the business machine than the user of a hundred cards a month even though the additional *cost* imposed by his greater use, in machine wear and tear, may be slight. Because he'll be getting much more value out of the machine, he'll be willing, assuming an absence of competitive machines, to pay more than the marginal user. This method of charging for computation resembles "value-of-service" pricing in public-utility and common-carrier industries —a common method of price discrimination that is effective as long as the high-value users have no good alternatives and arbitrage (purchase by the low-price customers for resale to the high-price ones) can be prevented. Remember that a competitive industry sells its output at a price equal to marginal cost. The value of the product to the intramarginal consumer does not affect the price at all. The single-price monopolist captures the consumer surplus enjoyed by some of the intramarginal customers, but not by those who obtain value from the product over and above the monopoly price. When the the monopolist is able to vary price of the product, that is, price discriminate, he can capture more of that value.

Although the price-discrimination theory of tying—and the fallacy of its rival, the leverage theory—entered the literature of antitrust in the 1950s,[15] it was disregarded by the courts and mainstream antitrust commentators for many years. The reasons are instructive:

1. Some commentators argued that to show that the purpose of tying is discrimination rather than exclusion misses the point—the *effect* is exclusionary and that is all that matters.[16] The argument is unsound. The

---

15. See Ward S. Bowman Jr., "Tying Arrangements and the Leverage Problem," 67 *Yale Law Journal* 19 (1957); also M. L. Burstein, "A Theory of Full-Line Forcing," 55 *Northwestern University Law Review* 62 (1960). The theory was originally developed by Aaron Director, an economist at the University of Chicago Law School. By emphasizing the price-discrimination theory, I do not want to leave the impression that it is the only nonmonopolistic motive for tying. Others include the avoidance of price control or a cartel price, protection of goodwill (which is discussed in the text below), and the joint pricing of complements (a practice related to price discrimination). See Benjamin Klein, "Tying," in *The New Palgrave Dictionary of Economics and the Law,* vol. 3, p. 630 (Peter Newman ed., 1998); Franklin R. Edwards, "The Economics of 'Tying' Arrangements: Some Proposed Guidelines for Bank Holding-Company Regulation," 6 *Antitrust Law and Economics Review* 87 (1973).

16. See Carl Kaysen and Donald F. Turner, *Antitrust Policy: An Economic and Legal Analysis* 157 (1959); Donald F. Turner, "The Validity of Tying Arrangements under the Antitrust Laws," 72 *Harvard Law Review* 50, 63 n. 42 (1958).

only exclusion of competitors that should be objectionable from an anti-trust standpoint is that which results in an increase in the market price above the competitive level. A tie-in imposed as a means of price discrimination is neither intended nor likely to increase the price level in the market for the tied product, the purpose of the tie-in being, rather, to enable the monopolist to extract higher profits from his monopoly in a separate market. The point of tying is to enable the monopolist to charge *his customers* alone a higher price for the tied product than the market price for that product.

Exclusion is in any event unlikely, regardless of what percentage of the output of the tied product is used with the tying product. Suppose *all* punch cards are used with and only with the computers manufactured by a computer monopolist. The monopolist still has no motive for driving the existing producers of punch cards out of business and producing the cards himself. He only wants the sale of cards channeled through him so that he can reprice them. Provided that the existing producers are competitive with one another and efficient, he will buy the cards from them for resale to the customers for his computers. Tying is not vertical integration.

There will be an exclusionary effect if the purpose of the tie-in is to protect the manufacturer's goodwill rather than to discriminate. Our hypothetical computer manufacturer might decide to make the cards himself because he believed that another firm would not produce them to the exacting tolerances required for them to function optimally in his computers. But exclusion in this case results from the superior efficiency of the tied sale to a sale of the products separately in promoting customer satisfaction. The Supreme Court brushed aside the goodwill argument in a real punch-card case [17] with the observation that the manufacturer had an alternative that would have restricted competition less: he could have issued specifications for any manufacturer of punch cards to try to meet. True, but at what cost? If the purpose of the tie-in was to protect goodwill rather than to discriminate, this implies that the specifications alternative was less efficient; otherwise the manufacturer would have promulgated specifications voluntarily. To hold that the tie-in unlawfully restricted competition was tantamount to saying that any time a monopolist decides to handle a step in the production process internally rather than invite competitive bids, he is guilty of monopolizing because he is unnecessarily

17. International Business Machines Corp. v. United States, note 9 above. Old fashioned as it seems today, the computer–punch card combination remains the basis of the widely used "punch ballot" voting technology that achieved notoriety in the 2000 presidential election.

restricting competition. This is not the general rule, and it makes no sense to apply it just to tie-ins.

