**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DSM DESOTECH INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Case No. 08 C 1531 |
| v. | ) | |
| | ) | Judge Lefkow |
| 3D SYSTEMS CORPORATION and 3D | ) | |
| SYSTEMS, INC., | ) | Magistrate Judge Keys |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF DSM DESOTECH INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO 3D SYSTEMS'
MOTION TO DISMISS DESOTECH'S ANTITRUST AND STATE LAW CLAIMS**

Bruce M. Gagala
Jeffrey B. Burgan
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
80 North Stetson Avenue
Chicago, Illinois 60601
(312) 616-5600
(312) 616-5700 – fax

Andrew S. Marovitz
Britt M. Miller
Thomas V. Panoff
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 – fax

*Attorneys for DSM Desotech Inc.*

Dated: July 8, 2007

# TABLE OF CONTENTS

I.  Introduction ................................................................................................................. 1

II.  Desotech's Complaint Satisfies *Twombly* .......................................................... 2

III.  Desotech Properly Alleges Tying (Counts I & II) ............................................. 5

    A.  Desotech Adequately Pleads all Elements of a Tying Claim ............... 6

        1.  Desotech Alleges Two Distinct Products ................................... 6

        2.  Desotech Alleges Sufficient Market Power by 3DS ................ 7

            a.  Desotech Alleges 3DS Has Market Power in the Tying Market ....................................................................................... 7

            b.  Desotech Alleges 3DS Has Market Power in the Tied Market ..................................................................................... 11

            c.  Desotech Alleges Coercion Even Though It Is Not a Required Element of a Tying Claim. ......................................... 13

                i.  Coercion Is Not Required When an Express Tie Is Alleged ........................................................................ 13

                ii.  The Complaint Alleges Coercion .................................... 15

            d.  3DS's Motion Improperly Relies on Summary Judgment Decisions Based upon Developed Factual Records .................... 16

            e.  3DS Cannot Demonstrate at the Motion To Dismiss Stage that Its Conduct Is More Procompetitive than Anticompetitive ............................................................................. 19

        3.  3DS Has Foreclosed Substantial Commerce in the Tied Market ........... 20

        4.  3DS Has an Economic Interest in Sales of Tied Product ......................... 22

    B.  Desotech Adequately Pleads Violations under the Rule of Reason ................... 22

IV.  Desotech Plainly Alleges Antitrust Injury ....................................................... 25

V.  Desotech Properly Alleges Attempted Monopolization (Count IV) ............................... 26

VI.  Desotech Properly Alleges Violations of the Illinois Antitrust Act (Count V) .............. 29

VII.  Desotech Properly Alleges Violations of the Illinois Deceptive Trade Practices Act (Count VI) ........................................................................................................ 29

VIII.  Desotech Properly Alleges Tortious Interference with Prospective Economic Advantage (Count VII) .............................................................................................. 31

IX.  Conclusion ......................................................................................................... 35

# TABLE OF AUTHORITIES

## <u>Cases</u>

*A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546 (7th Cir. 1992) ............ 11, 12, 13

*Ali v. Shaw*, 481 F.3d 942 (7th Cir. 2007) .................................................................. 31

*Am. Floral Serv. Inc.* v. *Florists Transworld Delivery Assn. & Teleflora, Inc.*,
    633 F. Supp. 201 (N.D. Ill. 1986) ....................................................................... 12

*Amerinet, Inc.  v. Xerox Corp.*, 972 F.2d 1483 (8th  Cir. 1992) ................................... 14

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...................................... *passim*

*Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123 (6th Cir. 1981) ................................. 20

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ............................................................................. 13

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) ........................................... 14

*Bogus v. Am. Speech & Hearing Ass'n*, 582 F.2d 277 (3d Cir. 1978)......................... 14

*Broadway Delivery Corp. v. UPS of Am., Inc.*, 651 F.2d 122 (2d Cir. 1981) ............. 11

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)...................... 3

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .................... 16, 25

*Builders Square, Inc. v. Illgross Partners & Co., Ltd.*, 1994 WL 549020
    (N.D. Ill. Oct. 5, 1994)....................................................................................... 34

*Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272 (7th Cir. 1983) .......................... 2

*Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727 (9th Cir. 1979) ............. 17, 18

*Candalaus Chicago, Inc. v. Evans Mill Supply Co.*, 51 Ill. App. 3d 38,
    366 N.E.2d 319 (1st Dist. 1977) ........................................................................ 33

*Cia. Petrolera Caribe v. Avis Rental Car Corp.*, 735 F.2d 636 (1st Cir. 1984) ........................... 14

*Collins v. Associated Pathologists, Ltd.*, 676 F. Supp. 1388 (C.D. Ill. 1987), *aff'd*, 844 F.2d
    473 (7th Cir. 1988)............................................................................................. 29

*Compuware Corp. v. IBM*, 259 F. Supp. 2d 597 (E.D. Mich. 2002)........................... 28

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) .................... 6

# TABLE OF AUTHORITIES
(continued)

**Page**

*CSR Ltd. v. Federal Ins. Co.*, 40 F. Supp. 2d 559 (D.N.J. 1998)....................................24

*Data Gen. Corp. v. Gumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994) ..........................14

*Delloma v. Consol. Coal Co.*, 996 F.2d 168 (7th Cir. 1993) ........................................34

*Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 816 N.E.2d 754
(1st Dist. 2004)........................................................31

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) .........................*passim*

*Erickson v. Pardus*, 127 S. Ct. 2197 (2007) ..............................................3

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) ....................................7

*Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986)...................................33

*Fortner Enters., Inc. v. United States Steel Corp.,* 394 U.S. 495 (1965)........................21

*Francorp, Inc. v. Siebert*, 211 F. Supp. 2d 1051 (N.D. Ill. 2002)............................31

*Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998 (S.D. Tex. 1997) ..................26

*Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000  (9th Cir. 2003),
*amended on denial of rehearing*, 352 F.3d 367 (9th Cir. 2003) ..........................26

*Glendora v. Gannett Co., Inc.*, 858 F. Supp. 369 (S.D.N.Y.), *aff'd mem.*, 40 F.3d 1238
(2d Cir. 1994)....................................................8

*Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954 (N.D. Ill. 2007)..................33

*Hardy v. City Optical, Inc.*, 39 F.3d 765 (7th Cir. 1994)..............................9, 12

*HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543 (8th Cir. 2007)..........11, 16, 17, 24, 25

*High Fructose Corn Syrup Antitrust Litig., In re,* 261 F. Supp. 2d 1017 (C.D. Ill. 2003) ............6

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738 (1976) ..........................2

*Ill. Tool  Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ....................1, 5, 11

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir. 1989)..................12

*JamSports & Entm't, LLC v. Paradama Prod., Inc.*, 2003 WL 1873563
(N.D. Ill. Apr. 15, 2003) ..........................................10

## TABLE OF AUTHORITIES
(continued)

**Page**

*JamSports & Entm't, LLC v. Paradama Prod., Inc.*, 336 F. Supp. 2d 824 (N.D. Ill. 2004) ........ 33

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) .................................................. 20

*Jewel Tea Co. v. United States*, 274 F. 2d 217 (7th Cir. 1960) .................................................. 24

*Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861 (D. Del. 1987) .............................................. 14

*Ken-Pin, Inc. v. Vantage Bowling Corp.*, 2004 WL 783092 (N.D. Ill. Jan. 20, 2004) ................ 33

*L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632
    (N.D. Ill. 1997).......................................................................................................... 12, 27, 28

*Laserworks v. Pitney Bowes, Inc.*, 1999 WL 33435671 (S.D. Ohio Dec. 29, 1999)............. 14, 20

*M & R Printing Equip., Inc. v. Anatol Equip. Mfg. Co.*, 321 F. Supp. 2d 949
    (N.D. Ill. 2004)........................................................................................................................ 31

*Martino v. McDonald's Sys., Inc.*, 81 F.R.D. 81 (N.D. Ill. 1979) .............................................. 14

*Marts v. Xerox, Inc.*, 77 F.3d 1109 (8th Cir. 1996) .................................................................... 17

*MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081 (7th Cir. 1983) ........................................... 6

*McLaughlin Equip. Co. v. Servaas*, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) ..................... 13

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967 (7th Cir. 1995)...................... 10

*Nat'l Black Expo v. Clear Channel Broadcasting, Inc.*, 2007 WL 495307
    (N.D. Ill. Feb. 8, 2007)........................................................................................................... 10

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d
    1048 (D. Colo. 2004) .............................................................................................................. 28

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821 (7th Cir. 1978)................................ 22

*Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712 (7th Cir. 1987) ........................ 11

*People ex rel. Scott v. Schwulst Bldg. Center, Inc.*, 89 Ill. 2d 365, 432 N.E.2d 855 (1982) ........ 29

*PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997) ................................... 19

*Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312 (7th Cir. 2006) .................................... 6, 11, 20

*Sheridan v. Marathon Petroleum Co. LLC*, 2008 WL 2486581
    (7th Cir. June 23, 2008) ..................................................................................................... *passim*

## TABLE OF AUTHORITIES
(continued)

**Page**

*Soderlund Bros. v. Carrier Corp.*, 278 Ill. App. 3d 606, 663 N.E.2d 1(1st Dist. 1995).............. 33

*Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447 (1993) ............................................ 27

*Southeastern Milk Antitrust Litig.*, *In re*, 2008 WL 2117159 (E.D. Tenn. May 20, 2008) ........... 1

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008)...................................... 3, 5, 15

*Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407 (11th Cir. 1987) ............. 14, 21

*Times-Picayune Publ'g Corp. v. United States*, 345 U.S. 594 (1953)......................... 13

