# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DSM DESOTECH INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Case No. 08-C-1531 |
| v. | ) | |
| | ) | Hon. Joan H. Lefkow |
| 3D SYSTEMS CORPORATION and | ) | |
| 3D SYSTEMS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY OF 3D SYSTEMS IN SUPPORT OF ITS MOTION
## TO DISMISS DESOTECH'S ANTITRUST AND STATE LAW CLAIMS

3D Systems Corporation and 3D Systems, Inc. ("3D Systems") submit this Reply in support of their motion to dismiss the antitrust and state law claims (Counts I-VII of the Amended Complaint ("AC")) brought by plaintiff DSM Desotech Inc. ("Desotech").

## I. INTRODUCTION

Desotech urges this Court to adopt an interpretation of the pleading standard established in *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007), that the Seventh Circuit has expressly rejected for antitrust cases, namely, that even under *Twombly*, "specific facts are not necessary" to state a cause of action. Resp. at 3, citing *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007). Judge Posner considered and rejected this very argument in *Limestone Development Corp. v. Village of Lemont,* 520 F.3d 797 (7th Cir. 2008).

The difference is context. In *Erickson*, a prisoner proceeding *pro se* complained that prison officials had wrongfully withheld treatment for hepatitis C. As Judge Posner explained,

> That was the context in which the Court said that "specific facts" need not be pleaded. A complaint must always, however, allege "enough facts to state a claim to relief that is plausible on its face," and how many facts are enough will depend on the type of case. In a complex antitrust . . . case a fuller set of allegations . . . may be necessary to show that the plaintiff's claim is not largely groundless.

*Id.* at 803, quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. at 1974. Judge Posner went on to explain, "If discovery is likely to be more than unusually costly, the complaint must include as much factual detail and argument as may be required to show that the plaintiff has a plausible claim." *Id.* at 803-04. Thus, Desotech's invocation of a "no specific facts are necessary" standard for this complex antitrust case is wrong as a matter of law.

Desotech then asserts incorrectly that it has met *Twombly*'s plausibility standard because its complaint "contains far more facts than necessary under Rule 12(b)(6)." Resp. at 2. Quantity of facts is not the issue under *Twombly*. *Twombly* requires "allegations plausibly suggesting (*not merely consistent with*)" an antitrust violation. 127 S. Ct. at 1966 (emphasis added). A plaintiff

cannot simply assert a legal conclusion ("3D Systems engaged in tying"), follow that conclusion with facts that do not by themselves plausibly suggest tying ("3D Systems put pressure on Lockheed to buy resins"), and thereby state a cause of action or establish the basis for discovery. *Id.*; *see also Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 595 (7th Cir. 2008) (Posner, J.) ("plaintiffs' naked assertion of [defendant's] 'appreciable economic power' -- an empty phrase -- cannot save the complaint").

Desotech frequently asserts in its response that 3D Systems has raised a factual dispute where 3D Systems has actually simply shown that a factual allegation in Desotech's Amended Complaint defeats its cause of action. 3D Systems has not raised a factual dispute or shown a need for discovery; it has simply pointed out that, on certain issues, Desotech has pleaded itself out of court. *See Hill v. City of Chicago*, No. 6 C 6772, 2007 WL 1424211, at *8 (N.D. Ill. May 10, 2007) ("litigants may plead themselves out of court by alleging facts that defeat recovery"), quoting *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005).

Accordingly, as set forth in 3D Systems' Memorandum in Support of its Motion to Dismiss ("Memorandum" or "Mem.") and below, the Amended Complaint should be dismissed.

## II.     ARGUMENT

Ignoring the express skepticism of the Supreme Court and the Seventh Circuit towards tying claims, Desotech instead attempts to distract the Court with a straw man argument – its assertion that 3D Systems' Memorandum contains a "report of the death of tying claims." Resp. at 5. Desotech refers to page 1 of the Memorandum, where 3D Systems quotes Judge Posner's statement in his book, *Antitrust Law*, that tying is "now recognized to be only rarely exclusionary." Richard A. Posner, *Antitrust Law* 197 (2d ed. 2001) (pp. 197-207, Mem. at Ex. A). Likewise, 3D Systems observed that the Supreme Court in *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 35, 45 (2006), explained that its previously "strong

disapproval of tying arrangements has substantially diminished" and that "many tying

arrangements . . . are fully consistent with a free, competitive market."

