**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **DSM DESOTECH INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 CV 1531** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **3D SYSTEMS CORPORATION and 3D SYSTEMS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This case arises out of an eight-count complaint filed by plaintiff, DSM Desotech, Inc.

("Desotech"), against defendants, 3D Systems Corporation and 3D Systems, Inc. (collectively,

"3DS"), for violations of federal antitrust law, state antitrust law, state tort law, and federal

patent law.  Before the court is 3DS's motion to dismiss Counts I through VII of Desotech's

complaint, the antitrust and state law claims, pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure.  For the reasons set forth below, 3DS's motion to dismiss [#29] will be granted

in part and denied in part.

**BACKGROUND**

3DS is a manufacturer of large-frame stereolithography ("SL") machines.  SL is a

process by which a physical object, such as a model, is created layer by layer from liquid resin

that is solidified into shape with a laser.  Because the end product created by the SL process is

dependent in large part on the quality and specifications of the resins used to create it, a

substantial amount of research and development is devoted to the creation of new types of resins.

Desotech is a leader in the SL resin market and the holder of two equipment patents allegedly

covering the resin recoating technology used in eight of the SL machines produced and sold by 3DS. 3DS likewise produces resins that can be used in the machines it sells.

Desotech alleges that since 2007, 3DS has engaged in unlawful tying, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and section 3 of the Clayton Act, 15 U.S.C. § 14, (Counts I and II) by conditioning the sale and maintenance of its large-frame SL machines on the purchase of 3DS's resins. According to the complaint, 3DS "has expressly refused to sell and service its most recent large-frame SL machine—the Viper Pro SLA System—unless customers exclusively purchase resin from 3DS." Am. Comp. ¶ 5.

According to Desotech, 3DS has begun informing customers that only "licensed" or "approved" resins can be used in the Viper Pro, though 3DS neither told customers about the resin limitation at the time of sale nor informed competing resin suppliers about the requisite approval process. To enforce this mandate, 3DS has included in the Viper Pro a radio frequency identification, or "RFID," feature which, if activated by 3DS, will prevent the machine from working should customers attempt to use competing brands of resin. Although customers were aware that the RFID component existed, they allegedly did not know this feature could be used to preclude the use of competing resins that they may want to use. Furthermore, 3DS did not attempt to activate the RFID feature until recent software updates were made to machines already purchased. Regarding those Viper Pro machines in which 3DS has not already activated the RFID feature, 3DS has told its customers that it soon intends to do so. 3DS has warned customers that if they refuse to allow the RFID feature to be activated or if they continue to use unapproved resin, the warranty supplied by 3DS at the time of purchase will be voided.

Desotech further alleges that although 3DS used to make several other large-frame SL machines that do not have an RFID component, 3DS has stopped manufacturing those models and, moreover, is attempting to systematically eliminate them from the market. For example, 3DS has allegedly reached an agreement with a leading SL machinery maintenance contractor, National RP Support, Inc. ("National RP"), to stop servicing those older large-frame machines for which no contractual servicing obligation exists. Desotech also asserts that 3DS is removing existing large-frame SL machines from the market by offering substantial incentives to customers to trade-in old machines and purchase a Viper Pro.

Desotech alleges that in addition to unlawful tying, 3DS's contracting and licensing practices amount to an unlawful restraint of trade and attempted monopolization of the SL resin market in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (Counts III and IV, respectively), and the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3 (Count V).

Desotech's complaint further alleges that 3DS has made false, misleading, and disparaging statements to Desotech customers about the quality and fitness for use of Desotech's resins, in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2(a)(7)–(8), and that 3DS has tortiously interfered with prospective economic advantages reasonably anticipated by Desotech, in violation of Illinois state law.

3DS moves to dismiss all of the antitrust and state law claims set forth in the complaint.

**STANDARD OF REVIEW**

Defendants bring their motion under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. The Supreme Court recently addressed the proper application of the federal notice pleading standards, particularly in regard to antitrust actions, in *Bell Atlantic*

3

*Corp.* v. *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). In *Twombly*, the

Court "retire[d]" the frequently quoted language of *Conley* v. *Gibson*, 355 U.S. 41, 45–46, 78 S.

Ct. 99, 2 L. Ed. 2d 80 (1957), "that a complaint should not be dismissed for failure to state a

claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968–69 ("The phrase is best

forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has

been stated adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint."). Instead, at the pleading stage, there must be "allegations

plausibly suggesting" an antitrust violation; the mere possibility of later "unearthing direct

evidence" through discovery is not enough to preclude dismissal. *Twombly*, 127 S. Ct. at 1966,

1968.

The Seventh Circuit has explained that despite "some language that could be read to

suggest otherwise, the Court in *Twombly* made clear that it did not, in fact, supplant the basic

notice-pleading standard." *Tamayo* v. *Blagojevich*, 526 F.3d 1074, 1083 (2008); *see also*

*Twombly*, 127 S. Ct. at 1973, n.14 (expressly disclaiming the establishment of "any 'heightened'

pleading standard" or broadening of the scope of Fed. R. Civ. P. 9); *Lang* v. *TCF Nat'l Bank*,

249 Fed. Appx. 464, 466–67 (7th Cir. 2007) (noting that notice pleading remains the pleading

standard). A plaintiff still must provide only "enough detail to give the defendant fair notice of

what the claim is and the grounds upon which it rests, and, through his allegations, show that it is

plausible, rather than merely speculative, that he is entitled to relief." *Lang*, 249 Fed. Appx. at

466 (internal quotation marks and ellipses omitted) (citing *EEOC* v. *Concentra Health Care*

*Servs., Inc.*, 496 F.3d 773, 776–77 (7th Cir. 2007) (citing *Twombly*, 127 S. Ct. at 1964)).

