IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DSM DESOTECH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 cv 1531 |
| | ) | |
| 3D SYSTEMS CORPORATION, and | ) | Judge Sharon Johnson Coleman |
| 3D SYSTEMS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum Opinion and Order**

Coming before the Court is defendants 3D Systems Corporation and 3D Systems, Inc.'s (collectively "3D") motion for summary judgment its affirmative defenses of equitable estoppel and laches on plaintiff DSM Desotech, Inc.'s ("Desotech") patent infringement claims. 3D asserts that this Court should grant judgment in its favor because Desotech should have pursued its patent claims prior to 2008 when it filed the instant lawsuit. Having considered all the submissions of the parties and heard oral argument on the motion, this Court denies 3D's motion for summary judgment on the defenses of equitable estoppel and laches as to infringement of U.S. Patent Nos. 6,340,297 and 6,733,267, for the reasons stated below.

**Background**

The following facts are not in dispute. 3D Systems Corporation and 3D Systems, Inc., manufacture stereolithography machines that use lasers to create solid parts or objects from UV-curable photopolymer liquid resins. Both DSM Desotech and 3D manufacture resin used in this process. 3D also distributes and sells resin (its own and other manufacturers' resin) for use in stereolithography. Desotech filed this lawsuit on March 14, 2008, charging 3D with infringing U.S. Patent No. 6,340,297 ("the '267 patent") issued on January 22, 2002, and related U.S.

Patent No. 6,733,267 ("the '267 patent") issued on May 11, 2004. The patents-in-suit are apparatus patents. The accused devices are the Zephyr recoaters used in 3D's stereolithography machines, first introduced in 1996. 3D claims non-infringement of the patents and asserts the defenses of equitable estoppel and laches.

In March 1999, Desotech acquired DuPont's Somos resin business, including one of 3D's Original stereolithography machines, the SLA-250. Desotech was aware of the Zephyr recoater installed in 3D's Original SLA machines as of February 18, 1999, coincident with Desotech's purchase of the Somos business from DuPont. Desotech also purchased an SLA-7000 in August 1999. On March 21, 2001, both Desotech and 3D issued press releases announcing their intention to develop and jointly market non-liquid stereolithography hardware, software, and materials. Desotech and 3D created the joint venture Optoform LLC in December 2001 to develop their relationship.

On January 25, 2002, Desotech sued Vantico, a resin manufacturer for infringement of one of Desotech's resin patents as well as its '297 patent. The complaint against Vantico alleged: "Upon information and belief, 3D Systems Corp. ("3D Systems") has manufactured and sold, and continues to make and sell, apparatus including Zephyr recoaters that are covered by the claims of the '156 patent [issued to DuPont prior to purchase by Desotech] and the '297 patent." Desotech did not name 3D as a defendant in the lawsuit against Vantico. The Vantico arbitration settled on December 17, 2004, when Desotech and Vantico signed a "Settlement and Mutual Release and Non-Exclusive License Agreement."

Although it is unclear from the record precisely how 3D acquired the information, the parties agree that 3D learned of the Vantico suit at some point shortly after it was filed. At the time, 3D and Desotech were forging a business relationship. By 2003, 3D had internally

2

evaluated whether Desotech could or would enforce its patent against 3D, and had requested opinions from outside patent counsel. 3D became aware of the '267 patent when it was issued on May 11, 2004. On May 27, 2004, 3D's outside counsel indicated that 3D's Zephyr recoaters were non-infringing of Desotech's patents.

3D and Desotech entered a two-year resin supply agreement in which Desotech became a non-exclusive supplier of resin to 3D. During the two-year term of the supply agreement (2002-2004), Desotech never expressly raised the issue of infringement with respect to 3D's machines with Zephyr recoaters. On June 22, 2004, 3D and Desotech entered a new non-exclusive two-year resin supply agreement that covered more of Desotech's resin products.

Desotech's General Counsel, in a December 18, 2003, letter to 3D, raised the subject of Desotech's resin patents and the possible infringement by the sale of 3D's new "Bluestone" resin, but did not raise the issue of infringement of Desotech's '297 and '267 apparatus patents. In October 2004, Desotech filed a patent infringement suit against 3D in Germany, asserting that 3D's Bluestone resin infringed on one of its resin patents. Desotech did not sue 3D for infringement based on the '297 patent or the '267 patent at this time. The German litigation was terminated in January 2010, when the German Federal Supreme Court issued a final decision revoking Desotech's resin patent at issue.

