**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DSM DESOTECH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 cv 1531 |
| | ) | |
| 3D SYSTEMS CORPORATION, and | ) | Judge Sharon Johnson Coleman |
| 3D SYSTEMS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>Memorandum Opinion and Order</u>**

Coming before the Court is defendants 3D Systems Corporation and 3D Systems, Inc.'s (collectively "3D") motion for summary judgment on Count VIII of DSM Desotech Inc.'s ("Desotech") Third Amended Complaint alleging tortious interference with contractual relations. Having considered all the submissions of the parties and heard oral argument on the motion, this Court denies in part and grants in part 3D's motion for summary judgment for the reasons stated below.

**Background**

This being the third Memorandum Opinion and Order this Court has issued on summary judgment motions in this case, many of the background facts describing the parties and their relationship have been addressed elsewhere and will not be reiterated here. Count VIII of Desotech's Third Amended Complaint alleges that 3D tortiously interfered with Desotech's contractual relations with four customers: Laser Reproductions, Dynacept Corporation ("Dynacept"), FineLine Prototyping ("FineLine"), and Moeller Design & Development ("Moeller Design").

*Laser Reproductions*

In August 2005, Laser Reproductions began negotiations to purchase the Viper Pro. 3D sent Laser Reproductions a "proposal and agreement that had a proposal date of December 13, 2005. Paul Border, President of Laser Reproductions, testified that he believed the first resin they used was Accura 50, but they switched it out for the Accura 25. In an email to 3D dated January 20, 2009, Laser Reproductions wrote: "We are very happy with the Accura 25 and plan to switch 100% [of our resin to Accura 25.]" Bordner also testified that if he could use Somos Next he would. Laser Reproductions entered into a volume purchase agreement ("VPA") for resin with Desotech on July 27, 2006. 3D knew Laser Reproductions bought resin from Desotech and got a discount. No one at Desotech ever specifically informed Mr. Bordner or Laser Reproductions that, because Laser Reproductions does not use a Somos resin in its iPro machine, it is in breach of its contract with Desotech.

*Dynacept*

On May 31, 2006, Mark Primavera, President of Dynacept authorized Dynacept's purchase of the Viper Pro. The proposal and agreement included a "Full-Size Vat Fill of 3D Material – Material type to be determined at the time of order." The Viper Pro was delivered with Desotech's Somos 14120. On May 24, 2007, Dynacept entered into a resin VPA with Desotech by which Dynacept "agreed to use any current or future DSM-Somos resin in all three [of Dynacept's] machines exclusively for a period of two years."

On May 31, 2007, Desotech noted in an internal email to James Reitz (business director for DSM Somos) and Charlie Kaufmann (Desotech salesperson who called on Dynacept), that it was "obligated to inform [its] customers" that it "may no longer be the case" that "DSM Somos has a cross license for the RFID technology to supply resins for Viper Pro."

In September 2007, 3D took Dynacept's Viper Pro machine, purchased in May 2006, and replaced it with a new one because the first one did not work. 3D agreed to provide the new Viper Pro with 490 kg of the Accura resin of Dynacept's choice. As part of the agreement, Dynacept had to "make available the existing Viper Pro when the new unit arrived," "to keep the arrangement confidential," and "to run only licensed material in the new Viper Pro." (Primavera Tr. at 113:17-21.) 3D gave Dynacept the option to use Somos 14120 in the new Viper Pro, but they decided on Accura 55 instead. Desotech presents email evidence that 3D was aware in March 2007 that Dynacept was a customer of Desotech and Desotech would need to be compensated if 3D took them over as a customer. (PX-135.)