Should the cost savings from a tie-in intended to protect the manufacturer's goodwill have to be balanced against costs in reduced competition resulting from the exclusion of the independent producers of the tied product? Probably not, since a tie-in is unlikely to have *any* competitive significance in the market for the tied product. If 1 percent of the ink sold in this country were sold to users of Dick mimeograph machines (undoubtedly an overestimate), the effect of Dick's deciding to make its own ink (an improbable decision, incidentally) would be to reduce the sales of other ink manufacturers by an average of 1 percent.

2. Whatever its purpose, tying might make new entry into the market for the tying product less likely. A firm wanting to enter that market would have to enter the market for the tied product as well—a new computer manufacturer would have to produce his own cards.[18] The premise of this argument is invalid, of course, if the existing manufacturer is buying and repricing, rather than making cards, or if, though he manufactures the cards, there are other manufacturers as well. And if he is manufacturing the cards for use with his computers, the presumption is that the tie-in has an efficiency justification. But might he decide to make his own cards precisely in order to impede entry into the computer market? In few of the classic tie-in cases could such a motive plausibly be attributed to the manufacturer. As I have emphasized, tying rarely gives the producer of the tying product a monopoly position in the market for the tied product, thus requiring a firm desiring to enter the market for the tying product to produce the tied product as well because there are no independent producers. A new entrant would have no difficulty in procuring in the open market the requisite cards or ink or salt[19] to supply together with its business machines, duplicating equipment, or salt machinery. But the possibility that tying might discourage entry into the monopolized market for the tying product cannot be excluded altogether. I shall give an example later, in discussing the *United Shoe Machinery* case.

3. To identify a practice as a form of price discrimination is not to commend it in most people's eyes. Much of the hostility to price discrimination is based on erroneous premises, for example that it is an exclusionary practice, which it is not unless it involves predatory pricing, of which more in the next section of this chapter. Yet there are, as we know, economic objections to systematic (as distinct from sporadic) price discrimination, in particular that by increasing the expected gains from monop-

---

18. See, e.g., Kaysen and Turner, note 16 above, at 157.

19. The tied product in International Salt Co. v. United States, note 10 above.

oly it increases the social costs of monopoly. The higher expected profits of discriminating monopoly induce the expenditure of additional resources on getting and holding monopolies, and there is no presumption that these resource costs will be offset by the efficiency gains from a greater output under discriminating monopoly, since there is no ground for confidence that discrimination results, on average, in a greater output than nondiscriminating monopoly. In addition, price discrimination impairs efficiency in the market in which the purchasers from the discriminating seller sell by creating competitive cost disparities unrelated to differences in the relative efficiency of the competitors. The purchaser to whom the discriminating seller sells at a lower price may be no more efficient than the competing purchaser who is charged a higher price.

These objections dwindle in settings in which society wants to increase the amount of monopoly, for example to spur invention; and then the effect of higher monopoly profits in inducing more monopolizing may count as a social gain rather than as a social loss. This observation is especially relevant to the many cases in which tie-ins have been imposed by patentees in order to increase their profits from the patented invention. If one thought that the patent laws tended to undercompensate inventors, resulting in a suboptimal rate of innovation, one might want to encourage price discrimination in order to increase the amount of investment in inventive activity. Unfortunately, as we saw in chapter 1, no one has any idea whether the nondiscriminatory exploitation of patents would result in too much, too little, or just the right amount of invention.

But it does seem odd that the earliest cases in which tie-ins were condemned were patent tie-in cases. One might try to defend the results in these cases on the legal rather than the economic ground that the patent laws were not intended to permit patentees to discriminate in price, in which event there would be a legitimate sense in which tying could be thought to extend the patent monopoly beyond the scope authorized by law. The trouble with this argument is that it has generally been assumed that patentees are perfectly free to discriminate in price directly by varying the charge for the use of their patents according to the amount of use, just as in a tie-in. It is arbitrary to prohibit doing the same thing indirectly, by means of tie-ins, unless they have an exclusionary effect—and we have just seen that, when the purpose of the tie-in is discrimination, there is no reason to expect any such effect to be present. Worse than arbitrary; it is futile. Given the absence of any general prohibition against price discrimination, forbidding tie-ins just deflects monopolists to other methods of discrimination. If all the alternative methods were either substantially more costly or substantially less effective than tying, the amount of discrimination might be substantially reduced as a result even

of the limited prohibition. But the premise is implausible. Intensity of use can be metered directly, as Xerox, for example, does with its copying machines, as well as indirectly by use of a tie-in.