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ......................................... 7, 8

*United States Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623 (7th Cir. 2003).................... 25

*United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172 (D.R.I. 1996) ........................ 24

*United States  v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) ........................................ 18

*Waldo v. N. Am. Van Lines, Inc.*, 669 F. Supp. 722 (W.D. Pa. 1987) ........................... 14

*Will v. Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir. 1985)................................ 9, 12

*Xerox Corp. v. Media Sci. Int'l, Inc.*, 511 F. Supp. 2d 372 (S.D.N.Y. 2007).............. 8, 16, 18, 19

## Rules

Fed. R. Civ. P. 8(a)(2).......................................................................... 3, 35

Fed. R. Civ. P. 12(b)(6)......................................................................... 2, 35

## Statutes

740 ILCS 10/3................................................................................. 29

740 ILCS 10/3(4).............................................................................. 29

740 ILCS 10/11............................................................................... 29

815 ILCS 510/2(a)(7).......................................................................... 29

815 ILCS 510/2(a)(8)....................................................................... 30, 31

815 ILCS 510/2(b)............................................................................. 31

## I.    Introduction

From its first pages, 3DS's motion to dismiss Desotech's Amended Complaint[1] fundamentally misapprehends the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). 3DS reads *Twombly* to require a plaintiff to script its entire case, with specific facts and specific evidence, before the first Rule 16 conference has taken place. Recognizing that this level of factual pleading "could rarely, if ever, be met by a plaintiff in an antitrust case before discovery," a federal court faced with a similar motion earlier this year observed that "[a]rguing that plaintiffs have not pleaded sufficient facts appears to have become the mantra of defendants in antitrust cases." *In re Southeastern Milk Antitrust Litig.*, 2008 WL 2117159, at *11 n.7 (E.D. Tenn. May 20, 2008) (denying motion to dismiss). The court recognized that *Twombly* "was not intended as a shield to be used by antitrust defendants to defeat even a meritorious claim." *Id.*

Because Desotech's 29-page Complaint easily satisfies all relevant pleading requirements under applicable federal antitrust and state law, and adds a high-level of factual detail as well, 3DS is forced, from the very inception of its brief: 1) to suggest that tying is no longer a viable antitrust claim; and (2) to argue the purported reasonableness of its conduct. 3DS's first point would surprise the Supreme Court and Seventh Circuit (which both recently confirmed the viability of tying claims: *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Sheridan v. Marathon Petroleum Co. LLC*, 2008 WL 2486581 (7th Cir. June 23, 2008) (Posner, J.)); its second point—its argument about the facts—is appropriate for trial, not a motion to dismiss.

---

[1]   As used in this memorandum, "3DS" collectively refers to defendants 3D Systems Corporation and 3D Systems, Inc.; "Desotech" refers to plaintiff DSM Desotech Inc.; and "Complaint" or "Compl." refers to the Amended Complaint (Dkt. 21).

Desotech's Complaint contains far more facts than necessary under Rule 12(b)(6). *Twombly*, 127 S. Ct. at 1964 ("a complaint attacked by a Rule 12(b)(6) motion to dismiss *does not need detailed factual allegations*") (emphasis added). Complaints are not required to lay out *all* the evidence that will be elicited in discovery and used at trial; indeed, "in antitrust cases, where 'the proof is largely in the hands of the alleged [wrongdoer],' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (citation omitted); *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1282 (7th Cir. 1983) (same).

Desotech has filed a Complaint that more than satisfies the pleading standards articulated last year in *Twombly*. 127 S. Ct. at 1974. 3DS's motion to dismiss should be denied.

## II.    Desotech's Complaint Satisfies *Twombly*.

Before specifically demonstrating that Desotech properly alleges the elements of each cause of action in its Complaint, it is important to address the central flaw in 3DS's overall analysis: its misapplication of *Twombly*. In *Twombly*, plaintiffs for a putative class, consisting of 90% of all local telephone and Internet subscribers in the continental United States, alleged that Incumbent Local Exchange Carriers conspired to inflate prices charged to customers and prevented entry into the market by potential competitors. 127 S. Ct. at 1962-63. Rather than allege facts supporting an actual agreement to conspire, the plaintiffs in *Twombly* alleged that such an agreement could be *inferred* from the "'absence of any meaningful competition … in one another's markets, and in light of the parallel course of conduct.'" *Id*. In other words, the *Twombly* plaintiffs attempted to allege a positive (*i.e.*, the existence of a conspiratorial agreement) by relying on a negative (*i.e.*, the absence of competition) and an antitrust theory based upon parallel conduct that courts have long held is often equally consistent with

procompetitive behavior. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) ("conscious parallelism" is "not in itself unlawful").

The Supreme Court rejected the *Twombly* plaintiffs' approach, holding that their "bare assertion of conspiracy" without accompanying facts was insufficient under Rule 8(a)(2) to give the defendants "fair notice" as to plaintiffs' claims. 127 S. Ct. at 1966.  Although the Supreme Court held that "fair notice" requires a plaintiff to allege a "*plausible*" cause of action, the Court emphasized that it was not requiring "heightened fact pleading of specifics."  *Id.* at 1974 (emphasis added); *Sheridan*, 2008 WL 2486581, at *6 (plaintiff need only "allege a plausible theory of antitrust illegality").

Just two weeks after deciding *Twombly*, the Supreme Court reiterated this point in *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (complaint needs only "'a short and plain statement of the claim showing that the pleader is entitled to relief.'  *Specific facts are not necessary*.") (emphasis added).  The Seventh Circuit has since echoed this same admonition, cautioning that *Twombly* "'must not be overread'" and that the decision "made clear that it did not, in fact, supplant the basic notice-pleading standard."  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (denying motion to dismiss).  As the Supreme Court explained, the plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [behavior]."  127 S. Ct. at 1965.  Desotech has more than met this requirement: here, the Complaint's specific allegations (*see, e.g., infra* at 4-5) stand in stark contrast to the inferences required to be drawn in *Twombly*.

Even though Desotech was not required to allege specific facts in support of its causes of action, *Erickson*, 127 S. Ct. at 2200, it did so throughout its 29-page Complaint.  Unlike the

boilerplate allegations contained in *Twombly*, Desotech's Complaint provides the who, what, where, when and how of Desotech's claims. For example, the Complaint alleges that:

- In a June 4, 2007 email from Lee Dockstader, Vice President of 3DS, to David Yarnell, Director of Rapid Prototyping at Dynacept, Dockstader told Yarnell that using Desotech's resins would render the Viper™ Pro SLA® System ("Viper Pro") machine inoperable, even though Dynacept had used Desotech resins in its Viper Pro machine for years without quality problems. Compl. ¶ 61.

- In August 2007, 3DS refused to service a Viper Pro owned by Dynacept Company, Inc. unless Dynacept agreed to stop purchasing its resins from Desotech. *Id.* ¶ 63.

- In mid-2007, 3DS pressured Lockheed Martin into purchasing a Viper Pro by refusing to service an older stereolithography ("SL") machine and requiring Lockheed to purchase resins exclusively from 3DS as a condition to purchasing the Viper Pro. *Id.* ¶¶ 65-67.

- In March 2007, 3DS required Tangible Express to purchase its resin exclusively from 3DS upon buying six Viper Pro machines from 3DS. *Id.* ¶ 68.

- In August 2007, 3DS required AP Proto to begin purchasing its resins exclusively from 3DS when AP Proto traded-in an older SL machine for a Viper Pro. *Id.* ¶¶ 69-70.

- 3DS engaged in similar anticompetitive conduct with Express Pattern Inc., *id.*. ¶¶ 56-59 (prohibiting the use of the Desotech ProtoCast™ AF 19120 resin it desires), and National RP Support, Inc. *Id.* ¶ 72 (February 2008 email from Dennis Fogle of National RP Support to John Schaefer of Desotech informing Schaefer that National RP Support agreed with 3DS not to service machines using non-3DS distributed resins).

These specific allegations, as well as the more general allegations of anticompetitive behavior (*e.g., id.* ¶¶ 5, 9, 40-42), are more than sufficient to give 3DS "fair notice" of

Desotech's more-than-plausible claims.  *Tamayo*, 526 F.3d at 1083 (in antitrust cases, while a "fuller set of factual allegations may be necessary to show that relief is plausible," *Twombly* prevents only "largely groundless claim[s]" from proceeding to discovery).  And these are just a few examples of the anticompetitive conduct that will come to light during discovery.

3DS remarkably acknowledges the necessity of discovery (and the futility of its motion) by suggesting that the full extent of the relevant facts regarding its alleged anticompetitive behavior are as yet unknown.  Br. at 9 ("For example, *if* that 'pressure' was simply a discount on resins to get Lockheed to agree to a package deal, no tying occurred.") (emphasis added).  As 3DS is the only party to the litigation currently privy to this information, there is some irony in its decision to argue that the Complaint should be dismissed for Desotech's failure to divine more specific facts from documents 3DS has not yet produced and witnesses 3DS has not yet tendered.  Even without these resources, Desotech has alleged more than enough facts to create a "reasonable expectation" that discovery will "reveal evidence" of the alleged anticompetitive conduct.  *Twombly*, 127 S. Ct. at 1965; *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 458, 464 (1992) (affirming denial of summary judgment in light of Kodak's "pressure" on equipment owners).