Desotech selectively quotes from *Sheridan,*, but the decision itself demonstrates the

Seventh Circuit's skepticism of tying claims – as is clear even from the paragraph from which

Desotech took its quote:

> Beginning in the 1970s, however, the Court began to reexamine and in some
> instances discard antitrust doctrines that (like tying agreements) place limitations
> on distributors or dealers. The Court has not discarded the tying rule, and we have
> no authority to do so. But it has modified the rule by requiring proof that the seller
> has "market power" in the market for the tying product.

*Sheridan,* 530 F.3d at 593-94 (rejecting tying claim for failure to allege a tying product market).[1]

With the Supreme Court's and Seventh Circuit's view of tying in mind, we turn to the

failure of Desotech to adequately several required elements of its cause of action for tying.

**A.    Desotech Fails to State Essential Elements of Its Cause of Action for Tying**

Desotech's Amended Complaint fails to allege facts that plausibly suggest coercion and

market power in the alleged tying and tied product markets.[2]

**1.    There Are No Factual Allegations of Coercion**

As shown in the Memorandum, the Amended Complaint is devoid of alleged facts which,

if proven, would establish coercion by 3D Systems.  Desotech's first response is that allegations

of coercion are not necessary where an express tie is alleged.  Resp. at 13.  The Supreme Court,

however, has made it clear that coercion is the essence of a tying claim. *Jefferson Parish*

*Hospital District No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("the essential characteristic of an invalid

---

[1]    *See also Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1020 (7th Cir. 2002) (Easterbrook, J.) ("the
idea that you can use tying to lever your way to a second . . . monopoly is economic nonsense, imputing
systematic irrationality to businessmen").

[2]    Desotech addressed other elements of a tying claim, but 3D Systems did not challenge those
elements and does not address them here.  The deficiencies that 3D Systems addressed by themselves
require dismissal, as shown in the Memorandum and this Reply.

tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product" that the buyer did not want to buy). In any event, Desotech does not (and could not) argue that 3D Systems cannot sell customers both resins and Viper™ Pro SLA ("Viper™ Pro") systems so long as those sales are not unlawfully linked.

Desotech next acknowledges that to state a tying claim, it must allege facts showing that 3D Systems has imposed on customers a requirement "to purchase 3D Systems resins exclusively *as a condition to* buying their Viper Pro machines." Resp. at 15 (emphasis added). It refers first to Amended Complaint ¶¶ 5, 80, 90, 94, 102 and 119, none of which contains any such facts. They are simply bare legal conclusions (*e.g.,* "3DS's conduct in conditioning the sale and/or maintenance of its . . . machines on the purchase of its own SL resins constitutes an illegal tying agreement," ¶ 80).

The Response then asserts that the complaint alleges that customers "AP Proto, Lockheed and Tangible Express all were *required* to purchase 3D Systems resins exclusively as a condition to buying their Viper Pro machines."[3] Resp. at 15. An admitted requirement of a tying claim, however, is simply not present in the Amended Complaint's allegations for these customers. For Tangible Express and AP Proto, Desotech merely asserts that those customers and 3D Systems entered into "deals" where Tangible Express and AP Proto committed to buy systems and resins from 3D Systems.[4] AC ¶¶ 68-70. If that constitutes a tie-in, without any allegation of conditioning or forcing, then every contract in which a buyer binds itself to purchase more than one item is illegal – which, of course, is not the law. *See Jefferson Parish*, 466 U.S. at 12. As for

---

[3]    Desotech apparently concedes that it alleged no upfront coercion of Express Pattern and Dynacept and simply asserts "lock-in" for these two customers (see below). Resp. at 15, 19.

[4]    Desotech improperly characterizes 3D Systems' inclusion of its Memorandum of Understanding ("MOU") with Tangible Express as an "improper attempt to insert new facts." Resp. at 16. Desotech made the MOU central to its claims about Tangible Express, so the MOU is properly considered in this motion to dismiss. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002); Mem. at 10 n.8.

Lockheed, Desotech's allegation is no more than a recitation of the formula for a tying claim with the name "Lockheed" inserted. AC ¶¶ 65-67. These neutral facts do not become plausible suggestions of tying simply because they are interspersed with recitations of the cause of action.