For complaints involving complex litigation—for example, antitrust or RICO claims—a fuller set of factual allegations may be necessary to show that plaintiff's claims are plausible. *Limestone Dev. Corp.* v. *Village of Lemont, Ill.*, 520 F.3d 797, 803 (7th Cir. 2008). Nevertheless, a plaintiff's complaint need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide the defendant with "fair notice" of the claim and its basis. *Twombly*, 127 S. Ct. at 1964. In addressing a rule 12(b)(6) motion, the court construes the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations and drawing all reasonable inferences in her favor. *Tamayo*, 526 F.3d at 1081.

## DISCUSSION

### I. Tying Claims (Counts I and II)

Desotech has filed two counts against 3DS for unlawful tying, the first under § 1 of the Sherman Act (Count I) and the second under § 3 of the Clayton Act (Count II). Although some older cases state otherwise, the standards for adjudicating tying claims under the two statutes are now recognized to be the same. *Sheridan* v. *Marathon Petroleum Co.*, 530 F.3d 590, 592 (7th Cir. 2008). In a tying agreement, a seller conditions the sale of a product or service on the buyer's purchase of another product or service from, or by direction of, the seller. *Id.* at 592. Of course, every refusal to sell two products separately cannot be said to restrain competition. *Reifert* v. *S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 322 (7th Cir. 2006). If each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market. *D.O. McComb & Sons, Inc.* v. *Memory Gardens Mgmt. Corp., Inc.*, 736 F. Supp. 952, 957 (N.D. Ind. 1990).

The Supreme Court has established that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or would have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2, 12, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984), *abrogated on other grounds by Ill. Tool Works, Inc.* v. *Indep. Ink, Inc.*, 547 U.S. 28, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006). Where such "forcing" is present, "competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.* In order to establish the per se illegality of a tying arrangement, a plaintiff must demonstrate that (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected. *Reifert*, 450 F.3d at 316 (7th Cir. 2006). In addition, the Seventh Circuit has held that "an illegal tying arrangement will not be found where the alleged tying company has absolutely no economic interest in the sales of the tied seller, whose products are favored by the tie-in." *Carl Sandburg Vill. Condo. Ass'n No. 1* v. *First Condo. Dev. Co.*, 758 F.2d 203, 207–08 (7th Cir. 1985); *accord Reifert*, 758 F.2d at 316.

Defendants contend that Desotech's complaint fails to adequately allege the first three elements of an unlawful tying arrangement. Because the court agrees that Desotech did not adequately plead the third element—that the tying arrangement forecloses a substantial volume of commerce—the other elements need not be addressed at this time.

The ultimate flaw in Desotech's tying claim is its failure to allege the existence of a coerced tying arrangement on the part of 3DS. As the Supreme Court has explained, "the

essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product" he does not want. *Jefferson Parish*, 466 U.S. at 12 (emphasis added). If the consumer remains free to buy the tying product without also buying the product to which it is ostensibly tied, then no coercion has occurred. *See id.* at 12 n.6 (citing *N. Pac. Ry. Co.* v. *United States*, 356 U.S. 1, 6 n. 4, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958)). Even if the defendant attempts to induce consumers into purchasing both products he sells by offering the bundle at discount prices, he has not engaged in illegal tying so long as the consumer remains free to purchase each item separately. *See Schor* v. *Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) (drug manufacturer did not effect a tying arrangement when selling a patented drug in combination with another drug at a discount because patented drug was also available for sale separately). This is because antitrust law is only concerned with behavior that has "a substantial potential for impact on competition." *Jefferson Parish*, 466 U.S. at 16. Furthermore, "[i]f only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law." *Id.*

Many circuits thus require plaintiffs alleging tying claims to show not only that a defendant has market power but also that the defendant has wielded such market power to force consumers to alter their purchasing choices. *See, e.g.*, *United States* v. *Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001); *Thompson* v. *Metro. Multi-List, Inc.*, 934 F.2d 1566, 1577 (11th Cir. 1991). Although the Seventh Circuit does not explicitly require evidence of coercion as an independent element of tying claims, Judge Wood has recognized that demonstrating foreclosure of competition in the tied product market—the third element of the Seventh Circuit's test—is

essentially equivalent to the "coercion element" required by other circuits. *Reifert*, 450 F.3d at 323 (Wood, J., concurring). After all, if the defendant has not forced consumers into the tying arrangement alleged, it can hardly be said that such arrangements have substantially affected interstate commerce to the detriment of those consumers.

Here, Desotech's complaint fails to adequately allege coercion on the part of 3DS. Although Desotech states that 3DS "expressly refuses to sell and service" its newest line of SL machines unless customers purchase their resin exclusively from 3DS, Am. Compl. ¶ 5, Desotech's allegations regarding particular customers fail to support such a conclusion.

Desotech alleges that 3DS told two Desotech customers, Express Pattern and Dynacept, that they could not use newer Desotech resins in their Viper Pro machines. Desotech further alleges that 3DS told Dynacept that if it continued to use "non-approved" Desotech resins in its Viper Pro machines, 3DS would withhold maintenance service and void existing warranties. Am. Compl. ¶ 63.