On August 23, 2004, Desotech's counsel wrote to 3D's counsel stating:
"The purpose of this letter is to clarify DSM Desotech Inc.'s discussions with 3D Systems Corporation regarding our interest in your cooperation with discovery in a 3rd party matter that does not directly involve 3D Systems Corporation. It is not DSM Desotech Inc.'s intention to use any such discovery information to assert DSM Desotech Inc. patents against 3D System Corporation. We are willing to enter into an agreement to the effect that we will use the

information produced only for our third party dispute and no other purpose."

From 2002 through 2007, 3D was involved in a series of negotiations with Desotech that included negotiations regarding a supply and distribution agreement in 2002 and an expanded supply and distribution agreement in 2004, a Memorandum of Understanding ("MOU") in 2005 and 2006, and negotiations involving a cross licensing agreement pursuant to the MOU in 2006 and 2007. In 2006 and 2007, both Desotech and 3D participated in active and ongoing negotiations to reduce the MOU to a final agreement. In a January 11, 2006, press release announcing the MOU, James Reitz, Desotech's Somos Business Manager, stated, "[t]his agreement allows both [parties] to fully focus on efforts to grow stereolithography technology to the benefit of the rapid prototyping and rapid manufacturing markets." They continued exchanging correspondence until November 2007 when the negotiations came to an end.

On September 2, 2005, 3D's patent counsel updated a report entitled "DSM N.V. and DSM Desotech, Inc. Patents," which lists the '267 and '297 patents and reiterates the non-infringement position from the previous formal opinions. 3D did not seek new formal opinions on infringement after developing the Pro series machines. 3D has not made any technical changes to the recoating system of any of its stereolithography machines with a Zephyr recoater as a result of this lawsuit.

From the issuance of the '297 patent on January 22, 2002, 3D continued to sell its Original SLA line of machines without altering the design of the Zephyr recoater first introduced in 1996. Desotech's expert, Mohan Rao, Ph.D., calculated sales of the Original SLA machines from March 1, 2002, through July 27, 2010 (when the patents expired), to be $129,710,074. In 2005, 3D introduced its Pro series of machines that also had a type of Zephyr recoater. Dr. Rao calculated sales for the Pro series machines at $39,289,853, from 2005 through July 27, 2010.

4

While developing the invention, the named inventors on the patents-in-suit, Daniel Mickish, Brian Chapman, Christian Clausen, and Eustatios Vassiliou held group meetings, during which the invention and the figures in the patents were discussed. All of the named inventors, signed an oath with respect to patent '919 the predecessor to which patent '156 and the patents-in-suit are continuations. Vassiliou was responsible for drafting the patent application upon which the '297 and the '267 patents are based. There is testimony in the record from the other named inventors, Mickish, Chapman, and Clausen that suggests that they did not know or could not recall the precise roles and contributions of the other inventors.[1]

After negotiations to finalize the MOU ended with no agreement in late 2007, Desotech filed the instant lawsuit against 3D alleging patent infringement and various anti-trust and unfair trade practices claims. 3D filed four motions for summary judgment asserting that it is entitled to judgment as a matter of law on all claims and the two defenses at issue in the instant motion. This Court heard oral argument on this motion on July 19, 2012.

**Legal Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). When considering a summary judgment motion, the Court construes the facts and all reasonable inferences in the light most favorable to the non-moving party. *Abdullahi v. City of Madison*, 423 F. 3d 763, 773 (7th Cir. 2005). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011).

---

[1] Mr. Vassiliou passed away in 2006 before he could be deposed.

**Discussion**

3D argues that it is unfair and highly prejudicial to allow Desotech to charge 3D with patent infringement for the first time in 2008. Asserting the defenses of equitable estoppel and laches, 3D makes four basic arguments: (1) Desotech was aware of 3D's stereolithography machines as early as 1996, well before the USPTO issued the first of Desotech's patents-in-suit in 2002; (2) Desotech sued a third party resin manufacturer, Vantico, in 2002 for patent infringement alleging in the complaint that 3D's machines were covered by one of the patents-in-suit, but did not name 3D as a defendant; (3) Desotech actually sued 3D in 2004 for patent infringement of Desotech's resin patents in Germany, but never mentioned the apparatus patents at issue here; and (4) Desotech had extensive business dealings with 3D from 2002 to 2007 that actively encouraged 3D to sell more of the stereolithography machines that Desotech now accuses of infringement.