*FineLine Prototyping*

FineLine bought its Viper Pro in December 2005. Sometime after March 29, 2007, the day Desotech introduced its new resin, DMX-SL 100, Rob Connelly, FineLine's President, expressed interest in using that Somos resin in FineLine's Viper Pro. Mr. Connelly testified: "I told [3D] that I would do the dual vat [upgrade on the Viper Pro] at a certain price if we could put DMX[-SL 100] in it and [3D] agreed that we could do that." (Connelly Tr. at 16:24-25, 120:5-20.) In an email exchange on April 23-24, 2007, FineLine discussed with 3D the use of Somos DMX-SL 100 resin in one of FineLine's Viper Pro machines. Lee Dockstader, currently 3D's VP of Business Development, wrote: "DSM has not made their new resin commercially available on the market and as a result it is not licensed to run in the Viper Pro." In a subsequent email, Mr. Connelly wrote that he had "no idea what license provision [3D] was talking about," to which Abe Reichental, 3D's CEO, responded, "our license arrangement with DSM is under review and as such new and non commercial materials are outside the scope." (Connelly Ex. 15.)

On April 26, 2007, Mr. Connelly wrote to Mr. Reichental (of 3D) and Mr. Reitz (of

Desotech), "I seem to be unable to put DSM's new DMX-100 in one of my Viper Pros." On May 3, 2007, Desotech sent Mr. Connelly a proposed VPA that provided, "DSM Somos will provide 480 kg of Somos DMX-SL 100 to fill a single vat 3D Systems Viper Pro stereolithography machine… at $36.00/kg." (Connelly Ex.16, 6) On May 9, 2007, FineLine contracted with Desotech "to use any current or future DSM-Somos resin in all five currently owned Vipers and the Viper Pro and new Viper referenced [in the contract] exclusively for a period of two years, except that periodic usage of 3D Systems SI-60 is permitted in the existing Vipers." (Connelly Ex.6)

On May 4, 2007, Mr. Reichental, wrote to FineLine, "3D Systems is willing to grant FineLine Prototyping a special license to use new DSM experimental DMX material [Desotech resin] for research and development purposes." FineLine declined. FineLine was asked to remove the resin, and Mr. Connelly testified that he did so voluntarily to maintain good relations with 3D. 3D compensated FineLine for the Desotech resin that it removed from its Viper Pro. The parties dispute whether 3D was aware of the contractual relationship between FineLine and Desotech entered on May 9, 2007.

*Moeller Design & Development*

Prior to 2006, Moeller Design financed the purchase of at least three stereolithography systems from 3D. Moeller Design purchased a Viper Pro in March 2006 as part of a settlement agreement ending litigation between Moeller Design and 3D Systems. Mr. Moeller wrote to Charlie Kaufmann at Desotech on March 29, 2006, and asked to be released from their resin purchase agreement from February 17, 2006. 3D does not dispute that it knew that Moeller had an agreement with Desotech to exclusively purchase its resin from Desotech. As part of its settlement agreement with 3D, Moeller entered a volume purchase agreement with 3D, wherein

3D would supply four Somos resins to Moeller. No 3D resin was included in the VPA. The agreement contained a provision that allowed Moeller to purchase a competitor's resin if the material supplied by 3D did not have the properties necessary for a specific application and Moeller would prefer to use another product. This provision was contingent on Moeller giving 3D sixty days to supply a resin that meets the performance criteria from 3D manufactured and marketed resin. Mr. Moeller testified that Moeller Design did not purchase all of its resin from 3D.

**Legal Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). When considering a summary judgment motion, the Court construes the facts and all reasonable inferences in the light most favorable to the non-moving party. *Abdullahi v. City of Madison*, 423 F. 3d 763, 773 (7th Cir. 2005). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011).

**Discussion**

Desotech alleges that it is continually trying to expand its business and customer base with valid business relationships and enforceable agreements with purchasers of resins for stereolithography machines, including Moeller Design & Development, Laser Reproductions, Dynacept, and Fine Line, and 3D has knowingly and intentionally interfered with them, causing Desotech's customers to breach their agreements with Desotech.

Under Illinois law a plaintiff claiming tortious interference with contractual relations

must prove: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154-155 (1989). "[T]he injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct. . . . Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about." *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 686 (7th Cir. 1987) (citing *Restatement (Second) of Torts* § 767, comment d, at 32 (1979), and *LaRocco v. Bakwin*, 108 Ill. App. 3d 723, 730 (2d Dist. 1982)). Put another way, "[e]stablishing inducement, in the context of a claim for tortious interference with a contract, requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *St. Therese Medical Ctr. v. Hull (In re Estate of Albergo),* 275 Ill. App. 3d 439, 446 (2d Dist. 1995).