But maybe there ought to be a general antitrust prohibition against price discrimination. A distinguished Federal Trade Commissioner, Philip Elman, in a concurring opinion in the *Peelers* case[20] discussed approvingly by the court of appeals that reviewed the Commission's decision,[21] once suggested that discrimination by a monopolist between competing customers was an act of monopolization even if the monopoly itself was a lawful one, for example a patent monopoly. The patentee of the only process for cleaning shrimp by machine leased the process at a higher price to Pacific Northwest shrimp processors than to Gulf Coast processors because the costs of cleaning by hand were higher for the former group. The result was to perpetuate a cost difference between competing segments of the industry that the development of machine cleaning would, in the absence of discrimination, have eliminated.

As a precedent for his view that a monopolist has a duty to refrain from discrimination, Elman cited *United States v. Terminal Railroad Association*,[22] but that case (like *United Shoe Machinery*) is distinguishable because the targets of the discrimination were competitors of the discriminating firms rather than customers. *Peelers* itself can be read narrowly as a case in which section 5 of the Federal Trade Commission Act was used to plug a loophole in the Robinson-Patman Act; the discrimination was effected through lease rather than sale, which placed it beyond the reach of the latter act. Later cases make clear that there is no general antitrust prohibition against price discrimination,[23] but leave open the question whether there should be one.

The common argument that such a prohibition would merely treat a symptom of monopoly, rather than monopoly itself, is unpersuasive. If systematic discrimination is a source of net social costs, an effective and inexpensive prohibition would increase social welfare. But just to determine whether a price is discriminatory in the economic sense (let alone "systematically" so) is very difficult because it is so difficult to measure a firm's marginal costs. "Marginal cost" is not a figure that appears on a company's books; it is a hypothetical entity: what a slight increase (de-

---

20. In re Grand Caillou Packing Co. (Peelers Co.), 65 F.T.C. 799, 865–69 (1964).

21. LaPeyre v. FTC, 366 F.2d 117 (5th Cir. 1966). For criticism, see USM Corp. v. SPS Technologies, Inc., 694 F.2d 505, 512–13 (7th Cir. 1982).

22. 224 U.S. 383 (1912).

23. See, e.g., in In re Brand Names Prescription Drugs Antitrust Litigation, 186 F.3d 781, 785 (7th Cir. 1999); USM Corp. v. SPS Technologies, Inc., note 21 above, at 512–13.

crease) in output would add to (subtract from) the firm's total costs. What is more, in a case like *Peelers* itself, where the "product" being sold (use of the patent) is intellectual property, marginal cost is usually below average total cost and so a price equal to marginal cost would not be compensatory. In such circumstances the most efficient pricing method is "discriminatory," as it involves, we recall from chapter 3, pricing inversely to the purchaser's elasticity of demand. And there is the possibility that the anticompetitive effects of the discrimination in the markets of consumers (the shrimp processors in *Peelers*) are offset by the effect of discrimination in drawing greater resources into invention. That possibility to one side, the most serious objection to attempting to forbid price discrimination is that it is often just a by-product of movement from one equilibrium to another—sometimes from a monopolistic to a competitive one—and prohibiting it would impede such movements. It is difficult in practice to distinguish between persistent or systematic discrimination, an unequivocal sign of monopoly, and temporary or sporadic discrimination, which might accompany a shift to a new equilibrium or indicate cheating by members of a cartel.

The question whether to forbid systematic price discrimination is related to the question discussed in chapter 3 of whether to permit discrimination to be used as evidence of collusive pricing. The limitations of economic science and the judicial process make me question how capable antitrust enforcement is of distinguishing systematic price discrimination not only from sporadic discrimination but from cost-justified price differences as well. The solution I find most appealing is to permit experimentation with the use of evidence of price discrimination in collusion cases, meanwhile deferring, probably for a very long time, a decision on whether to institute (either through interpretation of sections 1 or 2 of the Sherman Act or new legislation) a general ban on systematic price discrimination.[24] Under this approach, tie-ins would be permitted, at least for the present.