## III.    Desotech Properly Alleges Tying (Counts I & II).

3DS's report of the death of tying claims in American jurisprudence (Br. at 1) is premature.  Just two weeks ago, the Seventh Circuit explained that the Supreme Court "has not discarded the tying rule, and we have no authority to do so."  *Sheridan*, 2008 WL 2486581, at *3 (citing *Ill. Tool Works*, 547 U.S. at 42-43, which held certain tying arrangements—like those alleged in Desotech's Complaint—"are still unlawful").  Further, 3DS's attempt to dismember Desotech's tying claims in piecemeal fashion by leaping from fact to fact without ever addressing the overall nature of Desotech's allegations is the kind of approach that has been

roundly criticized by courts in antitrust cases. *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1190-91 (7th Cir. 1983) ("'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each'") (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *In re High Fructose Corn Syrup Antitrust Litig.*, 261 F. Supp. 2d 1017, 1021 (C.D. Ill. 2003) (same). Taken as a whole, the Complaint pleads all required elements of tying.

### A.    Desotech Adequately Pleads all Elements of a Tying Claim.

Because 3DS's brief did not detail the actual elements of a tying claim—the proper focus of any Rule 12(b)(6) motion—we do so here. A plaintiff bringing a Section 1 tying claim must plead four elements: (1) tying between two distinct products or services; (2) sufficient economic power by defendant in the tying market to appreciably restrain competition in the market for the tied product; (3) a not insubstantial amount of interstate commerce is affected; and (4) an economic interest by the tying seller in the sale of the tied product. *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316-17 (7th Cir. 2006).[2] Each of these elements is easily satisfied.

### 1.    Desotech Alleges Two Distinct Products.

The test for whether two products in a tying agreement are separate is whether customers view them as such. *Kodak,* 504 U.S. at 462 ("to be considered two distinct products, there must be sufficient consumer demand" for the products separately). Desotech's Complaint plainly alleges that large-frame SL machines and the resins used in those machines are distinct products because "[c]ustomers view SL machines and the resins used in those machines as two distinct products … [and] buy resin from resin suppliers other than 3DS." Compl. ¶ 28; *see id.* ¶ 38

---

[2]    The process of evaluating tying claims under the Sherman and Clayton Acts is identical. *Sheridan*, 2008 WL 2486581, at *1 ("the standards for adjudicating tying under the two statutes are now recognized to be the same").

("many customers prefer to use [Desotech's] resins in their Viper Pro machines due to their high performance quality"); ¶ 48 ("customers who have purchased resin from Desotech have expressly stated a preference for [its] resins"); ¶¶ 49-51 (3DS once distributed Desotech's resins along with its own); ¶ 59 ("Express Pattern has expressed to Desotech its desire to continue to purchase Somos resins from Desotech"); ¶ 62 (Dynacept preferred to use Desotech resins); ¶ 67 ("Lockheed has stated that it would prefer to use Desotech's Somos 12120 resin in its Viper Pro"); ¶ 69 (oral commitment from AP Proto to buy Desotech resin).  In short, Desotech has alleged ample facts that large-frame SL machines and resins are distinct products.  *Kodak*, 504 U.S. at 462 (evidence that the two items "have been sold separately in the past" is sufficient to demonstrate distinct products).

### 2.    Desotech Alleges Sufficient Market Power by 3DS.

#### a.    Desotech Alleges 3DS Has Market Power in the Tying Market.

Market power "is key" in any tying analysis.  *Sheridan*, 2008 WL 2486581, at *2.  Market power is the ability "to force a purchaser to do something that he would not do in a competitive market," and is characterized as a producer's ability to "raise price" or "restrict output."  *Kodak*, 504 U.S. at 464 (internal quotation marks omitted).  There are at least two distinct indicia of market power:  (1) "evidence of anticompetitive effects"; or (2) if the defendant's market share "exceeds whatever threshold is important for the practice in the case."  *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).  Desotech alleges under *both* methods that 3DS has market power.

First, Desotech's Complaint alleges sufficient market power by outlining evidence of anticompetitive effects.  For example, Desotech alleges that, "[a]fter a significant amount of

pressure," 3DS refused to sell a Viper Pro to Lockheed Martin unless it purchased its resins exclusively from 3DS, which Lockheed Martin eventually did.  Compl. ¶ 66.  3DS  engaged in similar conduct with Tangible Express, *id.* ¶ 68, and AP Proto, *id.* ¶ 70.  Not only has this anticompetitive behavior by 3DS discouraged innovation and dissuaded entry into the market, but it has reduced output by limiting the number of resins available to customers.  *Id.* ¶¶ 77, 78 ("resin [purchasers] will have a substantially smaller selection of resins from which to make their end products.  Given the lack of viable substitutes and unlikelihood of new entrants, 3DS will be able to raise prices and restrict output, thereby harming overall consumer welfare.").   The anticompetitive effect on specific customers is clear.  *Id.* ¶¶ 58-59 (Express Pattern can no longer use the ProtoCast™ AF 19120 resin it desires); ¶ 62 (Dynacept can no longer use the ProtoGen™ O-XT 18420 resin it prefers); ¶ 67 (Lockheed can no longer use Desotech's Somos 12120 resin); ¶ 73 (non-3DS resins available to customers reduced from over *forty* to *two*).  Courts have routinely held that the "federal antitrust laws seek to maximize consumer choice."  *Glendora v. Gannett Co.,*  858 F. Supp. 369, 371 (S.D.N.Y.), *aff'd mem.*, 40 F.3d 1238 (2d Cir. 1994); *see Xerox Corp. v. Media Sci. Int'l, Inc.*, 511 F. Supp. 2d 372, 381 (S.D.N.Y. 2007) ("[O]ffering consumers fewer choices … is exactly the type [of injury] that antitrust laws were designed to prevent ….").

Second, the Complaint alleges that 3DS's market share in the tying market exceeds the relevant "threshold."  *See Toys "R" Us,* 221 F.3d at 937.  Citing 3DS's intellectual property and barriers to entry, Desotech plainly alleges that "3DS dominates the market for large-frame SL machines," Compl. ¶¶ 4, 24, that "there is no large-frame SL machine manufacturer in the United States other than 3DS," *id.* ¶¶ 4, 29, and that "3DS maintains sufficient market power—the ability to raise prices above those charged in a competitive market or to exclude competition—in

the market for large-frame SL machines given its patent and other intellectual property related protections, among other factors." *Id.* ¶ 84.   Considering 3DS's market share of nearly 100% (given the absence of any competitors), one wonders how 3DS can plausibly argue (Br. at 15-17) that the Complaint fails to allege market power in the tying market.  *Hardy v. City Optical, Inc.*, 39 F.3d 765, 767 (7th Cir. 1994) (Posner, J.) (30% market share is "the minimum market share from which the market power required to be shown at the threshold of a tying case can be inferred"); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 672 (7th Cir. 1985) (same).

The importance of 3DS's monopolist market share was confirmed by the Seventh Circuit's analysis just last month in *Sheridan*.   There, in contrast to Desotech's specific allegations of 3DS's near 100% market share and market power, the Court affirmed dismissal of a complaint that contained "no information" about market share and instead made the "naked assertion" that defendant Marathon had "appreciable economic power."   2008 WL 2486581, at *4.   Marathon's 4.3% market share (a number the Court found only after searching a U.S. Department of Energy website) is "no one's idea of market power."  *Id.; compare* 2008 WL 2486581, at *5 (observing Sheridan's failure to allege monopolistic competition) *with* Compl. ¶¶ 4, 24, 29, 84 (repeatedly and specifically alleging that 3DS "dominates" the tying market and has near 100% market share).   Further, unlike *Sheridan*, the Complaint here plainly alleges that 3DS's Viper Pro customers have been barred from using competitive resins.  *See, e.g.*, Compl. ¶¶ 66, 68-70.   The opposite was true in *Sheridan*, where Marathon dealers were not prohibited from using competitive credit card processing services so long as they also used Marathon's. 2008 WL 2486581, at *1.   Judge Posner explained that this wasn't tying at all:

> To call this tying would be like saying that a manufacturer of automobiles who sells tires with his cars is engaged in tying because, although the buyer is free to buy tires from someone else, he is unlikely to do so, having paid for the tires supplied by the car's manufacturer.

2008 WL 2486581, at *5. Compare that situation to 3DS's anticompetitive conduct here, where 3DS has expressly barred its Viper Pro customers from using Somos resins and has enforced that bar by threatening to shut down their machines if they do. This situation (to borrow from Judge Posner's analogy) is tantamount to a monopolist automobile manufacturer requiring potential customers to swear that they will never install a competitor's tires, and mounting a device in the ignition [a/k/a the "RFID" (radio frequency identification) feature] to prevent the car from starting if a customer tries to install Michelins. That is classic tying.

Because both the pleadings and the law preclude dismissal, 3DS tries to expand the market defined by the Complaint—and thereby reduce its market power—by claiming that other technologies should be considered in the market. Br. at 16-17. But 3DS cannot garner a dismissal by disputing the facts. The Complaint details why the tying market is properly defined as large-frame SL machines, clearly differentiating other Rapid Prototyping technologies such as Laser Sintering, Fused Deposition Modeling, Digital Light Processing and 3D printers. Compl. ¶ 22. 3DS may disagree with this fact-intensive market definition, but "whether the market described is the relevant one or not is a determination of fact not proper for disposal on a motion to dismiss." *Nat'l Black Expo v. Clear Channel Broadcasting, Inc.*, 2007 WL 495307, at *9 (N.D. Ill. Feb. 8, 2007); *see Kodak*, 504 U.S. at 482 ("The proper market definition in this case can be determined only after a factual inquiry"); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 976-77 (7th Cir. 1995) (reversing dismissal of Sherman Act claim for failure to plead specific facts of market definition); *JamSports & Entm't, LLC v. Paradama Prod., Inc.*, 2003 WL 1873563, at *6 (N.D. Ill. Apr. 15, 2003) ("Market definition, however, involves a deeply fact-intensive inquiry … and for this reason a court must be hesitant to grant a motion to dismiss for failure to plead a relevant market."). 3DS's own cases (*see* Br. at 9, 13,

24) make exactly this point. *See, e.g.*, *HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007) ("The relevant product market is a question of fact"). In sum, whether one looks at 3DS's near 100% market share or the "anticompetitive effects" of its behavior, it is obvious that Desotech properly alleged 3DS's market power in the tying market.[3]

### b.    Desotech Alleges 3DS Has Market Power in the Tied Market.

3DS argues that it neither has market power in the tied market nor is there a substantial danger that it will acquire such market power. Br. at 18-22. Even assuming, *arguendo*, that the Seventh Circuit requires market power in the tied market as an element of a tying claim—a dubious assumption[4]—Desotech adequately alleges that 3DS has such power.