As 3D Systems showed in its Memorandum, the Amended Complaint also fails to allege coercion through post-sale "lock-in." There is nothing unlawful about a policy of refusing to honor warranties or offer maintenance for a system if unapproved parts or supplies are used, or redesigning a product so that others can no longer sell aftermarket supplies. Mem. at 12-14. Desotech asserts two incorrect arguments. First, it observes that 3D Systems cited summary judgment cases and leaps to the wrong conclusion that this issue can only be decided after discovery. Resp. at 17-18. The Memorandum, however, showed that Desotech's Amended Complaint contains factual allegations that, assumed to be true, would defeat any showing that 3D Systems' resins restriction was illegal. Thus, in *Marts v. Xerox Inc.,* 77 F.3d 1109, 1111-12 (8th Cir. 1996), the Eighth Circuit noted that where service was available from providers other than the manufacturer, a refusal to provide service was not anticompetitive. Taken as true, the Amended Complaint would likewise prove that service is available from other manufacturers, so there is no factual determination to be made. Mem. at 12-14 (discussing *HDC Medical, Inc. v. Minntech Corp.,* 474 F.3d 543 (8th Cir. 2007), and *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727 (9th Cir. 1979)).

Desotech's other argument is simply that it did indeed allege facts showing tying through post-sale lock-in. No such facts are alleged. Express Pattern, according to Desotech, is still using Desotech resins. AC ¶¶ 59. Desotech alleges that 3D Systems has threatened to stop servicing Dynacept's equipment if it uses unapproved resins, but there is no allegation that Dynacept has stopped purchasing Desotech resins or that 3D Systems has actually stopped servicing this

customer's system. AC ¶¶ 60-63. The allegations regarding the remaining three customers, Lockheed, AP Proto and Tangible Express, assert (albeit in conclusory form) that they knew of the resins restriction prior to purchasing systems, so no post-sale lock-in occurred. Desotech has thus failed to plausibly allege coercion.

**2.    Desotech Fails to Allege Market Power in the Alleged Tying Product Market**

In the Memorandum, 3D Systems pointed out that Desotech fails to allege market power in the tying market because its allegations, taken as true, would prove that the relevant market is bigger and more inclusive than the narrow definition asserted in the Amended Complaint. Desotech provides two theories to claim the required tying product market power (those being that it can allege market power either through anticompetitive effects or market share above a certain threshold in the alleged market). The evidentiary predicate for either theory, however, would be that the relevant market is the market for large-frame SL systems (AC ¶ 26) – a market definition that is defeated by Desotech's allegations.

The Amended Complaint contains allegations that defeat any possibility of that proof. Desotech concedes that SL is only one of a number of technologies in the rapid prototyping ("RP") industry that includes Laser Sintering, Fused Deposition Modeling, Digital Light Processors, and 3-D printers. By attempting to narrow the market to large frame SL machines to exclude the range of competitive RP technologies already pleaded, moreover, Desotech implicitly admits that SL machines other than large-frame systems also exist in the RP industry. AC ¶¶ 22, 26. Given the existence of many interchangeable RP technologies, Desotech had to allege facts showing that these other technologies and machines are not alternative technologies, do not constrain 3D Systems' behavior within the SL market and therefore are not within the relevant tying market.

6

Its attempt to allege those facts shows that it cannot do so. A relevant market is defined for the purpose of antitrust analysis as a market that is "so wholly segmented from the available substitutes that a rise in its price would not shift demand to some of the alternatives." *E&L Consulting, Ltd. v. Doman Industries Ltd.*, 360 F.Supp.2d 465, 473 (E.D.N.Y. 2005). Desotech has not attempted, in its Amended Complaint or even in its Response, to address this requirement. As shown in the Memorandum, Desotech simply notes a few differences between the various rapid prototyping technologies, asserting that one (Laser Sintering) does not produce products of comparable quality, that another is "neither fast nor cost-effective," and so on. It does not acknowledge, much less address, why SL systems other than large-frame systems are not in the same market. Courts have repeatedly rejected this kind of attempt to define a market based on variances as "economically meaningless," because those variances do not address whether a price increase will shift demand to the alternatives. *See* Mem. at 16-17.[5]