Although such actions on the part of 3DS might be considered a breach of warranty (or otherwise anticompetitive, as discussed in further detail below), such allegations do not amount to a tie-in. *See, e.g.*, *Va. Panel Corp.* v. *MAC Panel Co.*, 133 F.3d 860, 870–71 (D.C. Cir. 1998) ("[V]oiding a warranty on a product already sold, while possibly a breach of warranty, cannot be a tying arrangement because the purchaser is not deciding whether to buy a product."). To the extent Desotech complains that 3DS is tying the sale of its machine to its resins, such assertions cannot be supported by 3DS's actions towards Express Pattern and Dynacept, both of which had already purchased their Viper Pros at the time the alleged tie-in was executed. *See N. Pac. Ry.*, 356 U.S. at 5–6 ("For our purposes a tying arrangement may be defined as an agreement by a

party to *sell one product but only on the condition* that the buyer also purchases a different (or

tied) product, or at least agrees that he will not purchase that product from any other supplier.")

(emphasis added).

Furthermore, to the extent that 3DS alleges that service or maintenance of the machines

is the tying market at issue for these consumers,[1] Desotech has failed to identify, much less

adequately allege, a market for such service, as would be required in order to allege that 3DS has

market power in the tying market.[2] *Cf.* Am. Compl. ¶ 82 ("*Large-frame SL machines (i.e., the*

*tying product)* and resins for those machines (i.e., the tied product) constitute separate and

distinct products.") (emphasis added).

Nor are Desotech's tying allegations saved by its pleadings with respect to Tangible

Express or AP Pronto ("APP"), two other Desotech customers. Desotech alleges that as part of a

transaction in which Tangible Express purchased six Viper Pro machines from 3DS, those

companies executed a memorandum of understanding that "expressly required Tangible Express

to purchase all of its resin for the six Viper Pro machines directly from 3DS."[3] Am. Compl. ¶

68. While this allegation clearly alleges a contract of exclusive dealing between 3DS and

Tangible Express, Desotech does not allege that 3DS required such exclusive dealing as a

[1] Although the complaint never explicitly identifies maintenance of large-frame SL machines as a relevant "tying market," it repeatedly alleges that 3DS "*condition*[*ed*] *the* sale and/or *maintenance* of its large-frame SL machines on the purchase of its own SL resins." Am. Compl. ¶¶ 80, 90, 94.

[2] The complaint suggests that there are at least a few third-party maintenance contractors who could provide service to Viper Pro owners independent of 3DS. While one such contractor has allegedly agreed with 3DS not to provide service to Viper Pro owners who use Desotech resins, the court is unable to assess a maintenance/resin tying claim absent further factual detail about the market for SL machine service.

[3] Although 3DS submitted along with its motion to dismiss a copy of the memorandum of understanding, the court finds Desotech's allegations inadequate even without consideration of the submitted exhibit and, therefore, will not consider it at this time.

condition on the sale of its Viper Pro machines. Similarly, Desotech alleges that in a recent deal between 3DS and APP, "3DS required APP to trade-in an older SL machine for a Viper Pro and to purchase its resins exclusively from 3DS rather than Desotech." Am. Compl. ¶ 70. Desotech once again failed, however, to allege that such exclusive dealing was a precondition to the availability of 3DS's new Viper Pro.[4] It could be consistent with lawful behavior on the part of 3DS if it won those exclusive contracts through aggressive selling techniques or discounts on its products. *See Waldo* v. *N. Am. Van Lines, Inc.*, 669 F. Supp. 722, 731 (W.D. Pa. 1987) ("[S]imply characterizing an exclusive dealing arrangement as a tying arrangement does not necessarily make it one.") (citations omitted). Indeed, nowhere does Desotech allege that either of these customers is unhappy with its current resin sourcing arrangements.

The closest Desotech comes to an adequate allegation of coercion is in its assertions regarding the interaction between 3DS and Lockheed Martin ("Lockheed"), another Desotech customer. Desotech alleges that in mid-2007, Lockheed Martin informed 3DS that one of its SLA 500 machines, a predecessor to the new Viper Pro, stopped working.[5] Desotech further alleges that "[a]fter a significant amount of pressure from 3DS, including 3DS's refusal to sell the Viper Pro machine to Lockheed unless Lockheed agreed to purchase resins exclusively from 3DS and to stop purchasing resins from Desotech, Lockheed agreed to purchase a Viper Pro to

---

[4] In its response brief, Desotech asserts that the complaint alleges that "AP Proto, Lockheed and Tangible Express were *required* to purchase their resins exclusively from 3DS as a condition to buying their Viper Pro machines." Pl.'s Resp. at 14 (emphasis in original). Desotech did not, however, include such an assertion in its amended complaint. Furthermore, even if that language had been included in the amended complaint, it is not clear that such a "conclusory allegation," without more factual specificity as to each of the three customers, would be sufficient under *Twombly*, 127 S. Ct. at 1966.

[5] According to the complaint, 3DS has stopped manufacturing its older lines of SL machines, including the SLA 500.

10

replace its SLA 500 machine." Am. Compl. ¶ 66. Desotech also alleges that Lockheed is unhappy about this arrangement and has expressed to Desotech its desire to use Desotech's resins rather than 3DS's.