*1. Equitable Estoppel*

Equitable estoppel is a defense to patent infringement that, if applied, acts as a complete bar to infringement. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1029, 1041 (Fed. Cir. 1992). There are three elements that the defendant must prove to establish equitable estoppel: the patentee, through <u>misleading conduct</u>, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce the patent against the alleged infringer; the alleged infringer <u>relies</u> on the conduct; and due to its reliance, the alleged infringer will be <u>materially prejudiced</u>, if the patentee is allowed to proceed with its infringement claim. *Scholle Corp. v. Blackhawk Molding Co.*, 133 F.3d 1469, 1471 (Fed. Cir. 1998).

*a. Misleading Conduct*

"Conduct" may include statements, actions, inaction or silence where there was an

obligation to speak. *Aukerman*, 960 F.2d at 1041. "The alleged infringer may not rely upon its 'unilateral expectations or even reasonable hopes' in concluding that no possible patent challenge exists." *R2 Med. Sys., Inc. v. Katecho,Inc.*, 931 F. Supp. 1397, 1417 (N.D. Ill. 1996) (citing *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1559 (Fed. Cir. 1983)). The question is whether the defendant could reasonably infer from the plaintiff-patentee's course of conduct that the patentee was not going to enforce its patents. *Aukerman*, 960 F.2d at 1043. On summary judgment, "such inference must be the only possible inference from the evidence." *Id.* at 1043-44.

3D argues that Desotech's misleading conduct led to the "inescapable" conclusion that although Desotech did seek to enforce its resin patents against 3D, it never intended to enforce its apparatus patents, including the patents-in-suit. 3D argues that the following conduct was misleading. Desotech remained silent as to 3D's alleged infringement even though it has been aware of the accused machines as early as 1996, having owned the accused machines since 1999, and having sued Vantico in 2002. Desotech entered two supply agreements with 3D in 2002 and 2004, and a MOU (the Memorandum of Understanding) in 2006 that encouraged 3D's sales of the accused machines. Desotech allegedly gave written assurance in 2004 that it did not intend to assert its patents against 3D. Lastly, Desotech filed suit against 3D in 2004 for alleged infringement of a resin patent, but did not allege infringement of, or sue on, any of its apparatus patents.

In response, Desotech argues that it did not have any legal rights to the '156 patent or the application on which it was based until March 1999 when it purchased the Somos business from DuPont and there is no evidence linking DuPont's knowledge of the accused machines to Desotech. With respect to the '267 patent, Desotech contends that any conduct prior to 2004

7

when the patent issued could not have been misleading because it did not yet exist. Desotech argues the agreements in 2002 and 2004 were part of a long-term strategy to develop a business relationship with 3D that would resolve all of the patent issues between the companies. Desotech's alleged written assurance to 3D that it did not intend to sue was actually a request for discovery assistance in the Vantico litigation and a promise that it would not use anything learned in discovery to assert its patents against 3D. Lastly, Desotech argues that it did not sue on the '297 and '267 patents in the German litigation because it did not believe infringement was an issue outside of the United States and the parties were simultaneously trying to develop a relationship to resolve these disputes.

     3D analogizes *Scholle Corp. v. Blackhawk Molding Co.,* as an instance of similar conduct found to be misleading. In *Scholle*, the court affirmed summary judgment barring the plaintiff's suit for infringement based on the doctrine of equitable estoppel. *Scholle,* 133 F.3d at 1473. There, the plaintiff, as assignee of patent '354, sent the defendant Blackhawk a letter on December 16, 1991, accusing the defendant's WATERSAFE cap of infringing on Scholle's patent under the doctrine of equivalents and demanding that Blackhawk cease and desist sales of the cap. *Id.* at 1470. Blackhawk's attorney twice wrote to Scholle requesting that Scholle identify the claims alleged to be infringed, but Scholle refused to respond with details. *Id.* On July 2, 1992, Scholle sued another company for infringement and obtained a verdict on February 24, 1995. Meanwhile, in late 1991, Blackhawk started working on designing an alternative to the WATERSAFE cap, eventually patenting and marketing the SAFEGUARD cap in February 1993. *Id.* In April 1993, Blackhawk approached Scholle and showed the new cap and informed Scholle that it did not believe the cap to be infringing and it was going to consider it as such unless Scholle advised otherwise. *Id.* Scholle did not respond. Between April 1993 and February

1996, when Scholle filed its complaint against Blackhawk, the parties had several high-level corporate discussions and Scholle never suggested the SAFEGUARD cap might be infringing. *Id.* at 1470-71. The court found it wholly reasonable for Blackhawk to derive the inference that it would not be sued given Scholle's silence, and this inference was reinforced by Scholle's course of conduct, including silence after Blackhawk said it considered the new product non-infringing unless Scholle said otherwise. *Id.* at 1472.