3D moves for summary judgment on this claim arguing that the undisputed facts preclude any showing that 3D had any knowledge of Desotech's volume purchase agreements with Laser Reproductions, Dynacept, or Fine Line. 3D does not dispute that it knew of the existence of an exclusive agreement between Desotech and Moeller Design. 3D further asserts that the undisputed facts show that 3D did not induce any of these four companies to breach their agreements with Desotech.

There can be no liability for inducing the breach of a contract the defendant did not know

existed. *Farley v. The Kissell Co.*, 18 Ill. App. 3d 139, 146-47 (1st Dist. 1979). Here, 3D would have had to know that the agreement was either exclusive or would be breached in some other way if the customer purchased resin from 3D. Desotech asserts that 3D knew of Laser Reproductions' volume purchase agreement with Desotech because in an email from Steve Hanna, 3D's Product Manager for SL Materials, Hanna stated, "I believe they only buy [Accura] 25 and [Accura] 50 from us. All Somos stuff is from Somos." (PX-131 at 3DS_X00536823). However, this email shows only that 3D knew Laser Reproductions purchased resin from Desotech in addition to the resin it purchased from 3D. There is nothing in the record to indicate that Laser Reproductions could not purchase resin from both 3D and Desotech or risk breaching a contract. Therefore, Desotech has failed to show that a genuine material of fact exists on the issue of whether 3D had knowledge of a contract between Desotech and Laser Reproductions that would be breached if Laser Reproductions purchased resin from 3D.

There is a similar lack of evidence with respect to Dynacept. Desotech offers an email from 2004 from 3D to Mark Primavera of Dynacept that asks: "What is the nature of your contract with Somos[?] Can you run another companies [sic] resin without giving up a lot? Have you signed exclusive?" (PX-134 at 3DS_X00617297). This email expressly shows that 3D did not know the nature of Dynacept's relationship with Desotech, and Desotech has not presented a response email where these questions were answered. Desotech also offers the 2004 distribution agreement between 3D and Desotech which contained a provision that for certain "Tier 2" customers 3D agreed to reimburse Desotech if 3D sold resin to those customers. (PX-47, 3D Corp. Wit. Dep. Ex. 13). Desotech offers an email from a Desotech employee (Myron Bezdecik) to a 3D employee (Steve Hanna) asking for cooperation in conducting an audit to determine whether 3D owed Desotech any compensation pursuant to their 2004 distribution agreement for

sales made by 3D to Tier 2 customers. The distribution agreement and subsequent email do not show that 3D was aware that Desotech had a contractual relationship with Dynacept that would be breached if Dynacept purchased resin from 3D.

The evidence cited by Desotech to show that FineLine had an exclusive agreement to purchase resin from Desotech and that 3D was aware of the contract does not show exclusivity of the agreement. Indeed, the testimony from Robert Connelly of FineLine shows that FineLine had a contract in September 2006 to purchase resin from Desotech; he says nothing about it being exclusive. Nevertheless, Connelly stated that he was up front with 3D about the agreement with Desotech and that FineLine wanted to maintain that relationship in good standing. (PD-16 at 109:20-111:6). Thus, there is no dispute that 3D was aware of a contractual relationship to purchase resin between Desotech and FineLine.

3D argues that even if we assume that it knew of Desotech's agreements with these third-parties that would still be insufficient to establish tortious interference with contractual relations, citing *R.E. Davis Chem. Corp. v. Diasonics, Inc.,* 826 F.2d 678 (7th Cir. 1987), and *Medco Research, Inc. v. Fujisawa USA, Inc.,* Nos. 93-2705, 93-2724, 1995 U.S. Dist. LEXIS 1065, at *8 (N.D.Ill. Jan. 30, 1995).