Even if banning tie-ins were thought to be an effective method of combatting price discrimination, it would probably be an unwise policy. One reason is the difficulty of distinguishing between tie-ins imposed for the purpose of discriminating and those intended to protect goodwill or get around a cartel price (since a discount on the tied product could be a method of discounting a cartelized tying product, or vice versa), and of distinguishing tie-ins from perfectly innocuous combination or package

24. This stopgap proposal appeared in the first edition of this book, published twenty-five years ago; nothing has happened in the interim to outmode or supersede it.

sales. The concept of a tie-in is conventional rather than analytical. We think of a mimeograph machine and its paper and ink as separate products that if sold together are "tied," but we do not think of a left and right glove, or an automobile and its radiator, in the same way. Yet nothing in the traditional legal thinking about tie-ins enables one to distinguish among these cases. Since virtually all products have components, the potential reach of the doctrine is devastating. What keeps it in check is a tacit assumption that the more obvious combination sales could readily be justified by their lower costs compared to selling the components separately. But there is something wrong with a doctrine that makes virtually every combination sale a prima facie unlawful tie-in that the seller may have to convince a jury is cost justified. And since courts have not rejected the concept of a "technological tie-in"—the case in which the tying and tied product are physically integrated (an automobile and brakes, for example, or a computer operating system and its browser functionality, alleged in the *Microsoft* case to constitute an unlawful technological tie)—the potential scope of the tie-in doctrine is vast indeed.

Were it agreed that the only function of tie-ins relevant to antitrust law was price discrimination, the legal concept of the tie-in could be limited to cases in which the tied product was used in varying proportions with the tying product. For if the two products are used in fixed proportions (as in the case of the left and the right shoe, or the operating system and its built-in browser), the tied product cannot be used to meter the intensity of use of the tying product by different customers.[25] But when tie-ins are attacked (as in the *Microsoft* case) as a method of impeding entry, the distinction between fixed and variable proportions loses its significance.

The conventionality of the legal concept of a tie-in is illustrated by the "best-efforts" clause. This standard provision in distribution agreements (and one that is implied in all such agreements that give the distributor the exclusive right to distribute the manufacturer's product) requires the distributor to promote the manufacturer's product vigorously. If the manufacturer sells more than one product to the distributor and the best-efforts provision covers the entire line, the provision may, like a tie-in agreement, induce the distributor to buy a product that he would prefer not to carry, as a condition of his being permitted to buy the products in the manufacturer's line that he does want to carry. A doctrine that implies that a vast number of distribution agreements contain, unbeknownst to their signatories, a provision that seems to be in prima facie violation of the antitrust laws is radically defective. Best-efforts provisions can be defended by noting the manufacturer's legitimate interest in obtaining

25. We shall see an exception later, however, when we come to block booking.

effective distribution of his goods, a factor absent in conventional tie-in cases. Yet the attempted distinction invites the facile response that the manufacturer should be required to devise a less restrictive method of obtaining effective distribution.

We'll see in the next chapter that at least in "new economy" industries there may be cases in which tie-ins are anticompetitive. But there is no justification for a special doctrine that singles them out from the host of other contractual or design decisions that can impair competition in particular market settings. The general prohibition in section 2 of the Sherman Act against monopolizing is adequate to deal with the rare case in which a firm imposes a tie-in with the purpose or likely effect of monopolizing the market for the tied (or for that matter tying) product. A special tie-in doctrine, with inevitably a life of its own, is unnecessary and inappropriate.

Nor is it compelled by section 3 of the Clayton Act, passed in 1914, which forbids, with certain immaterial limitations, tie-in and exclusive-dealing contracts the effect of which may be substantially to lessen competition.[26] The legislative history reveals belief in the leverage theory; and courts are not free to disregard legislative policy just because they think its premises unsound. But Congress did not outlaw tie-ins. It required proof of anticompetitive effect. By doing so it implicitly authorized the courts to alter the scope of the prohibition in accordance with changing perceptions of the competitive effects of particular practices, even to the point where no practice would fall within it.