In disavowing its market power in the tied resin market, 3DS claims that "50 percent share is legally insufficient, alone, to establish monopoly power." Br. at 18. That argument is specious for two reasons. First, 3DS's use of market share as a proxy for market power is an evidentiary point, not a pleading point. Market share above a certain threshold constitutes prima facie *evidence* of market power (and a jury can be so instructed); it does not mean that market share under that threshold precludes a finding of market power if other *evidence* is presented. *Broadway Delivery Corp. v. UPS of Am., Inc.*, 651 F.2d 122, 128 (2d Cir. 1981) ("the [Supreme] Court has reaffirmed its unwillingness to base market power determinations simply on market

---

[3]  3DS's reliance on *Illinois Tool Works* completely undermines its motion. Br. at 1. In *Illinois Tool Works*, the Supreme Court held that a patent does not automatically give rise to a *presumption* of market power. 547 U.S. at 42-43. Instead, it "must be supported by *proof* of power in the relevant market." *Id.* at 43 (emphasis added). The Supreme Court remanded the case (*which reached the Court in the context of a summary judgment motion*) so that the respondent could "be given a fair opportunity *to develop and introduce evidence*" as to market power, *id.* at 46 (emphasis added), thereby acknowledging that market power is not properly resolved on a motion to dismiss.

[4]  *Compare Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 719 (7th Cir. 1987) ("[T]he requirement that there be a threat of market power in the tied product has not been endorsed … by a Supreme Court majority"), *Reifert*, 450 F.3d at 316 (in 2006, not listing market power in tied market as an element of a tying claim), and *Sheridan*, 2008 WL 2486581 (in 2008, examining market power in tying market, not tied market), *with A.O. Smith*

share data, preferring to treat market share as strong, perhaps *presumptive, evidence* of the presence or absence of market power, *subject to bolstering or rebuttal by other evidence*") (emphasis added); *L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632, 637 (N.D. Ill. 1997) ("'market share is at best an indicator of market power'") (quoting *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989)); *Am. Floral Serv. Inc. v. Florists Transworld Delivery Assn. & Teleflora, Inc.*, 633 F. Supp. 201, 221 (N.D. Ill. 1986) ("market share is at best a proxy for market power"). 3DS's attempt to use a 50% market share percentage alone as a dispositive indicator of market power would be improper on summary judgment or at trial. Its attempt to do so here on a motion to dismiss is especially misguided.

Second, the Seventh Circuit has consistently held that *market* power can be inferred from a market share of at least 30%. *Hardy*, 39 F.3d at 767 (30% market share is "the minimum market share from which the market power required to be shown at the threshold of a tying case can be inferred"); *Will*, 776 F.2d at 672 (same). Desotech's Complaint alleges that 3DS currently has a 50% market share in the large-frame SL resin market and that its market share is *growing* based on its anticompetitive conduct. Compl. ¶ 9 ("growing market share of over 50%"), ¶ 46 ("3DS's market share has grown while it has engaged in its anticompetitive conduct."), ¶104 ("present and growing control over approximately 50% of the market"). By asserting that "Desotech has failed to allege that 3D Systems' practices have enhanced or increased its market power in the tied market," Br. at 19, 3DS pretends that ¶¶ 9, 46, and 104 and other similar paragraphs of the Complaint do not exist. And 3DS's repeated statement that market shares in the tied market are static is contradicted not only by the actual allegations of the

---

*Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546, 551-52 (7th Cir. 1992) (market power in tied market was mentioned in 1985).

Complaint, but also by 3DS's own argument that the sales and market share Desotech lost to 3DS do not amount to antitrust injuries. Br. at 25 ("Desotech has simply alleged that it lost business to 3D Systems"). Not surprisingly, 3DS shifts focus to the *past* instead of addressing the Complaint's allegations about the present and future states of the marketplace as a result of 3DS's anticompetitive conduct. 3DS's approach is like a tortfeasor arguing against liability because the victim was healthy before he was injured.

Finally, 3DS's focus on *monopoly* power (Br. at 18-19) to the exclusion of *market* power is misguided, as demonstrated by the very cases on which 3DS relies in its brief. *A.O. Smith*, 979 F.2d at 550-51 (discussing *market* power in tied market); *McLaughlin Equip. Co. v. Servaas*, 2004 WL 1629603, at *24 (S.D. Ind. Feb. 18, 2004) (same); *see also Sheridan*, 2008 WL 2486581, at *3 ("'*market* power' is key") (emphasis added).[5] As the Supreme Court has stated, "[m]onopoly power under § 2 requires, of course, something greater than market power under § 1." *Kodak*, 504 U.S. at 481. Here, the Complaint properly alleges market power.

### c.   Desotech Alleges Coercion Even Though It Is Not a Required Element of a Tying Claim.

3DS devotes substantial space in its brief to arguing that Desotech's tying claims insufficiently allege coercion. Br. at 6-15. Its argument is misguided on a variety of grounds.

### i.   Coercion Is Not Required When an Express Tie Is Alleged.

Allegations of coercion are *not* required where, as here, an express tie is alleged. *Times-Picayune Publ'g Corp. v. United States*, 345 U.S. 594, 605 (1953) ("a seller coerces" by

---

[5]   3DS also misapprehends *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995), even though 3DS directly cites the relevant language from that case: "Fifty percent is below any accepted benchmark for inferring *monopoly* power from *market* share." Br. at 19 (quoting *Blue Cross*, 65 F.3d at 1411) (emphasis added).

conditioning the sale of one commodity on the purchase of another); *Bogus v. Am. Speech & Hearing Ass'n*, 582 F.2d 277, 287 (3d Cir. 1978) ("[A] plaintiff need prove coercion of his or her purchase of the tied product only if there is no evidence of the existence of an express tie-in. Proof that a seller expressly conditioned the sale of one product upon the purchase of another suffices as proof of the existence of a tie-in without further evidence of coercion."); *Martino v. McDonald's Sys., Inc.*, 81 F.R.D. 81, 87 (N.D. Ill. 1979) ("If the alleged tying arrangements were imposed by express contractual provisions in franchise agreements, or if the operation of the terms of a written contract imposed the tie, the court may presume that proof of coercion will be class-wide.").[6]   That is exactly the case here, where the Complaint alleges that AP Proto, Lockheed and Tangible Express were *required* to purchase their resins exclusively from 3DS as a condition to buying their Viper Pro machines.  Compl. ¶¶ 66, 68-70.  In fact, Paragraph 6 of 3DS's Memorandum of Understanding with Tangible Express, attached as Exhibit B to 3DS's motion, illustrates such an express tie.  3DS's characterization of its relationship with Tangible Express as "more extensive … than that of customer and supplier," Br. at 10, *might* be appropriate at summary judgment or trial, but it is not proper on a motion to dismiss, before a

---

[6]   Numerous courts have held that coercion is assumed when an express tie is alleged.  *Data Gen. Corp. v. Gumman Sys. Support Corp.*, 36 F.3d 1147, 1180 (1st Cir. 1994) ("In the absence of an explicit tying agreement, conditioning may be inferred from evidence indicating that the supplier has actually coerced ….."); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992) (requiring evidence of coercion only if "there is no explicit [tying] agreement"); *Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1416 n.15, 1418 n.18 (11th Cir. 1987) ("coercion" is not a distinct element of a tying claim and evidence of conditioning is sufficient); *Cia. Petrolera Caribe v. Avis Rental Car Corp.*, 735 F.2d 636, 638 (1st Cir. 1984) ("As there is no express contractual tie, [plaintiff] must prove 'coercion'"); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 450 (3d Cir. 1977) ("coercion…[must] be proven only…[when] conditioning of the sale of one product upon purchase of another was not reflected in the agreement…."); *Laserworks v. Pitney Bowes, Inc.*, 1999 WL 33435671, at *9 (S.D. Ohio Dec. 29, 1999) ("Absent an express tie-in or an admission, a plaintiff must show that consumers were coerced…."); *Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861, 882 (D. Del. 1987) (same); *Waldo v. N. Am. Van Lines, Inc.*, 669 F. Supp. 722, 727 (W.D. Pa. 1987) (tying arrangement can be established "either by reference to an express contractual provision or by showing that the plaintiff was coerced into accepting the tied item").  If the Court decides that the Complaint needs to plead coercion or some other allegation that it believes is not sufficiently pled (*see infra* at 15-16), plaintiff respectfully requests an opportunity to replead.

single document has been produced or a single deposition has been taken.  *Tamayo*, 526 F.3d at 1083.

ii.     <strong>The Complaint Alleges Coercion.</strong>

Although Desotech was not required to allege coercion—and coercion can be "inferred from the seller's possession of a predominant share of the market" (*Kodak*, 504 U.S. at 464)— Desotech's Complaint nonetheless alleges coercion, both generally and specifically.  Desotech alleges that 3DS "conditions the sale and/or maintenance" of its large-frame SL machines on the purchase of its own resins, Compl. ¶¶ 5, 80, 90, 94, 102, 119, and that 3DS is attempting to eliminate the market for its older machines (which do not have the technological capability to exclude non-3DS resins) by refusing to service such machines and has reached an agreement with the leading SL machine servicer—National RP Support—to do the same.  *Id.* ¶¶ 42, 71. Desotech also alleges that 3DS has implemented (or soon plans to) the RFID feature on Viper Pro machines to exclude non 3DS-distributed resins, even though many customers do not prefer RFID and were told when purchasing the machine that they could continue to use resins from any resin supplier after RFID was activated.  *Id.* ¶¶ 32-33, 39, 40-42, 56, 64.  These general allegations alone are more than sufficient to plead coercion.  *Twombly*, 127 S. Ct. at 1964 ("detailed factual allegations" are unnecessary).