### 3. Desotech Fails to Allege Market Power in the Alleged Tied Market

Desotech asserts that it is "dubious" that market power in the tied product market is required for a tying claim in the Seventh Circuit (Resp. at 11), without offering any case or authority to support that assertion other than *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 719 (7th Cir. 1987). The Seventh Circuit overruled *Parts & Elec. Motors* on this point in *A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546, 550 (7th Cir. 1992). The court explained that it had established the requirement of tied market power in *Carl Sandburg Vill. Condo. Assoc. No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 210 (7th Cir. 1985), and *Will v.*

---

[5] "Plaintiffs remain responsible for defining a relevant market at the complaint stage." *Siemer v. Quizno's Franchise Co.*, No. 07-2170, 2008 WL 904874, at *9 (N.D. Ill. March 31, 2008) (dismissing tying claim), relying on *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). A complaint should be dismissed when its allegations defeat any chance of recovery. *Hill*, 2007 WL 1424211 at *8.

*Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir. 1985). Neither case has been reversed.[6]

*See also McLaughlin Equip. Co. v. Servaas,* No. IP98-0127-C-T/K, 2004 WL 1629603, *24 (S.D. Ind. Feb. 18, 2004) ( "An essential element of a tying claim is market power in the tied product market"). Tied market power is also a statutory requirement for Desotech's claim under Section 3 of the Clayton Act (Count II). *See* 15 U.S.C. § 14; *Apani Southwest, Inc. v. Coca-Cola Enterprises., Inc.*, 300 F.3d 620, 625 (5th Cir. 2002).

Desotech then asserts another straw man argument – that 3D Systems has attempted "to use a 50% market share percentage alone as a dispositive indicator of market power." Resp. at 12. It then asserts that 30 percent market share should have just that dispositive effect. *Id.* Whether market share is 30 percent or 50 percent, it is not dispositive, as 3D Systems set forth in its Memorandum. Market share is considered along with any other circumstances that, all together, impact 3D Systems' power in the alleged market. Mem. at 18-20.

As 3D Systems showed in its Memorandum, Desotech's allegations would defeat any proof of circumstances that, together with market share, would show 3D System's market power in the alleged tied product market. The existence of barriers to entry or expansion is frequently a factor that courts consider, along with market share, to determine whether a seller has market power. *See Will*, 776 F.2d at 672 n.3. Desotech, however, alleges the exact opposite: "Resin suppliers compete vigorously for business by ***continually offering new, improved resins***." AC ¶ 28 (emphasis added). It then contradicts itself with empty recitations of barriers to entry, but without any factual allegations, those conclusions are meaningless. AC ¶ 9. Desotech implies that 3D Systems uses its resins approval policy to prevent entry or expansion, but its allegations that some customers do not know about the policy and that one inquiry did not get returned are inadequate to allege the policy has an adverse effect on the "vigorous" competition for resins.

---

[6]    For a complete discussion of these authorities, *see* 3D Systems' Mem. at 18 n.11.

Moreover, 3D Systems' market power is also limited by the stiff competition that the Amended Complaint alleges exists now – not just in the past, as Desotech incorrectly asserts in its Response (at 23). As noted in the previous paragraph, Desotech claims that "resin suppliers compete vigorously for business by continually offering new, improved resins." ¶ 28. "Suppliers vigorously compete for [resin] customers." ¶ 47. Desotech also alleges the existence now of three main suppliers, as well as other smaller suppliers. ¶ 46.[7]

Finally, contrary to Desotech's argument, the Amended Complaint fails to allege that there is a dangerous probability that 3D Systems will acquire market power in the resins market. First, there are no factual allegations that plausibly suggest that resins used in Viper ™ Pro systems can only be used in Viper™ Pro systems, or that they can only be used in large-frame SL machines. AC *passim*. Second, Desotech acknowledges the existence of an installed base of systems and a secondhand market for large-frame SL systems. ¶¶ 29-31, 41. According to Desotech, the Viper™ Pro system has "severe quality problems" and many customers "prefer" Desotech's resins to those of 3D Systems, AC at ¶¶ 35, 38, so the theory of tying collapses of its own weight: with laser sintering, non-large-frame SL systems, and other rapid prototyping technologies available as well as a secondhand market for large-frame SL systems, it is indeed "imputing systematic irrationality to businessmen" to allege that customers will agree to buy resins they do not like if it is the only way to get the "more expensive" Viper™ Pro system, a system they do not want because of its alleged quality problems. *Scheiber*, 293 F.3d at 1020. As 3D Systems previously stated, the alleged tying would result in fewer sales of Viper™ Pro systems and more sales of competing RL technologies, not greater sales of resins.