With these allegations concerning Lockheed, Desotech has given 3DS notice of its claim and identified a particular set of events from which 3DS could begin to prepare a defense. Most importantly, Desotech alleges that Lockheed did not want to purchase 3DS's resins, but that Lockheed was nevertheless required to if it wanted to continue to purchase and use 3DS's SL machines. Such allegations form the cornerstone of a successful tying claim. Still, these particular allegations alone cannot carry Desotech's burden on this motion to dismiss. As the Supreme Court made clear in *Jefferson Parish*, "[i]f only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law," 466 U.S. at 16, and, furthermore, Desotech alleges that Lockheed purchased only a single Viper Pro machine.

Because Desotech has failed to sufficiently allege the existence of an illegal tying arrangement, Counts I and II of its complaint will be dismissed without prejudice.

## II. Attempted Monopolization (Count IV)

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ." 15 U.S.C. § 2. Desotech alleges that 3DS has attempted to monopolize the SL resin market. To prove attempted monopolization, a plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific

intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 456, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993); *accord Indiana Grocery, Inc.* v. *Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir. 1989); *Nat'l Black Expo* v. *Clear Channel Broad., Inc.*, 2007 WL 495307, at *8 (N.D. Ill. Feb. 8, 2007).

### A. Dangerous Probability of Success

The "dangerous probability" element requires allegations that 3DS had sufficient market power to threaten actual monopolization within the relevant market. *Indiana Grocery*, 864 F.2d at 1413. As discussed below, Desotech's complaint sufficiently alleges that 3DS poses a dangerous probability of acquiring monopoly power in the SL resin market .

### 1. Market Power

Desotech alleges that 3DS has the market power to threaten actual monopolization. Specifically, Desotech alleges that 3DS has a "present and growing market share of over 50%" of the SL resin market, making it the single largest supplier. Am. Compl. ¶ 9. Although 3DS cites *Blue Cross & Blue Shield United of Wisconsin* v. *Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995), for the proposition that "[f]ifty percent is below any accepted benchmark for inferring monopoly power from market share," 3DS has conflated the terms *monopoly* power and *market* power. Although the terms are synonymous in most respects and are sometimes used interchangeably, *see, e.g.*, *Cost Management Services, Inc.* v. *Washington Natural Gas Co.*, 99 F.3d 937, 950 n.15 (9th Cir. 1996), "monopoly power" generally denotes some higher threshold of market power than does the term "market power" alone.[6] *See, e.g.*, *Eastman Kodak*

---

[6] Whereas the Seventh Circuit has long been comfortable defining monopoly power in simple terms—e.g., "power over price" or "the ability to cut back the market's total output and so raise prices," *Indiana Grocery*, 864 F.2d at 1414—it commented in a recent opinion that "'market power' is key, but its meaning requires elucidation." *Sheridan* v. *Marathon Petroleum*

*Co.* v. *Image Technical Services, Inc.*, 504 U.S. 451, 481, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1."); *Bacchus Indus., Inc.* v. *Arvin Indus., Inc.*, 939 F.2d 887, 894 (10th Cir. 1991) ("Monopoly power is also commonly thought of as substantial market power.").

With respect to a claim for attempted monopolization, a plaintiff need only show that 3DS currently has *market* power and that such market power will tend to approach monopoly power if the alleged unlawful conduct remains unchecked. *See Star Fuel Marts, LLC* v. *Sam's East, Inc.*, 362 F.3d 639, 648 n.3 (10th Cir. 2004) ("[A]n attempted monopolization claim requires . . . that the defendant have sufficient market power such that there is a 'dangerous probability' that an attempt to achieve monopoly power will succeed.") (internal quotation marks omitted) (citing *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 251, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993)). In *Lektro-Vend*, the court held that the defendant's alleged practices "raise[d] a dangerous propensity for creation of an actual monopoly." *Lektro-Vend Corp.* v. *Vendo Co.*, 403 F. Supp. 527, 534 (C.D. Ill. 1975), *aff'd* 545 F.2d 1050 (7th Cir. 1976), *rev'd on other grounds*, 433 U.S. 623, 97 S. Ct. 2881, 53 L. Ed. 2d 1009 (1977). In reaching this determination, the court emphasized that the defendant maintained a "significant market share," "most probably over 20%." *Id.* The court also observed that "the number of competitors [had] been steadily declining" within the relevant market. *Id.*; *see also Hardy* v. *City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994) (noting in a related context that 30% is "the minimum market share from which the market power required to be shown at the threshold of a tying case can be inferred").

_____

*Co. LLC*, 530 F.3d 590, 594 (7th Cir. 2008).

Here, Desotech similarly alleges that since 3DS began the alleged unlawful behavior in mid-2007, 3DS's market share has been increasing and, consequently, the shares of Desotech and other resin dealers steadily decreasing. At this stage of the litigation, absent the aid of discovery, Desotech need not allege in exact numbers the percentage increase of 3DS's market share. Furthermore, "the Sherman Act's prohibition against attempted monopolization does not require that the attempt in fact ripen into an actual monopoly. It is the attempt which is the offense." *Lektro-Vend Corp.* v. *Vendo Co.*, 660 F.2d 255, 270 (7th Cir. 1981). As alleged by Desotech, the market for SL resin is highly concentrated, with 95% of the market represented by three suppliers—3DS (50%), Desotech (35%), and Huntsman (10%). If Desotech were forced out of the market, 3DS's market power would likely increase substantially.