The situation here is significantly different than in *Scholle*. Unlike in *Scholle*, here Desotech was never presented with the Zephyr and asked if it was infringing and *then* remained silent after being told that 3D would assume non-infringement unless otherwise informed. In *Scholle*, the parties were not engaged in ongoing negotiations as they were here. Moreover, while the evidence itself is not generally in dispute here, the inferences to be drawn from it are contested by the parties. A jury could reasonably infer from the parties' ongoing negotiations, particularly with respect to the MOU, that rather than abandoning its claims, Desotech would not enforce them if an agreement was reached for cross-licensing their patents. Even the litigation in Germany suggests that Desotech would enforce its apparatus patents, but as Desotech asserts, it believed infringement of the '297 and '267 patents only affected the United States market. This Court finds that in the light most favorable to Desotech there are at least questions of fact as to whether Desotech's conduct was misleading and whether 3D could reasonably infer that Desotech intended to abandon its infringement claims.

    b. *Reliance*

To establish reliance, the accused infringer must show that it "substantially relied on the misleading conduct of the patentee in connection with taking some action." *Aukerman,* 960 F.2d at 1042-43. "To show reliance, the infringer must have had a relationship or communication with

9

the plaintiff which lulls the infringer into a sense of security in going ahead with its infringing conduct" *Id.* at 1043.

3D argues that Desotech lulled it into a false sense of security throughout its longstanding relationship, numerous communications, and agreements. 3D asserts that it relied on Desotech's conduct such as suing Vantico in 2002 for infringement but not 3D even though Desotech had owned one of the accused machines since 1999, and that Desotech had entered two supply agreements with 3D that encouraged sale of 3D's machines. 3D also relied on its own counsel's advice that Desotech would be subject to laches and estoppel defenses if it sued. With this knowledge, 3D continued to sell its Original SLA systems equipped with the Zephyr recoater subsequent to 2002 and proceeded to introduce its Pro systems in 2005.

3D analogizes *ABB Robotics v. GMFanuc Robotics Corp.,* 828 F.Supp. 1386 (E.D. Wis. 1993), and *Wafer Shave Inc. v. Gillette Co.,* 857 F. Supp. 112 (D. Mass. 1993)*.* In *ABB Robotics*, the plaintiff owned a patent for a robotic wrist and the defendant manufactured robotic devices. *ABB Robotics*, 828 F.Supp. at 1387. The defendant obtained a patent for its hollow robot wrist design and a few months later the parties met and discussed licensing and infringement. *Id.* at 1388. The defendant maintained that its new design did not infringe. After another meeting a year later, the plaintiff's management decided not to sue and no further discussions were held between the parties. On January 17, 1992, seven years after their last meeting, the plaintiff filed a lawsuit against the defendant for infringement. *Id.* In rejecting the plaintiff's primary argument that its silence represented a continuing threat, the court reasoned that silence always represents a continuing threat therefore the court must look to other conduct in conjunction with silence to draw the inference that the patentee had abandoned its claim. Thus, the court found that the silence that followed the charge of infringement gave rise to the inference that the plaintiff had

10

decided to forgo suing in order to maintain a business relationship with the defendant's parent company, CM. There was also evidence that CM, though named as a plaintiff, did not participate in the decision or litigation of the case, which the court found supported the defendant's assertion that CM admitted that it abandoned its infringement claim. *Id.* at 1399.

In *Wafer Shave*, the court granted summary judgment in favor of the defendant on the defense of equitable estoppel. The court found the plaintiff's threat of litigation for infringement became misleading when it was followed by several years of inaction beginning with the plaintiff's failure to respond to the defendant Gillette's November 22, 1985, letter requesting the reasons for the plaintiff's charge of infringement. *Wafer Shave,* 857 F.Supp. at 120. In July 1986, Gillette sent the plaintiff a letter suggesting that it propose terms for a non-exclusive license. *Id.* Gillette heard nothing more on the matter until Wafer Shave filed the lawsuit alleging infringement in March 1989. *Id.* The court found that the plaintiff's conduct, including the 1985 letters threatening "appropriate action," followed by failing to communicate any intention of pressing the claim of infringement for three years and five months (October 1985 to March 1989), and communicating with Gillette to mention only the possibility of selling the patent or a license to Gillette, would inevitably mislead Gillette to believe that the patentee did not intend to pursue the earlier infringement claim. *Id.* at 121.