This Court agrees with respect to Laser Reproductions and Dynacept. Desotech fails to present any evidence to show inducement. In *R.E. Davis*, the Seventh Circuit concluded that "the element of 'inducement' in the context of a claim for intentional interference with contractual relations requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another." *R.E. Davis*, 826 F.2d at 686. In *Medco Research, Inc.*, the court held that "[m]erely entering into an agreement with a third party with the knowledge that the third party cannot perform both the present agreement and the prior

-8-

agreement does not alone constitute tortious interference." 1995 U.S. Dist. LEXIS 1065, at *8 (citing *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1257 (7th Cir. 1990) ("Absent a causal link between the defendant's actions and the plaintiff's loss, tort liability is usually not imposed.")).

Desotech cannot establish that 3D intended or desired Laser Reproductions or Dynacept to breach its contracts with Desotech. 3D contends that the undisputed facts show that 3D introduced its policy of testing resins prior to qualifying them on the Viper Pro for the purpose of offering benefits to customers, not for the purpose of causing customers to breach contracts with Desotech. Indeed, 3D licensed other suppliers' resins, including two of Desotech's Somos resins, for use in the Viper Pro.

There is nothing to suggest that 3D forced Laser Reproductions to purchase all of its resin from 3D in breach of its agreement with Desotech. Moreover, Laser Reproductions' 2006 agreement with Desotech was not exclusive nor was it intended to be exclusive. Paul Bordner of Laser Reproductions testified that, "I've been reminded that there is a contract, but [Desotech has] never [come] out and said you're in breach of [the agreement.]" (PD-25 at 263:3-5). Laser Reproductions decided against using Somos 14120, one of Desotech's licensed resins. Although Bordner testified that he wanted to use Somos Next, he could not because it was not licensed for use on the Viper Pro. With respect to Dynacept, it entered an agreement with 3D in which it agreed to run only licensed material in the Viper Pro. (PX-83, Primavera Dep. Ex. 24 at Spectrum00016). 3D actually informed Dynacept that it could run Somos 14120 on its replacement Viper Pro. Thus, 3D did not require Dynacept to purchase its material from 3D or otherwise induce Dynacept to breach its contract with Desotech. Accordingly, this Court grants summary judgment in favor of 3D as to tortious interference with Desotech's contractual

relations with Laser Reproductions and Dynacept.

The situation is somewhat different with Fine Line. It is clear from Connelly's deposition testimony that 3D was aware of FineLine's contract to purchase resin from Desotech. It is also clear that FineLine informed 3D that it wanted to maintain its relationship with Desotech by continuing to purchase resin from them. FineLine was in the process of negotiating the purchase of a second Viper Pro and there is evidence in the record, including testimony from Connelly and emails from 3D, that 3D did not want to sell the machine to FineLine unless FineLine agreed to purchase its material from 3D. Subsequently, FineLine switched to using Accura 60 instead of Somos 11120. Thus, there is sufficient evidence when viewed in the light most favorable to Desotech from which a jury could conclude by weighing the credibility of the testimony that 3D intended to induce FineLine and interfere with its contract with Desotech.

As noted above, 3D does not dispute that it knew of Desotech's exclusive agreement with Moeller Design. However, there is a factual question with respect to whether 3D induced Moeller Design to breach its contract with Desotech. The evidence shows that as part of settlement negotiations to resolve litigation between Moeller and 3D, that Moeller's agreement to purchase resin from Desotech became a sticking point. Moeller tried to cancel its contract with Desotech. As part of the settlement agreement with 3D, Moeller agreed to enter an exclusive resin purchase agreement with 3D to supply Moeller's Viper Pro. Although 3D points to testimony from David Moeller that cancelling the resin purchase agreement with Desotech was just one of several possible options on the negotiating table, that deposition was taken after 3D purchased Moeller Design for $2.6 million with an addition $1 million in 3D stock. Therefore, this Court concludes that a question of fact for the jury remains on the impact that Moeller's resin purchase agreement had on the settlement negotiations and whether 3D induced

Moeller to cancel its contract with Desotech and enter a resin contract with 3D. This Court denies 3D's motion for summary judgment as it relates to FineLine and Moeller Design.

**Conclusion**

Based on the foregoing, 3D's Motion for Summary Judgment on Count VIII of the Third Amended Complaint is granted in part and denied in part.

IT IS SO ORDERED.

Date: January 18, 2013.

Entered: _____
              Sharon Johnson Coleman

-11-