## PREDATORY PRICING

Turning to practices more likely to be genuinely exclusionary than tying, we'll want to distinguish between those that require the cooperation of a customer to be effective and those that don't. Predatory pricing, with which I begin, depends on the purchasers' willingness to buy from the predator (or the intended victim) at the predatory price; blowing up a competitor's plant, procuring a patent from the Patent Office by fraud, or harassing a competitor with baseless litigation[27] does not. This distinction is important because exclusionary practices that require the cooperation of the excluder's customers or suppliers will often fail because it is not in their interest to cooperate.

Suppose the Standard Oil Trust reduces its price in one market below

26.  15 U.S.C. § 14.
27.  See, e.g., Grip-Pak, Inc. v. Illinois Tool Works, Inc., 694 F.2d 466, 472–73 (7th Cir. 1982).

# EXHIBIT B

# Memorandum of Understanding

This Memorandum of Understanding is entered on March 14, 2007 between 3D Systems Corporation, a Delaware corporation ("3D Systems"), and DataOvation  LLC  dba Tangible Express, a Washington state LLC ("TE" or "Tangible Express"), in order to set forth certain preliminary understandings between the parties.

## 1.  Role of the Parties.

(a)  3D Systems is engaged in the manufacture and sale of equipment and materials, and the provision of services, for rapid prototyping, rapid manufacturing and 3-D printing applications.

(b)  Tangible Express is a service bureau that owns and operates certain 3D Systems' equipment and provides services to companies that seek to use the equipment owned by Tangible Express to, among other things, assist them in designing and fabricating parts.

(c)  Tangible Express desires to enter into a relationship with 3D Systems pursuant to which TE will (i) acquire additional equipment from 3D Systems, (ii) begin to offer a fractional ownership program to its customers and (iii) enter into certain other commitments to 3D Systems, and 3D Systems is willing to enter into these arrangements on the terms and conditions set forth below.

## 2.  Lead Management

3D Systems and Tangible Express would agree to share customer leads developed through their own marketing and communication activities that relate to (a) interest expressed by a person or company in the United States, in the case of 3D Systems, to obtain information about fractional ownership in 3D Systems equipment owned by Tangible Express and (b), in the case of TE, to obtain information about or to acquire any 3D Systems' equipment, materials or parts.

- 3D Systems and Tangible Express agree to work together to agree upon a process for the referral to TE of 3D Systems' customers who express an interest in fractional ownership of TE-owned systems.

2

- Tangible Express may promote and sell fractional ownership to leads provided by 3D Systems. 3D Systems retains the right to sell  services and to make systems' sales to any leads provided by 3D Systems.

- Nothing contained in this arrangement will affect 3D Systems' right to continue to provide parts' leads to its established Preferred Service Provider ("PSP") network.

- 3D Systems, in its sole discretion, may determine to share parts' leads with both Tangible Express and any PSP of 3D Systems' choosing.

- Tangible Express shall keep confidential any leads that 3D Systems provides to TE, and TE may not disclose, transfer or in any other way make them available to any other party, website or lead agency.

- Tangible Express will forward all TE-generated leads that indicate an interest in system or materials purchases or equipment parts' purchases to its 3D Systems' sales representative.

- Tangible Express will be solely responsible for the offer and sale of fractional ownerships, will comply with all applicable laws in connection therewith, including any applicable securities laws, and will indemnify and hold 3D Systems harmless from any loss, liability or expense that 3D Systems may become subject to in connection with the operation of any fractional ownership program conducted by TE.

- Tangible Express will provide 3D Systems, through its sales representative or as otherwise requested from time to time by 3D Systems, with monthly reports listing fractional ownerships sold during previous month and for the year-to-date period during the term of this arrangement.

## 3.  Public Relations

(a)  3D Systems and Tangible Express will cooperate with respect to agreed upon public relations activities the term of this arrangement. Such cooperation will include appropriate articles, news

releases, case studies, speeches and presentations relating to fractional ownerships in 3D Systems' equipment offered by TE.

(b)  As part of these public relations efforts, Tangible Express is not authorized to use 3D Systems' name or any of its trade names or trademarks for any purpose unless it shall have first obtained written approval from 3D Systems' corporate development department for all communications that use or refer in any way to 3D Systems' name or business or any of its trademarks.  3D Systems will provide Tangible Express from time to time with guidelines for the use of its name and trademarks, and whether or not such guidelines shall have been provided to it, Tangible Express shall follow 3D Systems' guidelines in all of its public relations activities.  3D Systems reserves the right to require TE to delete, pull, correct or discontinue the use of any modified, missed or incorrectly used 3D Systems' trademarks.