Desotech also alleges *specific* instances of coercion.  Desotech alleges that AP Proto, Lockheed, and Tangible Express all were *required* to purchase 3DS resins exclusively as a condition to buying their Viper Pro machines.  *Id.* ¶¶ 66, 68-70.  3DS asserts that Lockheed is the only example in Desotech's Complaint where 3DS refused to sell a Viper Pro unless the customer also purchased its resins and that "a tied sale to one customer does not constitute

actionable tying conduct." Br. at 9. But 3DS can make this argument only by glossing over the

Complaint. In addition to the Lockheed example, Desotech clearly alleges that:

> As part of the deal between AP [Proto] and 3DS, 3DS *required* AP [Proto] to trade-in an older SL machine for a Viper Pro *and to purchase its resins exclusively from 3DS rather than Desotech.*

Compl. ¶ 70 (emphasis added). 3DS's express tie involving Tangible Express—despite 3DS's

improper attempt to insert new facts about a "more extensive relationship" in its brief (at 10)—is

yet another example. Compl. ¶ 68. These specific examples are illustrative, not exhaustive.

Additional examples of similar anticompetitive conduct likely will be revealed through

discovery. *See Twombly*, 127 S. Ct. 1965 (the plausibility requirement "simply calls for enough

fact to raise a reasonable expectation that discovery will reveal evidence of illegal [behavior].").[7]

### d.    3DS's Motion Improperly Relies on Summary Judgment Decisions Based upon Developed Factual Records.

According to 3DS, despite the allegations contained in the Complaint, (1) voiding

warranties post-sale for using non-3DS resins is not coercive; and (2) activating the RFID feature

to exclude non-3DS resins is not coercive. Br. at 12-15. But as demonstrated in the very

warranty cases 3DS cites, whether voiding a warranty is anticompetitive is a highly fact-

intensive inquiry that is not susceptible to dismissal on the pleadings. For example, the plaintiff

in *HDC Medical* (a summary judgment case cited three times by 3DS (Br. at 9, 13, 24)) claimed

that the defendant anticompetitively refused to honor warranties on its reprocessing machines if

customers used reprocessing solution from a competing supplier. The defendant in *HDC*

---

[7]  3DS argues in its brief that Desotech has not alleged that the RFID feature has been activated yet for any of the five specific customers identified. Br. at 14. But a plaintiff "need not wait to make [its] claim until it is 'actually … driven from the market and competition is thereby lessened.'" *Xerox*, 511 F. Supp. 2d at 381 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 n.14 (1977)). Moreover, Desotech sufficiently alleges that 3DS has already activated the RFID feature for some customers. Compl. ¶ 39 ("3DS recently began to activate the

*Medical* argued, as does 3DS here, that its warranty policy was justified to maintain the integrity and functionality of its machines. In deciding the dispute, the court focused upon facts that had been elicited in discovery and could not have been resolved on the pleadings, holding that plaintiff "offer[ed] no *evidence* to refute [defendant's] legitimate business justification." *HDC Medical*, 474 F.3d at 550 (emphasis added); *see id.* at 549 (acknowledging defendant's warranty practice might have been anticompetitive if plaintiff presented evidence to show that the practice was "without legitimate business purpose"); *id.* at 546 (emphasizing the need for "ample opportunity for discovery"). That 3DS is forced to rely upon summary judgment cases (with their fully developed factual records) in support of the proposition that its conduct was not coercive is highly revealing at the motion to dismiss stage.

3DS's citation of *HDC Medical* is neither a fluke nor an aberration. In *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996), another warranty summary judgment case cited repeatedly by 3DS (Br. at 12-13), the court focused on the importance of a factual record and rejected the tying claim because the plaintiff had failed to present "sufficient evidence," *not* because the claim was facially defective as a matter of law. Indeed, the *Marts* court found the existence of other service providers to be a key factor. 77 F.3d at 1112. Here, the Complaint specifically alleges that 3DS reached an agreement with the leading independent servicer, National RP Support, to refuse to service machines using non-3DS resins. Compl. ¶ 72.

The same flaw applies to 3DS's claim that its RFID feature is a procompetitive technological improvement. In one of the key cases that it cites in support of this argument, *California Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727 (9th Cir. 1979) (Br. at 14, 23), the

---

RFID feature on Viper Pro machines by having 3DS field engineers download a software update onto the machines."), ¶ 44 ("3DS has begun activating the RFID feature").

plaintiff brought monopolization and attempted monopolization claims against IBM, asserting that IBM made design changes on its CPUs, disk drives and controllers designed to exclude rival computer peripheral suppliers. But the *California Computer Products* court did not decide *at the motion to dismiss stage* that such technological changes were procompetitive; instead, the court received substantial evidence on the issue, among other issues, as part of "three years of discovery," "fifty-four days of trial covering three months," and "records and transcript … compris[ing] 132 volumes." *Id.* at 731. In evaluating the plaintiff's "technological manipulation" argument alone, the court heard from several trial witnesses as to whether IBM's design modifications were legitimately procompetitive or exclusionary. *Id.* at 744.

Just last year, another court reached the same decision in denying a motion to dismiss in a tying case involving a technological redesign. *Xerox*, 511 F. Supp. 2d at 387-390. In *Xerox*, a competing supplier of solid ink sticks for Xerox's color printers alleged that Xerox altered the feed channels in its printers to prevent competing suppliers from selling ink sticks to users of Xerox printers. The court emphasized that Xerox offered "no cases establishing a per se rule that modification and patenting of a product can never constitute prohibited anticompetitive conduct." *Id.* at 388 (citing a case 3DS frequently cites in its brief, *United States v. Microsoft*, 253 F.3d 34, 65 (D.C. Cir. 2001) ("Judicial deference to product innovation, however, does not mean that a monopolist's product design decisions are per se lawful.")). "To the contrary, several courts have found that product redesign, when it suppresses competition and is without other justification, can be violative of the antitrust laws." *Id.* (collecting cases). The court emphasized that, on a motion to dismiss, it could not make a determination as to the overall impact on competition of the redesign; such a determination was more appropriate for summary judgment or trial where the defendant could "present[] evidence that the modifications improved

18

the product or otherwise served valid business reasons." *Id*. at 389. 3DS will have every opportunity later in the proceedings to dispute the Complaint's allegation that there is no legitimate business justification for the RFID feature and that it is simply intended to exclude competing resin suppliers and foreclose competition. Compl. ¶¶ 33, 40.

> **e.      3DS Cannot Demonstrate at the Motion To Dismiss Stage that Its Conduct Is More Procompetitive than Anticompetitive.**

Finally, 3DS's attempt at the motion to dismiss stage to require Desotech to "prove[]" that 3DS's conduct (in locking-in customers) is "more anticompetitive than procompetitive" (Br. at 12) again resorts to factual disputes. Contrary to 3DS's assertion, Desotech expressly alleges that customers are frequently locked-in after they purchase a Viper Pro. Compl. ¶¶ 43-45, 61, 63 (the warranty will be voided and machine will become inoperable if customers use non-3DS resins); ¶¶ 71-72 (National RP Support agreed not to service Viper Pro machines using non-3DS resins). As Desotech alleges, customers purchased their Viper Pro machines with the understanding that they could continue to use resins from any supplier after the RFID feature was activated. *Id*. ¶ 32 ("3DS never informed customers that the radio frequency identification … feature on the Viper Pro could be used to exclude competing resin suppliers."), ¶ 40 (customers "were informed by 3DS only that the RFID feature would help improve the machines' performance quality, not that the RFID feature could be used as a method to exclude competing resin suppliers"). Express Pattern "specifically asked 3DS when it was deciding whether to purchase the Viper Pro if it could use [Desotech's] resins with the Viper Pro machine and was expressly told by 3DS that it could use any resins with the machine." *Id.* ¶ 56. Post-purchase policy changes after customers have already expended substantial capital to purchase a machine are precisely the kind of anticompetitive behavior criticized in *Kodak*. 504 U.S. at 476-477; *see also PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997)

(*Kodak* lock-in theory applicable when defendant changed policy post-sale and was not "forthcoming" with relevant information to consumers); *Laserworks,* 1999 WL 33435671, at *8 (*Kodak* lock-in theory not applicable because defendant's policy "was fully disclosed and was not changed after the lease agreements were signed").

### 3.    3DS Has Foreclosed Substantial Commerce in the Tied Market.

The third element of a tying claim is that "'a substantial volume of commerce is foreclosed'" in the tied market.  *Reifert*, 450 F.3d at 317 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984)).  The Seventh Circuit has explained that "[t]his element can be broken into two sub-questions: (1) Is there at least one competitor in the tied product market other than the favored seller; and (2) Is the quantity of interstate commerce affected not-insubstantial?"  *Reifert*, 450 F.3d at 318.  Desotech's Complaint plainly defeats 3DS's argument (Br. at 18-23) that Desotech did not adequately allege this element.