---

[7]    Desotech notes that foreclosure of a substantial volume of interstate commerce is an element of a tying claim and asserts that the "Complaint plainly defeats 3DS's argument" on this point. Resp. at 20. 3D Systems did not make that argument or challenge this element of Desotech's tying claim, but the Amended Complaint is still fatally deficient. *See* note 2 above.

####    4.    Desotech Fails to Allege Harm to Competition, A Requirement of Antitrust Injury and a Rule of Reason Tying Claim

Desotech failed to plead factual allegations of an adverse effect on competition, a requirement of a rule of reason tying claim and of a showing of antitrust injury. *Banks v. National Collegiate Athletic Association,* 977 F.2d 1081, 1087-88 (7th Cir. 1992) (rule of reason claim); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977) (antitrust injury).

Desotech again asserts that its Amended Complaint is "replete" with allegations of an effect on competition, but an examination of each of the paragraphs to which it refers on pages 22-23 (¶¶ 5, 9, 40, 73, 75-77 and 78) shows that each is simply a factually empty conclusion of the required adverse effect. For example, Desotech asserts in its Response that it alleged an effect on competition in Paragraph 46 by stating that "3D Systems' market share has grown while it has engaged in its anticompetitive conduct." This is not a plausible allegation of unlawful conduct – it is merely a pairing of a neutral factual allegation ("3D Systems' market share has grown") with a legal conclusion ("it has engaged in its anticompetitive conduct"). The allegation is that 3D Systems' market share grew "while," not "because," it engaged in anticompetitive conduct, and nothing in the allegation precludes growth due to superior marketing or other lawful conduct.

Desotech next argues, incorrectly, that the motion to dismiss asks the Court to determine the factual issue of whether 3D Systems' resins approval process is pro- or anti-competitive. Resp. at 24. The motion to dismiss, however, simply points out that the Amended Complaint plausibly suggests a pro-competitive basis for the resin approvals process and does not contain factually sufficient allegations to support its suggestion that the process is a sham. According to the Amended Complaint, 3D Systems approved two of Desotech's resins (¶¶ 53, 73), discussed the approvals process with Desotech during negotiations regarding their relationship (¶ 52), and has explained to customers that the resins approval process addresses 3D Systems' concern that

untested and unapproved resins will not work properly in the Viper™ Pro system (¶ 54, 61). Desotech's allegations that this procedure is a sham are based on one inquiry that did not receive a response. There is no allegation that 3D Systems has ever refused to test a Desotech resin for potential approval. ¶ 55. Thus, Desotech has alleged a pro-competitive basis for the approvals process without alleging facts to show anticompetitive effects and thus has itself defeated its attempt to state a rule of reason claim for tying. *See United States v. Microsoft*, 253 F.3d at 95-96 (a practice is unlawful tying only if its harms outweigh its benefits in the tied product market).

All the Amended Complaint alleges with the factual specificity required by *Twombly* is that Desotech has lost resin sales to 3D Systems. Mere allegations of sales losses by Desotech do not allege harm to competition in the market for resins, as lost sales to a competitor in the crucible of effective day-to-day competition is not injury to competition. *See Midwest Gas Services, Inc. v. Indiana Gas Co.*, 317 F.3d 703, 712-13 (7th Cir. 2003) (injury to one competitor insufficient to show harm to competition because "plaintiff can only recover if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior," *quoting Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)). Desotech has not alleged that its losses are the consequence of any action by 3D Systems that reduced output or raised prices to consumers. *Tri-General Inc. v. International Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006) (for antitrust standing, party must show that its loss stems from reduced output or higher prices). It makes no allegation that 3D Systems' resins approval policy has caused any supplier to take resins off the market, that prices have increased or that any resin is no longer available for use in the SL large-frame system marketplace. AC *passim*, Resp. at 25-26.