3DS maintains that Desotech's allegations of market power are nevertheless inadequate because market share alone is insufficient to indicate market power. Even if 3DS's market share alone is an insufficient indicator of its capacity to control prices and exclude competitors, however, consideration of other factors relevant to the dangerous probability analysis—"the alleged offender's ability to achieve the forbidden result, his intent, and the nature of his overt actions," *Lektro-Vend*, 660 F.2d at 271 (internal citations omitted)—indicate that Desotech has adequately alleged the dangerous probability element of its attempted monopolization claim.

For example, 3DS has allegedly leveraged its monopoly power in the market for large-frame SL machines to exclude competitors from the resin market by outfitting its machines with an RFID feature that will render the machine inoperable should the operator attempt to use unapproved resins. Further allegations indicate that 3DS has attempted to systematically remove from the market (or prevent from being serviced) older SL machines that lack the RFID feature.

Such actions would undoubtedly increase 3DS's ability to control prices and exclude competitors in the SL resin market. Although 3DS asserts that it has instituted a licensing and qualification process by which competing resin producers might remain active, Desotech has plausibly alleged that the asserted licensing process is in fact a sham.

### 2. Relevant Market

The relevant market is defined as "the market area in which the seller operates, and to which the purchasers can practicably turn for supplies." *Nat'l Black Expo*, 2007 WL 495307, at *8 (quoting *Tampa Elec. Co.* v. *Nashville Co.*, 365 U.S. 320, 327, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961)). The relevant market contains both product and geographical components. *Spectrum Sports*, 506 U.S. at 459. The definition of the relevant market is determined based on "the nature of the commercial entities involved and by the nature of the competition that they face." *United States* v. *Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 359, 90 S. Ct. 2035, 26 L. Ed. 2d 658 (1970).

Desotech defines the relevant product market as "resins used in [large-frame SL] machines" and the relevant geographic market as "the United States." Am. Compl. ¶¶ 26, 27. As market definitions are questions of fact ordinarily determined at trial, *L&W/Lindco Prods.* v. *Pure Asphalt Co.*, 979 F. Supp. 632, 638 (N.D. Ill. 1997), Desotech has pled a relevant market sufficient to survive a motion to dismiss. *See Todd* v. *Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001) ("At [the pleading] stage, it is sufficient that plaintiff has alleged specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes.").

## B. Predatory or Anticompetitive Conduct

The Supreme Court has characterized this element of the attempted monopolization offense as "the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak Co.* v. *Image Technical Servs., Inc.*, 504 U.S. 451, 482–83, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) (quoting *United States* v. *Griffith,* 334 U.S. 100, 107, 68 S. Ct. 941, 92 L. Ed. 1236 (1948)). Predatory conduct has been broadly defined as conduct "that has no legitimate business justification other than to destroy or damage competition." *Great Escape*, 791 F.2d at 541. The Seventh Circuit has stated more generally, however, that when it comes to liability under § 2 of the Sherman Act, "if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant." *Olympia Equip. Leasing Co.* v. *W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) (citing *Ball Mem'l Hosp.* v. *Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1338–39 (7th Cir. 1986)).

The conduct alleged by Desotech is plainly anticompetitive and intended to foreclose competition. 3DS cites Judge Posner's antitrust textbook for the proposition that "promoting customer satisfaction by restricting the supplies that can be used in a seller's equipment to those that meet the seller's qualification is procompetitive." Defs.' Memo. at 24 (citing RICHARD A. POSNER, ANTITRUST LAW 201 (2d ed. 2001)). But the allegations set forth in the complaint do not suggest that 3DS's restrictions on resins used in Viper Pro machines promote customer satisfaction. On the contrary, Desotech alleges that several of its customers have identified mechanical problems when using 3DS resins in their Viper Pros. For example, Lockheed is allegedly unable to use the Desotech resin that it has identified as ideal for its particular purpose;

instead, it has been required to use 3DS resins which it has found to be disappointing and "insufficiently accura[te], with particularly bad 'differential shrink,' which is different dimensional changes based on the thickness of the part." Am. Compl. ¶ 67.

Even if the court were to assume, however, that there are some 3DS consumers who are happier with the RFID-laden Viper Pro than they were with machines absent such a feature, 3DS's other alleged actions also foreclose competition. Desotech has alleged that the RFID licensing and qualification procedure is non-existent, which places 3DS in complete control of competition in the resin market for Viper Pros. Desotech has further alleged that because of this licensing inadequacy, 3DS has reduced the number of resins available to Viper Pro owners from over 40 to just a few.

Additionally, Desotech has alleged that 3DS is systematically preventing older SL machines from remaining on the market and that it is actively preventing current Viper Pro owners from disabling the RFID feature. According to Desotech, 3DS has stopped producing non-RFID machines altogether. While a company has no obligation to continue producing older lines of products it no longer deems profitable, Desotech alleges that 3DS is attempting to eliminate the secondary market for SL machines by removing its older products from commerce. *Cf. United States* v. *United Shoe Mach. Corp.*, 110 F. Supp. 295, 334, 343–44 (1922) (finding that defendant had monopolized the shoe machinery market by, in part, purchasing "second-hand machinery mostly of its own manufacture" for the purpose of "curtail[ing] competition from second-hand shoe machinery"), *aff'd* 347 U.S. 521, 74 S. Ct. 699, 98 L. Ed. 910 (1954) (per curiam). If successful, such a scheme could further strengthen 3DS's control over competition in

the SL resin market by eliminating from the market any older SL machines, which lack the RFID feature and thus allow for use of competing resins.