Here, Desotech presents sufficient evidence to raise a question of fact as to whether 3D actually relied on Desotech's conduct rather than the advice of its counsel and outside opinions. The situation here is different than in *ABB Robotics* and *Wafer Shave*. Unlike in those cases, here Desotech filed suit almost immediately after negotiations broke-down. While notice of intent to enforce is not required, the cases cited by 3D reflect the situation where a patentee has expressly invoked its patents and then either remains silent until filing suit or does not respond to the

11

alleged infringer's request for more information regarding the infringement. Here, Desotech did not expressly invoke its patents against 3D and then remain silent. Instead, it asserted infringement against Vantico and continued to pursue a business relationship with 3D. The Vantico law suit caused 3D to consider the possibility of an infringement claim against it. Therefore, 3D fails to establish that there is no genuine issue of fact that it relied on Desotech's conduct rather than its own judgment, the advice of its counsel, or the opinions of its retained evaluators who declared the accused device was non-infringing.

    c. *Material Prejudice*

Material prejudice can be established by showing that the accused infringer would suffer economic or evidentiary prejudice if the patentee were permitted to assert its infringement claim. "Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit. Such damages or monetary losses are not merely attributable to a finding of liability for infringement. Economic prejudice would then arise in every suit. The courts must look for a change in the economic position of the alleged infringer during the period of delay." *Aukerman*, 960 F.2d at 1033. Investment in production of the allegedly infringing device is not sufficient to show material prejudice. *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992). "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Id.*

3D argues it suffered economic prejudice in the form of $168,999,925 for sales of the accused products from March 1, 2002, when the first Patent-In-Suit was issued to July 27, 2010,

12

when the patents-in-suit expired. 3D asserts additional economic prejudice in connection with the Pro models introduced in 2005, including R&D expenses of $25,000,000, sales and marketing expenses of $34,994,600, and manufacturing start-up expenses of $14,687,100. Thus, if 3D is found liable for infringement it would lose the monetary investment from the Pro series machines as well as the $170 million in damages from the sales.

3D also asserts evidentiary prejudice from the loss of a source of key evidence for 3D's invalidity defense for improper joint inventorship. Specifically, one of the named inventors, Mr. Vassiliou, died in September 2006. None of the other named inventors could recall anything that Mr. Vassiliou contributed to the invention. In addition to being named as an inventor, Mr. Vassiliou was also responsible for drafting the patent applications on which the '297 and '267 patents are based.

This Court finds that there are questions of fact as to both economic and evidentiary prejudice. On the issue of expenses related to developing the Pro series, Desotech has sufficiently called into question the reliability of the numbers presented by 3D, by pointing to the testimony of 3D's corporate representative Hull, who testified that counsel made the calculations and Hull had no specific information as to how they were calculated. Additionally, 3D asserts that its sales continued to grow between January 2002 and March 2008, referencing a chart presented by Desotech's expert, Dr. Rao. The chart shows that sales remained relatively constant. There was an uptick from 2002 to 2003, but then sales leveled off and remained steady before declining sharply between 2007 and 2008. Desotech has also put forth evidence that 3D could have sought evidence from DuPont that may have shed light on Mr. Vassiliou's role as an inventor, but 3D chose not to pursue it. Therefore, this Court finds that Desotech has raised some questions of material fact as to economic and evidentiary prejudice. Accordingly, 3D fails to

demonstrate that it is entitled to judgment as a matter of law on its defense of equitable estoppel.

*4. Laches*

Laches is a defense to infringement that extinguishes a patentee's right to recover damages for infringement occurring prior to filing suit. *Aukerman*, 960 F.2d at 1027-28. A defendant invoking the laches defense must prove two elements: an *unreasonable and inexcusable delay* by the patentee in bringing suit; and *material prejudice* suffered by the accused infringer attributable to the delay. *Aukerman*, 960 F.2d at 1032. The clock measuring delay starts running when the patentee knew or should reasonably have known of the infringement, but not before the grant of the patent. *ABB Robotics, Inc.*, 828 F.Supp. at 1389. Where a patentee has delayed bringing suit for six years or longer, a rebuttable presumption of laches arises, which has the effect of establishing both unreasonable delay and material prejudice. *Aukerman*, 960 F.2d at 1038. The burden then shifts to the patentee to come forward with evidence to rebut the presumption. *Id.* "[T]he evidence must be sufficient to put the existence of a presumed fact into genuine dispute." *Id.* at 1037. The element of material prejudice for laches is the same as for equitable estoppel. *Id.* at 1043.