(c)  As referred to in this Memorandum of Understanding, public relations activities will include hands-on collaboration in the joint preparation and distribution by Tangible Express of:

- Periodic press releases communicating all significant developments such as:

  - Major equipment purchases from 3D Systems;

  - Announcement of the establishment of the relationships provided for in this Memorandum of Understanding or any definitive agreement related to it; and

  - Any other pertinent and significant milestones in the relationship between 3D Systems and TE.

- Case Studies communicating significant achievements in the program contemplated by this Memorandum of Understanding, such as:

  - Efficiency improvements of TE's fractional ownership users;

  - Industries reached and parts built by TE; and

  - Quotes from TE partners.

<u>4</u>

## 4. Marketing/Advertising

(a)  Marketing and advertising activities are defined under this Memorandum of Understanding as any activity by one of the parties that publicly uses the other party's logo, name, trademarks, images, products, etc. for a fee to any third party.

(b)  3D Systems will agree to collaborate with Tangible Express in connection with the following Marketing & Advertising activities:

- Reciprocal access to each other's booths for the purposes of exhibiting capabilities and selling products with the prior written approval of the corporate development department of 3D Systems and where space allows.

- 3D Systems will develop a special Fractional Ownership Provider (FOP) logo for Tangible Express to use in its trade show booth, literature, forms and websites as required.

- Tangible Express is responsible to obtain upfront written approval from the corporate development team of 3D Systems for any collateral, website, flyers, direct mail, ads etc. that would include 3D Systems' trademarks, registered trademarks, images of systems, logos or verbiage referring to the program or 3D Systems in any way.

- Integration of a common look which will include reciprocal use of each other's registered trademarks and logos; provided that such uses and look do not create confusion in the marketplace with respect to 3D Systems and TE as independent businesses.

- 3D Systems and Tangible Express agree to develop reciprocal website links to each other's product website. Such a web page will have dedicated content regarding the FOP program and its appropriate links.

- 3D Systems will plan to support co-advertising activities, to be matched by Tangible Express for the purpose of developing and deploying print ads, web ads and participating in other advertising mediums.

- All advertising activities have to be agreed upon by both

<u>5</u>

parties prior to any commitments, purchases and placements by either party. Written understanding of advertising content, expenses and timing has to be made between 3D Systems' corporate development team and Tangible Express must be reached prior to any commitments or expenses.

- Direct Mail and email blasts containing either party's trademarks, logos or mentions need to have prior approval. The party initiating and managing a direct mail project or an email blast is fully responsible to comply with the law and requirements for such activity, including but not limited to capturing, evaluating, recording and honoring unsubscribe requests received from any recipient of such marketing initiative.

(c)  All marketing and advertising activities such as collateral, forms, etc. require proper use of each other's corporate and trade names and trademarks, and wording require each other's approval prior to printing, publishing or communication; and must not create any confusion in the marketplace with respect to 3D Systems and Tangible Express as independent businesses.

## 5. Service, customer support and training

(a)  As part of the overall agreement covered by this Memorandum of Understanding, 3D Systems expects Tangible Express to enter into an initial 3-year service agreement commitment covering the systems Tangible Express currently owns, leases or otherwise operates as well as each and every additional system purchased or otherwise acquired by Tangible Express during the term of the agreement contemplated by this Memorandum of Understanding.

(b)  3D Systems is prepared to offer the following:

REDACTED
- Dedicated Trained Field Engineer onsite for annual fee  of $          commencing with signing of the agreement.

  o  3D Systems will review utilization, efficiency, etc. of this dedicated engineer after a 12-month period (from the beginning of this Memorandum of Understanding) and solely decide the continuation of such dedicated person.

6

- o Tangible Express will be notified of 3D Systems' decision to extend or discontinue a dedicated on -site engineer within 30 days after the 12 month period.

- Annual Service Agreement per installed system:
  - o Viper™ PRO S: $
  - o Viper™ PRO D: $
  - o Viper™: $
  - o Sinterstation® HiQ™: $
  - o Sinterstation® HiQ™HS: $

- Key spare parts consigned onsite for a monthly fee of $

- Purchase spare parts for TE's own use at    % discount off list price.