The Complaint specifically identifies the competitors in the tied market and their approximate, respective market shares.  Compl. ¶ 46 (Desotech, 35%; 3DS, 50%; Huntsman, 10%; smaller, niche suppliers, 5%), ¶ 5 ("SL resins … market [was] previously characterized by robust competition and comprised of three main suppliers, and several smaller, niche resin suppliers").  These allegations easily satisfy the requirement that a plaintiff allege "at least one competitor" in the tied market.  *Reifert*, 450 F.3d at 318.  Desotech also alleges that the interstate commerce affected is "substantial."  Compl. ¶ 46 ($20 million annual resin market for large-frame SL machines; Desotech, $7 million; 3DS, $10 million; Huntsman, $2 million; smaller, niche suppliers, $1 million), ¶¶ 74, 75 ("Desotech alone has already lost approximately $500,000 in sales…. [D]ue to 3DS anticompetitive conduct, the amount of lost sales experienced by Desotech and other resin suppliers will increase.").  To be considered "substantial," the affected commerce need only exceed a *de minimis* amount.  *Bell v. Cherokee Aviation Corp.*, 660 F.2d

1123, 1130 (6th Cir. 1981) (citing *Fortner Enters., Inc. v. United States Steel Corp.,* 394 U.S. 495, 501 (1969), and holding $140,000 over three years to be sufficient); *Tic-X-Press, Inc.*, 815 F.2d at 1419-20 (holding $10,091 to be sufficient).

3DS argues that the "obvious conclusion" from Desotech's Complaint is that "only a small part of the tied product market" is affected because there are other large-frame SL machines in existence. Br. at 20-21. It adds that "Desotech has nothing to fear from 3D Systems' [Viper Pro]." *Id.* at 22. As with many of 3DS's other arguments, this one is inconsistent with the allegations in Desotech's Complaint. The Complaint alleges that 3DS has engaged in anticompetitive conduct to shrink the market for older SL machines and has forced customers to purchase an RFID-enabled Viper Pro so that it can exclude competing resin suppliers. Compl. ¶ 41 (noting the "pressure exerted by 3DS on customers to purchase the more expensive Viper Pro" and that "3DS has discontinued manufacturing the SLA 5000 and SLA 7000"), ¶ 42 (alleging that 3DS reached an agreement with National RP Support to stop servicing older SL machines and that 3DS "is removing existing large-frame SL machines from the market by offering substantial incentives to customers to trade-in those machines and purchase a Viper Pro"), ¶ 66 (3DS applied a "significant amount of pressure" on Lockheed Martin to trade-in its older SLA-500 for a Viper Pro), ¶ 70 ("3DS required AP [Proto] to trade in an older SL machine for a Viper Pro"), ¶ 71 ("3DS has attempted to extinguish the market for older large-frame SL machines by reaching an agreement with National RP Support" and "3DS has required National RP Support to buy all parts through 3DS, thereby raising prices for older, larger-frame SL

machines").[8]  3DS's assertion that the tied market is static and that only a small portion of the tied market is affected is plainly contradicted by Desotech's Complaint.

### 4.    3DS Has an Economic Interest in Sales of Tied Product.

3DS does not dispute that the Complaint properly alleges a sufficient economic interest of 3DS in the large-frame SL resin market.  As described above, 3DS has approximately $10 million in annual sales in the tied market—representing 50% of the market—and its "market share has grown while it has engaged in its anticompetitive conduct." Compl. ¶¶ 46, 75. Accordingly, Desotech has adequately alleged its tying claim, including this final element.  *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978) (requiring defendant to have only minimal interest in tied product market).

### B.    Desotech Adequately Pleads Violations under the Rule of Reason.

3DS's most blatant attempt to substitute its version of the facts for those in the Complaint appears in its argument that Desotech has not established a rule of reason violation.  3DS argues that Desotech has not adequately pled that the tying arrangement was unreasonable—that it had an adverse effect on competition greater than its benefit to competition.  Br. at 22.[9]  This argument, too, is contradicted by the actual allegations in Desotech's Complaint.

Desotech's Complaint is replete with allegations that 3DS's tying conduct has had an overall negative impact on competition by foreclosing consumer choice.  Compl. ¶ 5 ("foreclose competition in the separate market for SL resins"); ¶ 9 ("anticompetitive behavior" and

---

[8]  3DS's argument (at 7 n.6) that "Desotech alleges that customers do not actually even want the [Viper Pro]" fails to appreciate that 3DS's anticompetitive conduct has left many customers with no other choice.  *See also generally* Br. at 21-22.  Because 3DS and the leading service provider are no longer servicing older machines, as alleged in Desotech's Complaint, customers are forced to purchase a Viper Pro if they wish to continue operating a large-frame SL machine.

"anticompetitive goal of substantial foreclosure"); ¶ 40 ("3DS is now using the RFID feature to foreclose competing resin suppliers"); ¶ 73 ("3DS's anticompetitive conduct also has substantially narrowed the selection of resin available to customers" from forty to only a few); ¶¶ 75-77 (alleging lost sales and lost potential sales from competing resin suppliers, discouragement of innovation and dissuading new entrants into the market); ¶ 78 ("3DS will be able to raise prices and restrict output, thereby harming overall consumer welfare").

3DS's rule of reason argument is problematic for at least two other reasons. First, its argument is premised on serial misreadings of Desotech's Complaint. For example, 3DS declares that "Desotech concedes that the resin market *is* 'highly competitive.'" Br. at 22 (emphasis added) (citing Compl. ¶ 47). What ¶ 47 actually states, however, is that the large-frame SL resin market "*has been* highly competitive," and the remainder of the Complaint makes clear that 3DS's conduct threatens this state of competition. 3DS also claims that "Desotech nowhere alleges that it or other resin suppliers have lost market share." Br. at 23. Again, the actual allegations in the Complaint clearly state otherwise. Compl. ¶¶ 46 ("3DS's market share has grown while it has engaged in its anticompetitive conduct."), 75 ("Due to 3DS's anticompetitive conduct, … the amount of lost sales experienced by Desotech and other resin suppliers will increase").

3DS also suggests that Desotech agrees that the "licensing" or "approval" process for resins used in the Viper Pro is legitimate. Br. at 23. Desotech's Complaint, however, alleges just the opposite. Compl. ¶¶ 112, 113 (3DS told customers that Desotech's resins are not approved or licensed even though no such approval or licensing process exists). Indeed, 3DS

---

[9]   3DS's argument that the Complaint does not adequately allege market power in the tied product market is addressed *supra* at pp. 11-13.

undermines its own argument four pages earlier in its brief by conceding that "Desotech attempts to dismiss 3D Systems' approvals process *by suggesting it is sham*." Br. at 19 (emphasis added). Perhaps the Reply will explain how 3DS can simultaneously claim that the Complaint concedes the legitimacy of the licensing approval process and characterize it as a "sham."[10]

The second problem with 3DS's motion is that it improperly weighs the purported procompetitive impact of its behavior against the anticompetitive effects. Courts have long held that a rule of reason analysis is highly fact-intensive and cannot be resolved on a motion to dismiss. *Jewel Tea Co. v. Amalgamated Meat Cutters*, 274 F.2d 217, 223 (7th Cir. 1960) (rule of reason "determination cannot be disposed of on a motion to dismiss but must be properly aired in a trial where both parties have an opportunity to offer evidence as to facts peculiar to the business to which the restraint is applied"); *CSR Ltd. v. Federal Ins. Co.*, 40 F. Supp. 2d 559, 565 (D.N.J. 1998) (denying motion to dismiss because "discovery is necessary to make a determination as to the reasonableness of the defendants' activities under the…fact intensive, Rule of Reason"); *United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172, 174 n.3 (D.R.I. 1996) (denying motion to dismiss, noting "fact-intensive inquiry the rule of reason analysis requires").

This same point is illustrated by *HDC*, a case on which 3DS extensively relies in its brief. Br. at 24. The *HDC* court conducted a rule of reason analysis at the *summary judgment* phase, focusing on the fact that HDC "offer[ed] *no evidence* to refute [defendant's] legitimate business

---

[10]   3DS also seems to make much of the fact that it has purportedly "approved" *two* Desotech resins for use with its Viper Pro. Br. at 4. What 3DS fails to mention—and what Desotech plainly alleges in its Complaint, Compl. ¶¶ 56, 73—is that these two resins are older resins that many customers no longer desire and that 3DS has refused to "approve" the other *forty* non-3DS resins actually desired by customers.

justification." *HDC*, 474 F.3d at 550 (emphasis added).  As *HDC* demonstrates, a rule of reason analysis typically requires discovery and evidence.  3DS cannot short-circuit that process here.

**IV.    Desotech Plainly Alleges Antitrust Injury.**

An antitrust plaintiff must allege that its injuries are "of the type the antitrust laws were intended to prevent" and must "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  *Brunswick*, 429 U.S. at 489.  As the Seventh Circuit has held, in addition to harm to the plaintiff, there must also be harm to the competitive process, such as in the form of "reduced output" or "higher prices."  *United States Gypsum Co. v. Indiana Gas Co.,* 350 F.3d 623, 626-27 (7th Cir. 2003).  Contrary to 3DS's argument (at 25-26), Desotech has more than adequately alleged antitrust injury in its Complaint.