Assuming *arguendo* that Desotech is correct in arguing that reduced choice constitutes harm to competition as a matter of law, no such reduction is plausibly alleged. Desotech refers

the Court to its claims that Express Pattern, Dynacept and Lockheed Martin would each like to use a particular Desotech resin but cannot (Resp. at 26), but, as shown above, there are no plausible factual allegations that these customers' choice of resins has been coerced. Moreover, the Amended Complaint acknowledges that Express Pattern and Dynacept "continue" to use Desotech resins now. AC ¶¶ 59, 62. Desotech also claims that it has alleged a reduction in choice by asserting that "Viper Pro customers now have only *two* non-3DS resins from which to choose rather than *forty*." Resp. at 26 (emphasis in original). This claim is contradicted by the allegations that customers such as Express Pattern continue to use non-approved resins, and that 3D Systems told customers that it has a process for approving other resins, approved two of Desotech's, and has discussed the licensing of resins with Desotech. Desotech can hardly show reduced choice by failing to do more than making one inquiry to get its resins approved.

**B.      Desotech Fails to Allege Facts Plausibly Suggesting the Elements of its Claim for Attempted Monopolization (Count IV)**

The parties agree that Desotech must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 540 (7th Cir. 1986). As shown in the Memorandum and this Reply, Desotech's factually neutral allegations and legal conclusions do not allege any "anticompetitive conduct" with sufficient specificity to allege the first element of attempted monopolization. Mem. at 27. Also as shown, Desotech failed to allege adequately the second element because the facts it pleaded (as opposed to conclusions recited) allege only a lawful intent to exclude competitors. *Id.* "Mere intention to exclude competition" does not show specific intent to monopolize, even where conduct drives a party's sole competitor out of business. *Great Escape,* 791 F.2d at 541.

Desotech notes that it alleged a 3D Systems share of the putative resins marketplace of 50%, and then misreads *L&W/Lindco Products* as standing for the proposition that "a market share of 40% is sufficient to prevail on the 'dangerous probability of success' element" (Resp. at 28). The case actually stands for something quite different:

> In *Vendo*, although a 30% market share, standing alone, was insufficient to establish a dangerous probability, the court noted that market performance, "while relevant [to monopoly power], is by no means dispositive." Similarly, in *Indiana Grocery*, the court emphasized that "market share is at best an indicator of market power." Accordingly, Pure Asphalt's alleged 40% potential market share does not preclude Lindco from proving at trial the "dangerous probability" element because market share is not dispositive of market power.

*L&W/Lindco Products, Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632, 637 (N.D. Ill. 1997).

*L&W/Lindco Products* simply held that market share alone is not dispositive.

Thus, whether the required dangerous probability exists depends on factors other than market share, as the other case cited by Desotech observes. *Nobody in Particular Presents, Inc., v. Clear Channel Communications, Inc.*, 311 F. Supp. 2d 1048, 1099-1103 (D. Colo. 2004). Here, however, Desotech has alleged that "resin suppliers compete vigorously for business by continually offering new, improved resins," competition both has been and is vigorous, AC ¶ 28, 46-47, and suppliers sell resins for use in the installed base of non-Viper™ Pro SL systems. These allegations defeat any possibility that Desotech can prove that a dangerous probability exists that 3D Systems will monopolize the alleged resins market. *See* Section II.A.3 above.

### C.    Desotech Fails to State Any Other Cause of Action

#### 1.    The Parties Agree that Tying Under the Illinois Antitrust Act Is Subject to the Same Law as Desotech's Sherman Act Claim (Count V)

Desotech agrees with 3D Systems' position that Desotech's state-law antitrust claims are subject to the same law as Desotech's federal antitrust claims. Hence, Desotech has failed to make out a state-law cause of action for the reasons discussed in Section II.A above.

2.    **Desotech Fails to Allege Required Elements of its Illinois Deceptive Trade Practices Act ("UDTPA")Claim (Count VI)**

As shown in 3D Systems' memorandum, the Illinois Uniform Deceptive Trade Practices Act ("UDTPA") requires specificity in pleading, which Desotech does not dispute. Resp. at 30. Moreover, as noted above, *Twombly* requires that a plaintiff set forth enough facts to show that its claims are plausible and not merely conceivable. Mem. at 5-6.