For example, Desotech alleges that maintenance contractor National RP has entered into a contract with 3DS that requires National RP "to cease servicing and refurbishing all SLA 500 machines not currently covered by an existing maintenance contract." Am. Compl. ¶ 71. Such a contract has no obvious business justification other than increasing 3DS's market power in the SL machine and resin markets. National RP has also allegedly agreed with 3DS to stop servicing Viper Pro machines used with "non-approved" Desotech resins. Am. Compl. ¶¶ 63, 72. The procompetitive justifications for such a restriction are not readily apparent. For example, if a 3DS customer would rather void the warranty on its Viper Pro than be subject to restrictions on its choice of resin, what legitimate interest would 3DS have in preventing that customer from independently hiring a third-party maintenance provider such as National RP? Ultimately, Desotech will have the burden of proving that the anticompetitive harm from 3DS's conduct outweighs the procompetitive benefits. For purposes of this motion to dismiss, however, Desotech has sufficiently alleged predatory or anticompetitive conduct.

### C. Specific Intent

Because "[a]ll lawful competition aims to defeat and drive out competitors," the "mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize." *Great Escape Inc.* v. *Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986) (internal citations omitted). Rather, the acts from which the court can infer specific intent must be essentially predatory in nature. *Id.* Although the specific intent requirement is consistently listed in the Seventh Circuit as a separate inquiry from the predatory

18

conduct element, the same evidence that is used to prove predatory conduct often establishes specific intent as well. *See, e.g.*, *L&W/Lindco*, 979 F. Supp. at 638–39. As discussed above, Desotech has sufficiently alleged predatory conduct, and specific intent—"an intent to control prices and destroy competition," *id.* at 639—can be inferred from the same allegations. *See Great Escape*, 792 F.2d at 541 ("Specific intent may be inferred from predatory conduct . . . .").

### D. Antitrust Injury

3DS's last argument for dismissal of Desotech's attempted monopolization claim is based on its contention that Desotech has failed to allege antitrust injury. To have a right of action under the antitrust laws of the United States, a "plaintiff must prove the existence of '*antitrust injury*, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 334, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990) (emphasis in original) (quoting *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)). In other words, it is not enough for a plaintiff to show injury in fact that is causally linked to the illegal conduct; the plaintiff must further show injury that "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp.*, 429 U.S. at 489.

The Seventh Circuit has interpreted this standard as requiring that a plaintiff "show that its loss comes from acts that reduce output or raise prices to consumers" in order to sufficiently plead antitrust injury. *See Stamatakis Indus., Inc.* v. *King*, 965 F.2d 469, 471 (7th Cir. 1992) (quoting *Chi. Prof'l Sports Ltd. Partnership* v. *Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992)); *accord U.S. Gypsum Co.* v. *Ind. Gas Co.*, 350 F.3d 623, 626–27 (7th Cir. 2003). If

"a victory for the competitor can confer no benefit, certain or probable, present or future, on consumers . . . a court is entitled to question whether a violation of antitrust law is being charged." *Brunswick Corp.* v. *Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984).

Desotech has plainly alleged antitrust injury. Desotech's complaint states that 3DS's anticompetitive behavior forecloses existing competition, discourages innovation, and "dissuades potential new entrants from entering the large-frame SL resin market." Am. Compl. ¶ 77. It alleges further that as a result of 3DS's actions, resin purchasers "will have a substantially smaller selection of resins from which to make their end products." Am. Compl. ¶ 78. Should Desotech ultimately prove these allegations and prevail in this litigation, Desotech's victory would also be a win for consumers.

For these reasons, the court denies 3DS's motion to dismiss Desotech's claim for attempted monopolization, Count IV of the amended complaint.

## III. Unreasonable Restraint of Trade (Count III)

In Count III, its claim for unreasonable restraint of trade under section 1 of the Sherman Act, Desotech alleges that in addition to the tying allegations,

> 3DS's conduct in contracting and licensing with its customers constitutes an unreasonable restraint of trade and commerce, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. In particular, 3DS's unilateral declaration that all machine warranties are void if a customer does not purchase its resins from 3DS and its failure to service a large frame SL machine until a customer switches resin orders to 3DS constitute an unreasonable restraint of trade.

Am. Compl. ¶ 94.

In its memorandum in support of its motion to dismiss, 3DS does not specifically address the sufficiency of Count III. Although 3DS does argue that the complaint fails to make certain allegations that are "necessary for *all* of Desotech's antitrust claims," Defs.' Mem. at 15

20

(emphasis added), the court, in its analysis of the attempted monopolization claim, has already considered and rejected those general arguments.

"The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1." *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, — U.S. —, 127 S. Ct. 2705, 2712, 168 L. Ed. 2d 623 (2007). Rule of reason analysis of claims arising under section 1 of the Sherman Act is similar to analysis of monopolization claims under section 2. *United States* v. *Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001). Under either analysis, courts apply a balancing approach, weighing the anticompetitive harm of the conduct against the procompetitive benefit. *Id.* The essence of the rule of reason analysis under section 1 is the requirement that the plaintiff "show that the challenged restraint has an adverse impact on competition in a relevant market." *Dos Santos* v. *Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir. 1982). Having found (as discussed above) that Desotech sufficiently alleged a claim for attempted monopolization under section 2, the court finds that the same allegations also support, in large part, its claim under section 1.