*a. The '297 Patent*

Desotech does not dispute that the presumption of laches applies to the '297 patent since Desotech did not sue 3D until six years after the patent issued and Desotech was aware of the alleged infringement. Desotech argues that there is ample evidence in the record creating a genuine issue of fact as to the reasonableness of Desotech's delay in suing 3D on both of the patents-in-suit sufficient to rebut the presumption and defeat summary judgment on laches for the '297 patent. Below, the Court addresses the issue of reasonableness of the delay as to both patents-in-suit.

*b. Reasonableness of the Delay*

3D also argues that laches applies to the '267 patent issued on May 1, 2004, because Desotech delayed nearly four years before filing suit on March 14, 2008. 3D argues that it was unreasonable and inexcusable for Desotech to delay filing its lawsuit for infringement while negotiating several agreements that encouraged 3D to sell more stereolithography machines and never once indicating that Desotech intended to enforce the patents-in-suit against 3D.

3D further argues that Desotech's delay cannot be excused by its involvement in the Vantico litigation because it never gave 3D notice of its intention to assert the '297 patent at issue against 3D in that case. Additionally, 3D contends that Desotech cannot rely on the MOU, which contained the parties' cross-licensing agreement-in-principle for 200 patents (including '297 and '267), citing *Baker Manufacturing Co. v. Whitewater Manufacturing Co.,* 430 F.2d 1008, 1013-14 (7th Cir. 1970).

In *Baker Manufacturing,* the plaintiff manufacturer sued the defendant manufacturer for infringement of its patent on pump construction. The defendant Whitewater asserted the defense of laches. The district court found that Whitewater infringed upon Baker's valid patent. The Court of Appeals reversed, holding that the claim was barred by laches. In 1956, Baker had given notice to Whitewater of its claimed infringement. The next year, Baker sent a letter proposing a licensing agreement. Baker then waited eight years to bring suit. Baker had indicated that it initially decided not to proceed with a suit, due to the modest recovery it would receive in comparison to the litigation expense. Baker's lack of diligence led Whitewater into the false assumption that it could continue to conduct its business in the same manner without legal ramifications. The court held that the suit was barred by laches on the basis that Baker failed to meet its burden of showing that nine-year delay in bringing suit was justified. *Baker Mfg. Co.*,

430 F.2d at 1014.

Here, Desotech has rebutted the presumption of laches on the '297 patent and established that genuine issues of material fact exist as to whether its delay in filing suit was reasonable and excusable as to both patents-in-suit. As in *Aukerman*, Desotech has presented evidence of involvement in other litigation as well as negotiations between the parties. *Aukerman,* 960 F.2d at 1044. It seems that the length of delay corresponds to the negotiations between the parties to develop a business relationship and resolve their patent and licensing issues. Rather, than being unfair or unreasonable, Desotech's conduct appears very reasonable and an earlier suit would have only led to a breakdown in the relationship sooner. Once negotiations ended without a final agreement in late-2007, Desotech filed suit a short time later in March 2008.

Additionally, since 3D's claimed economic prejudice is based predominantly on liability for infringement and many of the calculations come from counsel, there are issues of fact related to material prejudice as well. Moreover, Desotech presents evidence that questions whether 3D had a change in economic position during the period of delay and whether it was the result of the delay and "not simply a business decision to capitalize on a market opportunity." *ABB Robotics*, 828 F.Supp. 1386, 1395 (E.D. Wis. 1993)(citing *Aukerman* and *Hemstreet*). Finally, as is the case here, when defendants provide no evidence that they would have acted differently had plaintiffs sued earlier, defendants cannot claim material economic prejudice. *See Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992). Therefore, Desotech has raised sufficient issues of fact to rebut the presumption of laches on the '297 patent and at least take the issue of laches on both patents-in-suit to trial.

**Conclusion**

Based on the foregoing analysis, this Court denies defendant 3D's motion for summary judgment [343] on its defenses of laches and equitable estoppel.

IT IS SO ORDERED.

Date: September 28, 2012

Entered: _____
Sharon Johnson Coleman