- Unlimited use of hotline under the annual service agreement.

REDACTED

- Free software upgrades under the annual service agreement.

- Free monthly application engineering professional visit for process improvement under the service agreement.

- Parts' building back-up capacity through 3D Systems' Rapid Manufacturing Center ("RMC") at $    per cubic inch (for current Tangible Express utilized materials). Back-up capacity will be determined by 3D Systems based on availability and other obligations.

  - o Tangible Express has to request back-up capacity from 3D Systems' Rapid Manufacturer Center (RMC) Manager who will determine capacity availability.

## 6. Materials and Supplies

(a)    Under the agreement contemplated by this Memorandum of Understanding, 3D Systems expects Tangible Express to purchase all of its materials for the operation and service of the 3D Systems' machines owned or otherwise operated by Tangible Express directly from 3D Systems at 3D Systems' list prices and standard terms and conditions except as otherwise provided below:

7

Current Pricing for 3D Systems' Supplied Resins and Powders: Discount     % off current list price.

3D Systems Supplied Resins

| Volume/kg | % off current list price |
|-----------|--------------------------|
| 500+ | % |
| 1,000+ | % |
| 2,000+ | % |

REDACTED

3D Systems Supplied Powders

| Volume/lbs | % off current list price |
|------------|--------------------------|
| 2,000-4,000 | % |
| 4,000-6,000 | % |
| 6,000+ | % |

(b)  As mentioned above, 3D Systems will consign and store certain critical spare parts at Tangible Express in a caged store subject to the monitoring and control of a full time, onsite 3D Systems employee.  Tangible Express will at all times cooperate with 3D Systems in the maintenance of such inventory of spare parts in a manner that will enable 3D Systems to properly account for such inventory and changes in it.

(c)  3D Systems will undertake to deliver, within its published lead times, all materials timely ordered by Tangible Express.

## 7.  IT Systems

3D Systems will endeavor to work with Tangible Express on TE's IT infrastructure in an advisory role.  3D Systems agrees to share its own experience, to the extent that it is not confidential or proprietary, with Tangible Express as well as to identify and develop future architecture for seamless transactional integration for transactions between 3D Systems and Tangible Express during the term of the agreement contemplated by this Memorandum of Understanding.

## 8.  Scope, Term and Termination

(a)  The agreement contemplated by this Memorandum of Understanding will have an initial 2-year term and will apply to the United States only.

8

(b)    Tangible Express undertakes to do the following during the initial term:

- To purchase from 3D Systems a minimum of 6 Viper™ Pro Dual Vat SLA® Systems, one Viper™ Si on 3D Systems' customary payment terms but with a discount per machine of    % off list price.

- To purchase from 3D Systems a minimum of 3 Sinterstation® HiQ™ HS SLS® Systems on 3D Systems' customary payment terms but with a discount per machine of    % off list price.

- To pay to 3D Systems a late system release for shipment penalty of $           per system per month, to be paid commencing on the first day of the following month and until a committed system is released by Tangible Express for shipment.

- To purchase from 3D Systems all of its Accura® and/or DSM material as per agreed upon 3D Systems' terms and conditions.

- To purchase from 3D Systems all of its DuraForm® material as per agreed upon 3D Systems' terms and conditions.

- To purchase  all its maintenance and repair requirements from 3D Systems as outlined above after giving effect to first-year systems' warranty on each new system purchased but excluding in each case the dedicated, onsite field engineer's fee.

- To promote its additive manufacturing technology fractional ownership capabilities exclusively with 3D Systems and with only 3D Systems machines and materials.

REDACTED

(c)  In consideration of Tangible Express' commitments set forth in this Section 8 and, subject to TE's performance of those commitments, 3D Systems would agree to designate Tangible Express as its sole Fractional Ownership Provider for the duration of the initial term of the agreement.

9

## 9. Conditions

This Memorandum of Understanding sets forth the parties' preliminary understanding with respect to the subject matter hereof and is subject to the negotiation, execution and delivery of definitive documentation and to the obtaining of any necessary corporate or other approvals.

IN WITNESS WHEREOF, the parties have executed this Memorandum of Understanding as of the date first set forth above.

3D SYSTEMS CORPORATION

By _____ 3/14/07

Name:
Title:

TANGIBLE EXPRESS LLC

By _____

Name: Alex Linde
Title: President & COO