First, Desotech alleged that it has been injured by 3DS's anticompetitive conduct. Compl. ¶ 75 ("Due to 3DS's anticompetitive conduct, Desotech alone has already lost approximately $500,000 in sales….  [T]he amount of lost sales experienced by Desotech and other resin suppliers will increase."); ¶ 76 ("Desotech and other resin suppliers will also lose a substantial portion of these future sales").  Second, the Complaint clearly alleges that 3DS's anticompetitive conduct has hurt *competition*, not just competitors like Desotech.  *Id*. ¶ 10 ("As a result of this substantial foreclosure … competition in the resin supply market will no longer exist….  3DS will then be able to raise prices and restrict output, thereby harming overall consumer welfare …."); ¶ 77 (3DS's anticompetitive conduct forecloses existing competition, discouraging innovation and entry); ¶ 78 ("[R]esin [purchasers] will have a substantially smaller selection of resins from which to make their end products. . . . 3DS will be able to raise prices and restrict output, thereby harming overall consumer welfare.").

These allegations of harm to competition are specifically alleged in the Complaint.  *Id.* ¶¶ 58-59 (Express Pattern can no longer use ProtoCast™ AF 19120 resin it desires); ¶ 62 (Dynacept can no longer use ProtoGen™ O-XT 18420 resin it prefers); ¶ 67 (Lockheed Martin can no longer use Somos 12120 resin); ¶ 73 (Viper Pro customers now have only *two* non-3DS resins from which to choose rather than *forty*).   Courts have consistently held that reduced customer choice due to anticompetitive behavior constitutes antitrust injury.  *See supra*, pp. 25-26; *see also Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1011  (9th Cir.) ("antitrust injury is … [behavior that] prevents its victims from making free choices between market alternatives") (internal quotations omitted), *amended on denial of rehearing*, 352 F.3d 367 (9th Cir. 2003); *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998, 1019-20 (S.D. Tex. 1997) (refusing to find antitrust injury "[a]bsent evidence that Defendants' conduct threatened competition *or adversely affected consumer choice*") (emphasis added).

3DS also argues that "Desotech's allegations, if proven, would show that far from injuring competition, 3D Systems' policy of restricting resins used in the [Viper Pro] is procompetitive."  Br. at 26.  While 3DS has not been shy to offer its own facts in support of its arguments throughout its brief, a motion to dismiss is clearly not the proper avenue by which to evaluate factual argument.  *See* Br. at 3 n.2 (factual allegations must be "taken as true for the purposes of this motion").[11]

## V.    Desotech Properly Alleges Attempted Monopolization (Count IV).

There are three elements to an attempted monopolization claim under § 2 of the Sherman Act:   (1) the defendant engaged in anticompetitive conduct with (2) the specific intent to

---

[11]  3DS's motion raises no bases for dismissing Count III, other than antitrust injury or coercion (both addressed above).

monopolize and has (3) a dangerous probability of achieving monopoly power. *Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *L&W/Lindco Prods.,* 979 F. Supp. at 636. The motion challenges Desotech's attempted monopolization claim by recycling 3DS's arguments regarding tying, coercion and the rule of reason. Br. at 26-27. Desotech has more than adequately alleged attempted monopolization.

As described above, Desotech alleges in its Complaint numerous instances of illegal tying as well as other anticompetitive conduct regarding the maintenance of its machines, *see, e.g.*, Compl. ¶¶ 61, 66, 70-72, 94, 102, which will harm consumer welfare by restricting output or raising prices. *Id.* ¶¶ 10, 58-59, 67, 73, 77-78. As such, Desotech has sufficiently alleged the first element of attempted monopolization. *L&W/Lindco Prods.*, 979 F. Supp. at 638 ("Anticompetitive conduct must be such that its anticipated benefits are dependent upon its tendency to frustrate or eliminate competition and thereby enhance the defendant's long term ability to reap the benefits of monopoly power."); *see supra* pp. 13-16 (responding to 3DS's argument that Desotech has not alleged coercion, Br. at 27).

Desotech also alleges that 3DS's specific intent is to monopolize the market for large-frame SL resin. *See L&W/Lindco Products*, 979 F. Supp. at 638-39 ("specific intent is often established by the same evidence that is used to prove exclusionary conduct"). 3DS asserts in its brief that Desotech only "alleges that 3D Systems wants to exclude Desotech and other competitors" and that intent to exclude competitors is insufficient to show specific intent to monopolize. Br. at 27. But that is not what the Complaint says. Desotech repeatedly alleges that "3DS is attempting to foreclose *competition* in the separate market for SL resins," not that 3DS is simply targeting *competitors*. Compl. ¶ 5 (emphasis added); *see id.* ¶ 9 ("The end goal of 3DS's anticompetitive conduct is clear:  to foreclose competition in the market for resins ....");

¶ 10 ("As a result of this substantial foreclosure … competition in the resin supply market will no longer exist…. 3DS will then be able to raise prices and restrict output, thereby harming overall consumer welfare …."); ¶ 77 (3DS's anticompetitive conduct forecloses existing competition, discourages innovation, and dissuades potential new entrants); ¶ 78 (resin purchasers will have few choices and "3DS will be able to raise prices and restrict output, thereby harming overall consumer welfare"). As this District has held, "specific intent to monopolize implies an intent" by the defendant to "destroy competition." *L&W/Lindco Prods.*, 979 F. Supp. at 639. The result of 3DS's specific intent to monopolize is the foreclosure of *competition*, not just the exclusion of certain competitors.

Desotech also sufficiently alleges the third element of attempted monopolization: a dangerous probability of achieving monopoly power. The Complaint alleges that 3DS currently has 50% of the large-frame SL resin market and notes that 3DS's market share is growing as a result of its anticompetitive conduct. Compl. ¶ 9 ("growing market share of over 50%"), ¶ 46 ("3DS's market share has grown while it has engaged in its anticompetitive conduct."), ¶ 104 ("present and growing control over approximately 50% of the market"). This District has held that a market share of 40% is sufficient to prevail on the "dangerous probability" element and withstand a motion to dismiss. *L&W/Lindco Products*, 979 F. Supp. at 637; *see also Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.,* 311 F. Supp. 2d 1048, 1102 (D. Colo. 2004) ("A market share of 41% indicates that a firm has substantial economic power in the market, and, therefore, has the tools at its disposal to elevate its market share to monopolistic levels."). While 3DS's 50% and growing market share alone is sufficient to plead the "dangerous probability" element, discovery likely will reveal additional evidence. *Compuware Corp. v. IBM*, 259 F. Supp. 2d 597, 602 (E.D. Mich. 2002) (denying motion to dismiss attempted

monopolization claim because market share is "not the only way to show a dangerous probability" and allowing plaintiff to proceed to discovery to uncover such evidence).[12]

## VI.    Desotech Properly Alleges Violations of the Illinois Antitrust Act (Count V).

3DS's brief (at 28) correctly recites 740 ILCS 10/11's instruction that courts "shall use the construction of the federal law … as a guide in construing [the Illinois Antitrust Act]" when "the wording of [the Illinois Antitrust Act] is identical or similar to that of a federal antitrust law." The section of the Illinois Antitrust Act governing Desotech's state antitrust claims, 740 ILCS 10/3, is modeled after the Sherman Act and Clayton Act sections under which Desotech brings its federal antitrust claims.[13]  Because Desotech has adequately alleged all of its federal antitrust claims, its claims under the Illinois Antitrust Act also are valid.  *See People ex rel. Scott v. Schwulst Bldg. Center, Inc.*, 89 Ill. 2d 365, 369, 376, 432 N.E.2d 855, 857, 860 (1982) (acknowledging the similarity between the federal and state antitrust statutes and noting that "the Illinois legislature intended that tying arrangements be dealt with harshly").

## VII.   Desotech Properly Alleges Violations of the Illinois Deceptive Trade Practices Act (Count VI).

To state a claim under § 2(a)(7) of the Illinois Deceptive Trade Practice Act ("DTPA"), a plaintiff must allege that the defendant "represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another." 815 ILCS 510/2(a)(7).  3DS claims that Desotech "relies upon conclusory generalizations that fail to satisfy *Twombly*," and that the alleged statements were made to "unidentified third

---

[12] 3DS's argument that the procompetitive benefits of its conduct exceed the anticompetitive harms (Br. at 26) is addressed *supra* at pp. 19-20 and 22-25.

[13] The Illinois Antitrust Act's proscription against tying expressly applies to both goods and services.  740 ILCS 10/3(4).  *See also Collins v. Associated Pathologists, Ltd.*, 676 F. Supp. 1388, 1407 n.2 (C.D. Ill. 1987), *aff'd*, 844 F.2d 473 (7th Cir. 1988).

parties." Br. at 29.  Not only are these assertions contradicted by the allegations in Desotech's Complaint, but they also are contradicted in 3DS's own brief just a few sentences later where 3DS addresses disparaging statements made by 3DS to Express Pattern and Dynacept.  *Id.*

According to the Complaint, 3DS told specific customers that Desotech's Somos resins were not licensed, qualified or approved for use in the Viper Pro machine, despite the fact that such a licensing, qualification or approval process *never existed*.  Compl. ¶ 56 (Express Pattern); ¶ 63 (Dynacept); ¶¶ 112-13 ("no such licensing or qualification standard exists").  3DS also told customers that Desotech's resins "were of insufficient quality to run on 3DS's large-frame SL machines."  *Id.* ¶ 54.    Thus, Desotech has adequately alleged that 3DS has represented to customers that Desotech's resins are "of a particular standard, quality, or grade" (*i.e.*,  not fit for use on the Viper Pro and of "insufficient quality") even though no such standard exists and Desotech's resins were more than fit for use with the Viper Pro machine.  Indeed, many Viper Pro customers have used Desotech's resins in their Viper Pro machines for years without quality-related problems.  *Id.* ¶¶ 38, 48, 54, 67. 3DS's statement that "Desotech has not alleged that 3D Systems ascribed to the [Desotech] resins a false characteristic or property…or misrepresented the properties of the Somos resins," Br. at 30, is contradicted by the actual pleadings.