Most of the paragraphs of the Amended Complaint on which Desotech purports to rely for its UDTPA claim are merely empty recitations of the cause of action. Resp. at 29; AC ¶¶ 8, 53-55, 112 and 113. None of these paragraphs includes any facts about the dates, places or persons involved for any of the alleged disparaging statements. The allegations of disparagement that were rejected in *Stenograph Corp. v. Micrograph Corp.*, No. 86 C 10231, 1989 WL 99543, *4 (N.D. Ill. Aug. 22, 1989), are similar to Desotech's allegations. For example, one of the allegations of disparagement in that case was that the defendant had told customers that the plaintiff's products "do not function," just as Desotech has asserted that "3DS also told customers that Desotech's resins 'were of insufficient quality to run'" on 3D Systems' machines. *Id.* at *1; Resp. at 30; AC ¶ 54. The court in *Stenograph* held that such assertions lacked the specificity required to state a claim under the UDTPA. Without some specification of what was said to whom and when, the claim is possible for 3D Systems to investigate and would turn discovery into a massive fishing expedition. *See EEOC v. Concentra Health Service, Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (explaining that one of two "easy-to-clear hurdles" of *Twombly* is that "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests.")

The remaining few relevant statements – Paragraphs 52, 56, 63 and 67 of the Complaint – contain some detail, but fail to state a claim under the UDTPA for a different reason: they do not

contain any disparaging statements. As 3D Systems pointed out in its Memorandum, the UDTPA

defines disparagement as either a criticism of the quality of the plaintiff's goods, or a description

of those goods as substandard or harmful. Mem. at 29. The statements that Desotech refers to as

disparagement, however, are simply 3D Systems' explanations to customers that newer Somos

resins do not work with the Viper™ Pro. *See* AC ¶¶ 56, 63 & 67. Moreover, as stated above,

Desotech alleged that 3D Systems told its and others about its approval process and failed to

allege facts to suggest plausibly that the process was a sham. *See* AC ¶¶ 52, 53, 56, 58.[8]

### 3.    Desotech Fails to State a Cause of Action for Tortious Interference

"Lawful competition is not actionable even though carried to the extent of ruining a rival."

*Candalaus Chicago, Inc. v. Evans Mill Supply Co.,* 366 N.E.2d 319, 327, 51 Ill. App. 3d 38, 48

(Ill. App. Ct. 1977). Thus the question for Desotech's tortious interference claim is whether

Desotech has alleged facts that plausibly suggest unlawful competition. As shown in the

Memorandum and this Reply, Desotech has failed to do so, so this claim must also be dismissed.

## III.    CONCLUSION

For the foregoing reasons, 3D Systems requests that this Court dismiss Counts I-VII of the

Amended Complaint, and grant 3D Systems such other and further relief as is appropriate.

DATED: July 29, 2008

/s/   Paula W. Render
*One of the Attorneys for 3D Systems Corp.
and 3D Systems, Inc.*

Sidney David (sdavid@ldlkm.com)
Jonathan A. David (jdavid@ldlkm.com)
LERNER DAVID LITTENBERG KRUMHOLZ &
MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel: (908) 654-5000
Fax: (908) 654-7866

Michael Sennett (msennett@jonesday.com)
Paula W. Render (prender@jonesday.com)
Niloy Ray (nray@jonesday.com)
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601
Tel: (312) 782-3939
Fax: (312) 782-8585

---

[8]   Desotech misstates 3D Systems' Memorandum (and its own Amended Complaint) by ignoring the qualifier "newer," *cf.* Mem. at 30-31 & Resp. at 30, to argue that 3D is misleading customers regarding the compatibility between **older** Somos resins with the Viper Pro™. *See* Resp. at 30-31.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on July 29, 2008, a copy of the foregoing

**Reply in Support of Motion To Dismiss Desotech's Antitrust and State Law Claims** was

served via ECF pursuant to Local Rule 5.5 to the following attorneys of record:

Andrew S. Marovitz
Britt M. Miller
Thomas V. Panoff
courtnotification@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606

Bruce M. Gagala
Jeffrey B. Burgan
bgagala@leydig.com
jburgan@leydig.com
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
180 North Stetson Avenue
Chicago, Illinois 60601

/s/ Niloy Ray
Niloy Ray

CHI-1658909v10