Of course, in contrast to section 2, section 1 of the Sherman Act reaches only "unreasonable restraints of trade effected by a 'contract, combination . . . or conspiracy' between separate entities" and "does not reach conduct that is 'wholly unilateral.'" *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984) (quoting 15 U.S.C. § 1). Although Desotech's section 1 allegations are, by their own terms, premised largely on 3DS's "unilateral declaration," *id.* ¶ 94, Desotech further alleges that "[t]he contracts and licenses between 3DS and its customers constitute concerted action." *Id.* ¶ 95. Thus, Desotech's section 1 allegations are not based entirely on unilateral conduct and do not fail on that count.

3DS's motion to dismiss Count III is therefore denied.

**IV.  Illinois Antitrust Act (Count V)**

Both parties agree that courts "shall use the construction of the federal law by the federal courts as a guide in construing [the Illinois Antitrust Act]" when "the wording [of the Act] is identical or similar to that of federal antitrust law."  740 Ill. Comp. Stat. 10/11.  The language of 740 Ill. Comp. Stat. 10/3, the provision of the Illinois Antitrust Act cited in Desotech's state antitrust count, is similar, in relevant parts, to the Sherman Act and the Clayton Act.  The court will thus look to federal law interpreting the relevant language of those federal antitrust statutes for guidance in analyzing Desotech's claims under the Illinois Antitrust Act.  *A & A Disposal & Recycling, Inc.* v. *Browning-Ferris Indus. of Ill., Inc.*, 664 N.E.2d 351, 352–53, 279 Ill. App. 3d 337, 215 Ill. Dec. 954 (Ill. App. Ct. 2d Dist. 1996).  Because Desotech has stated valid claims for attempted monopolization under section 2 of the Sherman Act and for unreasonable restraint of trade under section 1 of the Sherman Act, Desotech has likewise stated a valid claim under 740 Ill. Comp. Stat. 10/3.  3DS's motion to dismiss Count V is therefore denied.

**V.  Illinois Uniform Deceptive Trade Practices Act (Count VI)**

In Count VI, Desotech brings claims for commercial disparagement under sections 2(a)(7) and 2(a)(8) of the Illinois Uniform Deceptive Trade Practices Act (IUDTPA), 815 Ill. Comp. Stat. 510/2.  To state a claim for commercial disparagement under section 2(a)(8), a plaintiff must allege that the defendant made specific statements "disparag[ing] the goods, services, or business of another by false or misleading representation of fact." 815 Ill. Comp. Stat. 510/2(a)(8); *accord Stenograph Corp.* v. *Microcat Corp.*, No. 86 C 10231, 1989 WL 99543, at *4 (N.D. Ill. Aug. 22, 1989).  Similarly, under section 2(a)(7), a plaintiff must allege

that the defendant "represent[ed] that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another." 815 Ill. Comp. Stat. 510/2(a)(7).

The complaint alleges that 3DS made various disparaging statements and misrepresentations to Desotech customers, including (1) that Desotech "had not done its 'due diligence'" with respect to certain of its resins, Am. Compl. ¶ 54; (2) that those resins "were of insufficient quality to run on 3DS's large-frame SL machines" (though, Desotech further alleges, "3DS itself had previously distributed some of the exact same resins under its distribution agreement with Desotech"), *id.*; (3) that certain Desotech resins were not "licensed" or "qualified" for use in the Viper Pro, though such a licensing or qualification process apparently did not exist, *id.* ¶¶ 55, 56; and (4) that using Desotech resins in the Viper Pro would "cause the machine's software to 'time bomb out' and make the machine inoperable," *id.* ¶ 61.

3DS contends that Desotech's allegation are "conclusory generalizations" that fail to specify any particular statements made by 3DS and, furthermore, are insufficient as a matter of law to show disparagement. 3DS argues, for example, that (1) the alleged statements by 3DS "neither '*criticize the quality* of one's goods or services,' nor describe the attacked service or product as 'substandard, negligent, or harmful,'" but "merely describe performance characteristics (and limitations) of the Viper Pro"; (2) Desotech "fails to show any '*false or misleading* representation of fact' regarding the Viper Pro or the use of newer [Desotech] resins"; and (3) Desotech "fails to allege that [3DS] incorrectly represented that the newer [Desotech] resins 'are of a particular standard, quality, or grade,' as it must to state a claim under [815 Ill. Comp. Stat. 510/2(a)(7)]." Defs.' Mem. at 29–30 (internal citations omitted) (emphasis

in original).  Construing the allegations in the light most favorable to the plaintiff, as the court

must on a motion to dismiss, the court is not persuaded by any of these arguments; at best, they

raise issues of fact that are more appropriately addressed at later stages of litigation.  The court

finds that Desotech's allegations under sections 2(a)(7) and 2(a)(8) of the IUDTPA are sufficient

and, accordingly, denies 3DS's motion to dismiss Count VI.

## VI.  Tortious Interference with Prospective Economic Advantage (Count VII)

In Count VII, Desotech asserts a claim for tortious interference with prospective

economic advantage.  To bring such a claim under Illinois law, a plaintiff must allege that "(1)

he had a reasonable expectancy of a valid business relationship; (2) defendant knew about the

expectancy; (3) defendant intentionally interfered with the expectancy and prevented it from

ripening into a valid business relationship; and (4) the intentional interference injured the

plaintiff."  *Associated Underwriters of Am. Agency, Inc.* v. *McCarthy*, 826 N.E.2d 1160, 1169,

356 Ill. App. 3d 1010, 292 Ill. Dec. 724 (Ill. App. Ct. 1st Dist. 2005).  Illinois law also requires

that the plaintiff's business expectancy be with a third party.  *Ali* v. *Shaw*, 481 F.3d 942, 944 (7th

Cir. 2007) (citing *Schuler* v. *Abbott Labs*, 639 N.E.2d 144, 147, 265 Ill. App. 3d 991, 203 Ill.