Further, to state a claim of disparagement under § 2(a)(8) of the DTPA, a plaintiff must allege that the defendant "disparages the goods, services, or business of another by false or misleading representations of fact."  815 ILCS 510/2(a)(8).  As described above, the Complaint plainly alleges that 3DS has told numerous customers, including Express Pattern and Dynacept, that Desotech's resins are not qualified or approved for use on the Viper Pro and that they are "of insufficient quality" even though no such qualification or approval process exists and Desotech's resins have been used by customers for years with their Viper Pro machines without any quality-

related issues. Such statements are highly misleading by suggesting the existence of a standard or approval process that does not in fact exist. They therefore violate § 2(a)(8) of the DTPA. As § 2(b) of the DTPA states, "in order to prevail in an action under [the DTPA]," a plaintiff need not prove "actual confusion or misunderstanding," but only "a reasonable likelihood of … misunderstanding." *Francorp, Inc. v. Siebert*, 211 F. Supp. 2d 1051, 1055 (N.D. Ill. 2002); *see* 815 ILCS 510/2(b).

Finally, 3DS told customers that Desotech had not done its "due diligence" with respect to certain resins. Compl. ¶ 54. Thus, in addition to alleging that 3DS disparaged Desotech's *products*, Desotech also alleged that 3DS disparaged Desotech's *business* by asserting poor work quality, which is proscribed under DTPA § 2(a)(8). *M & R Printing Equip., Inc. v. Anatol Equip. Mfg. Co.*, 321 F. Supp. 2d 949, 952 (N.D. Ill. 2004) (denying motion to dismiss, holding that "impugn[ing] the quality of [plaintiff's] business" was sufficient under § 2(a)(8)).

## VIII. Desotech Properly Alleges Tortious Interference with Prospective Economic Advantage (Count VII).

To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege: (1) a reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents that expectation from ripening; and (4) damages. *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007); *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 380, 816 N.E.2d 754, 767 (1st Dist. 2004). Illinois law also requires that the plaintiff's business expectancy be with a third party. *Ali*, 481 F.3d at 945-46. The Complaint sufficiently alleges all such elements.

Desotech alleges numerous examples of reasonable expectations for future resin sales with specific customers, easily satisfying the first element. Compl. ¶¶ 8, 59 ("Express Pattern has expressed to Desotech its desire to continue to purchase Somos resins from Desotech and to

enter into a new resin purchase contract ….”), ¶ 67 (“Lockheed has stated that it would prefer to use Desotech’s Somos 12120 resin in its Viper Pro rather than being required by 3DS to use 3DS’s resins.”); ¶ 69 (“Desotech had an oral commitment from AP Proto [for] … 100% of AP [Proto’s] SL resin requirements.”). 3DS’s assertion that Desotech has only alleged a “mere hope” of such expectancies finds no support in the actual allegations in the Complaint. Br. at 33.

In addition, Desotech adequately pleads the second element – 3DS’s knowledge of these expectancies – by alleging repeatedly that 3DS told customers they could no longer purchase resins from Desotech. Compl. ¶ 56 (“3DS informed Express Pattern … that Express Pattern would not be able to purchase Desotech’s newer Somos resins ….”), ¶¶ 61-63 (Dynacept); ¶ 66 (“After a significant amount of pressure by 3DS … Lockheed agreed … to stop purchasing resins from Desotech ….”), ¶ 70 (“As part of the deal between AP [Proto] and 3DS, 3DS required AP [Proto] … to purchase its resins exclusively from 3DS rather than Desotech.”); ¶ 119 (“3DS has knowledge of these relationships and/or expectancies ….”).

Desotech has also satisfied the third element by alleging purposeful interference by 3DS that prevented these expectancies from ripening. In particular, Desotech alleges that 3DS’s anticompetitive conduct extinguished expectancies of future resin sales that Desotech had with Express Pattern, *id.* ¶ 58 (“Express Pattern can no longer use [the ProtoCast™ AF 19120] resin.”), Lockheed Martin, *id.* ¶ 66 (“Lockheed agreed … to stop purchasing resins from Desotech”), and AP Proto. *Id.* ¶¶ 69-70; *see also id.* ¶ 119 (3DS “caus[ed] a termination of the relationships and/or expectancies”).

In response to this properly pled claim, 3DS asserts a “competitor’s privilege,” which Illinois law recognizes to protect competitors engaged in legitimate competition on the merits. Br. at 32-34. There are two fundamental problems with 3DS’s argument that Desotech’s

allegations "simply show that 3D Systems won [customers'] business away from Desotech." *Id.* at 33. First, Desotech alleges that 3DS has *not* competed on the merits. To the contrary, Desotech alleges that 3DS violated the Sherman Act, Clayton Act, and Illinois Antitrust Act, disparaged Desotech's resins and business, and made false or misleading statements about non-existent resin standards. 3DS simply turns a blind eye to these allegations.

Second, courts repeatedly have held that the competitor's privilege does not apply when the defendant employed "wrongful means." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 546-47 (7th Cir. 1986) (violation of antitrust laws voids competitor's privilege); *JamSports & Entm't, LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824, 852 (N.D. Ill. 2004) (alleged Sherman Act violation constitutes "wrongful means" and competitor's privilege therefore inapplicable); *Ken-Pin, Inc. v. Vantage Bowling Corp.*, 2004 WL 783092, at *8 (N.D. Ill. Jan. 20, 2004) (denying motion to dismiss, holding that "a party that has behaved unfairly, or used 'wrongful' means, is ineligible for the competitive privilege even if it acted purely with competitive motive"). The very cases 3DS cites in its brief in support of its competitor's privilege argument make this point. *Candalaus Chicago, Inc. v. Evans Mill Supply Co.*, 51 Ill. App. 3d 38, 48, 366 N.E.2d 319, 326-27 (1st Dist. 1977) (competitor's privilege applies only if defendant "does not employ improper means" and "does not … continue an *illegal restraint of competition*") (citing *Restatement of Torts* § 768, emphasis added); *Soderlund Bros. v. Carrier Corp.*, 278 Ill. App. 3d 606, 616, 663 N.E.2d 1, 8 (1st Dist. 1995) (same); *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 954, 971 (N.D. Ill. 2007) (competitor's privilege does not apply to "wrongful" or "disparaging" acts by defendant).

3DS also argues that "Desotech cannot show the required element of malice." Br. at 31. Setting aside the point that Desotech is not required to "show" anything in its Complaint—it

need only make *allegations* of plausible entitlement to relief, *Twombly*, 127 S. Ct. at 1974—3DS is mistaken in assuming Desotech is required to plead malice. Illinois law clearly states otherwise. *Delloma v. Consol. Coal Co.*, 996 F.2d 168, 170 (7th Cir. 1993) (plaintiff "must allege malice only if the defendants' actions were privileged"); *Builders Square, Inc. v. Illgross Partners & Co., Ltd.*, 1994 WL 549020, at *4 (N.D. Ill. Oct. 5, 1994) (denying motion to dismiss, holding that "malice is not an element of a plaintiff's prima facie case for tortious interference with prospective business advantage"). As demonstrated above, Desotech alleges numerous instances of "wrongful conduct" by 3DS (*i.e.,* anticompetitive, deceptive and disparaging conduct). There is simply no need for Desotech to allege malice in its Complaint.

Finally, Desotech sufficiently alleges the fourth element: damages caused by 3DS's tortious conduct. Desotech alleges that due to 3DS's anticompetitive and deceptive conduct, it has lost future resin sales. *See* Compl. ¶ 66 ("Lockheed agreed … to stop purchasing resins from Desotech"); *id.* ¶ 70 ("3DS required APP … to purchase its resins exclusively from 3DS rather than Desotech"); *see also id.* ¶¶ 75-76 ("Desotech alone has already lost approximately $500,000 in sales"), ¶ 121 ("Desotech has suffered, and will continue to suffer, substantial injury with existing and potential customers"). Desotech also alleges that its expectancies of future sales are with third parties. *See, e.g., id.* ¶¶ 58-59 (Express Pattern),  ¶ 66 (Lockheed Martin), ¶¶ 69-70 (AP Proto). Accordingly, Desotech has adequately alleged all required elements for the tort of intentional interference with prospective economic advantage.

## IX.     Conclusion

3DS's misapprehension of *Twombly*, its selective reading of the Complaint and its strategy of arguing its own version of the facts (to the exclusion of those actually pled) all lead to one conclusion: the Complaint, as written, easily satisfies Rules 8(a)(2) and 12(b)(6).  3DS's motion to dismiss should be denied in its entirety.

Dated:  July 8, 2008                                    Respectfully submitted,

                                                        *Plaintiff DSM Desotech Inc.*


                                                        By:  /s/ Britt M. Miller_____
                                                              One of its attorneys

Bruce M. Gagala                                         Andrew S. Marovitz
Jeffrey B. Burgan                                       Britt M. Miller
LEYDIG, VOIT & MAYER, LTD.                              Thomas V. Panoff
Two Prudential Plaza, Suite 4900                        MAYER BROWN LLP
180 North Stetson Avenue                                71 South Wacker Drive
Chicago, Illinois 60601                                 Chicago, Illinois 60606
(312) 616-5600                                          (312) 782-0600
(312) 616-5700 – fax                                    (312) 701-7711 – fax

1445607