Dec. 105 (Ill. App. Ct. 1st Dist. 1993)).

3DS contends that Desotech has not sufficiently alleged the first element of the cause of

action, a reasonable expectancy of a valid business relationship.  3DS cites *MJ & Partners*

*Restaurant Ltd. Partnership* v. *Zadikoff*, 126 F. Supp. 2d 1130 (N.D. Ill. 1999), for the

proposition that to establish the existence of a reasonable expectancy, Desotech must show that it

had more than the "mere hope" of continuing its relationship, *id.* at 1138, and asserts that "[f]or

three of the customers, Lockheed, Tangible Express and AP Proto, Desotech has merely alleged

24

facts showing that it hoped to sell resins to those customers but the customers chose . . . to buy resins from [3DS] instead." Defs.' Mem. at 33. 3DS's arguments, however, rely on an unduly narrow reading of the complaint. For example, Lockheed allegedly expressed its desire to continue using Desotech resins but was coerced into an agreement to purchase resins exclusively from 3DS. Viewing those allegations in the light most favorable to the plaintiff, the court finds that Desotech has alleged facts sufficient to show that it had much more than a mere hope of continuing its relationship with Lockheed.

3DS also argues that "for the two remaining customers, Express Pattern and Dynacept, Desotech does not even allege that they stopped buying [resins] from Desotech" and that Desotech has thus failed to establish the third required element, a showing that defendants interfered with the expectancy. Defs.' Mem. at 33–34. Here, again, however, 3DS has taken an overly literal view of the allegations. For example, Desotech has alleged that as a result of 3DS's conduct, "Express Pattern can no longer use [Desotech's] new resin." Am. Compl. ¶ 59. The logical bridge between (a) Express Pattern's no longer being able to use Desotech resin and (b) its ceasing to buy such resin is exceedingly short and one that the court is compelled to cross on this motion to dismiss. Furthermore, Desotech's allegations regarding other customers, such as Lockheed, who allegedly "agreed [with 3DS] . . . to stop purchasing resins from Desotech," *id.* ¶ 66, also satisfy the third element.

3DS further argues that Desotech fails to "show the required element of malice because Illinois recognizes a competitive privilege that protects competitors from claims of tortious interference with prospective business advantage." Defs.' Mem. at 31. In an action for interference with prospective business advantage, a defendant may raise the competitor's

privilege as an affirmative defense. *Soderlund Bros., Inc.* v. *Carrier Corp.*, 663 N.E.2d 1, 8, 278 Ill. App. 3d 606, 215 Ill. Dec. 251 (1995). That privilege "allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Id.* at 8 (citing *Candalaus Chi., Inc.* v. *Evans Mill Supply Co.*, 366 N.E.2d 319, 51 Ill. App. 3d 38, 9 Ill. Dec. 62 (1977); Restatement (Second) of Torts § 768(1)(d) & cmt. b, at 40 (1979)). But as the court notes in *Candalaus*, a decision on which 3DS relies, the privilege does not apply to a defendant whose conduct "create[s] or continue[s] an illegal restraint of competition." 366 N.E.2d at 326–27 (quoting Restatement (Second) of Torts § 768, at 39)). The Seventh Circuit has similarly explained that the competitor's privilege does not apply where "circumstances indicate unfair competition, that is, an unprivileged interference with prospective advantage." *A-Abart Elec. Supply, Inc.* v. *Emerson Elec. Co.*, 956 F.2d 1399, 1404–05 (7th Cir. 1992) (citing *Fishman* v. *Estate of Wirtz*, 807 F.2d 520, 546 (7th Cir.1987)).

As discussed above, Desotech has sufficiently alleged claims against 3DS for attempted monopolization and unreasonable restraint of trade under the Sherman Act. Because the same factual allegations form the basis for Desotech's tortious interference with prospective economic advantage claim, there is, at a minimum, an issue of fact as to whether 3DS's conduct was protected by the competitor's privilege. 3DS's motion to dismiss Count VII is therefore denied.

**CONCLUSION AND ORDER**

Defendants' motion to dismiss [#29] is granted in part and denied in part. The motion is granted with respect to Counts I and II and denied as to Counts III through VII.

Plaintiff's tying claims, Counts I and II of the amended complaint, are hereby dismissed without prejudice. Desotech is granted leave to replead its tying claims by March 2, 2009.

The discovery stay previously entered pending resolution of defendants' motion to dismiss is hereby lifted. Discovery may proceed on all of the outstanding antitrust and patent claims, including the patent damages issues.

A status hearing and scheduling conference is set for March 31, 2009 at 9:30 a.m. In the meantime, the parties are directed to confer about—and, if possible, submit—an agreed proposed case management schedule for the antitrust claims (a scheduling order for the patent claims having already been entered on December 2, 2008). They are also directed to consider whether a settlement conference at this time would facilitate resolution of the case.

Dated: January 26, 2009                    Enter: _____

                                           JOAN HUMPHREY LEFKOW
                                           United States District Judge